FILED

2012 OCT -9 PM 3: 54

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

1 | William J. Becker, Jr., Esq. (SBN: 134545)
2 | (Counsel of Record)
  | **THE BECKER LAW FIRM**
3 | 11500 Olympic Blvd., Suite 400
4 | Los Angeles, California 90064
  | Telephone: (310) 636-1018
5 | Facsímile: (310) 765-6328
6 | Email: bbeckerlaw@gmail.com

7 | Michael John Peffer, Esq. (SBN: 192265)
8 | **PACIFIC JUSTICE INSTITUTE**
  | P.O. Box 11630
9 | Santa Ana, CA 92711
10 | Phone: (714) 796-7150
  | Facsímile: (714) 796-7182
11 | Email:  michaelpeffer@pji.org

**CV12-8657** ~ABG~ (EX)

12 |
13 | Attorneys for Plaintiff SANTA MONICA NATIVITY SCENES COMMITTEE

14 | **UNITED STATES DISTRICT COURT**
15 | **CENTRAL DISTRICT OF CALIFORNIA**

16 | SANTA MONICA NATIVITY
   | SCENES COMMITTEE, a California
17 | non-profit corporation;
18 |
   |            Plaintiffs,
19 | vs.
20 | CITY OF SANTA MONICA,
21 | CALIFORNIA, a municipal corpora-
   | tion; RICHARD BLOOM, individually
22 | and in his in his official capacity as
   | mayor and council member of the City
23 | of Santa Monica; GLEAM DAVIS,
24 | individually and in his in her official
   | capacity as mayor pro tempore and
25 | council member of the City of Santa
26 | Monica; ROBERT HOLBROOK,
27 | KEVIN MCKEOWN, PAM
28 |

| **VERIFIED COMPLAINT FOR
PRELIMINARY AND
PERMANENT INJUNCTIVE
RELIEF, DECLARATORY
RELIEF AND DAMAGES**

(FIRST AND FOURTEENTH
AMENDMENTS TO THE UNITED
STATES CONSTITUTION & 42
U.S.C. § 1983)

DEMAND FOR JURY TRIAL

10.8.1                              1

**Initial Verified Complaint**

1   O'CONNOR, TERRY O'DAY and
2   BOBBY SHRIVER, individually and
    in their official capacity as council
3   members of the City of Santa Monica;
    and DOES 1 through 100,
4
5             Defendants.
6
7        Plaintiff, SANTA MONICA NATIVITY SCENES COMMITTEE, by and

8   through its undersigned counsel, bring this Complaint against the above-named

9   Defendants, their employees, agents, and successors in office, and in support

10  thereof allege the following upon information and belief:

11

12                        **INTRODUCTION**

13       1.      This case seeks to vindicate fundamental constitutional rights.  It is a

14  civil rights action brought pursuant to the First and Fourteenth Amendments to the

15

16  United States Constitution and 42 U.S.C. § 1983, challenging the unconstitutional

17  acts, policies, practices, procedures, and/or customs of Defendants as set forth in

18

19  this Complaint.

20       2.      Specifically, Plaintiff is challenging Defendants' denial of its request

21  to retain a 60-year-old policy of allowing Nativity displays to be exhibited in its

22

23  largest public park, Palisades Park, for a three-week period during the Christmas

24  holiday season in a manner similar to how they have been exhibited by Plaintiff

25
    and others for approximately 60 years.
26

27

28

10.8.1                                    2

**Initial Verified Complaint**

3.      Defendants denied Plaintiff's request under pressure from atheist groups, who took unfair advantage of Defendants' administrative guidelines for the private exhibition of unattended winter displays during the month of December. By surrendering to the transparently dishonest abuse of Defendants' permit application procedures, Defendants acted in response to a "heckler's veto." Defendants rationalized their decision to eliminate their winter display exemption policy, which allowed Nativity displays to be displayed in Palisades Park since its adoption in 2003, on the basis of undifferentiated fear and apprehension over disturbances they expected the Nativity displays to encounter and out of an erroneous understanding of their obligation to protect the whole community, including the religious community, against threats to its First Amendment liberties.

4.      Plaintiff seeks a declaration that Defendants have deprived it of its constitutional rights; a permanent injunction enjoining the enforcement of Defendants' content-based speech restriction; and an award of nominal damages for the deprivation of its constitutional rights.  Plaintiff also seeks an award of the reasonable costs of litigation, including attorney's fees and expenses, pursuant to 42 U.S.C. § 1988, California Code of Civil Procedure § 1021.5, and other applicable law.

**Initial Verified Complaint**

**JURISDICTION AND VENUE**

5.     This action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343.

6.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.  Plaintiffs' claim for nominal damages is made pursuant to 42 U.S.C. § 1983.

7.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

**PLAINTIFF**

8.     Plaintiff Santa Monica Nativity Scenes Committee ("Committee") is a not-for-profit 501(c)(4) association of 13 churches and the Santa Monica Police Officers Association (the police union) with its headquarters located in Santa Monica, California.  Plaintiff's affiliated members are generally comprised of devout Christians, who wish to proclaim their respect and devotion to Jesus Christ as their Lord and Savior during the traditional Christmas season.

**DEFENDANTS**

9.     Defendant City of Santa Monica (referred to herein alternately as "the City" and "the City of Santa Monica") is a public entity established, organized and

10.8.1

4

**Initial Verified Complaint**

1   authorized under and pursuant to the laws of California, with the authority to be

2   sued in its own name.  Its executive and legislative leadership consists of a mayor,

3   a mayor pro tempore and (both of whom sit as council members) and five addi-

4   tional council members.  The City Council makes policy decisions for the City.

5   

6   The City Council is responsible for the policy decision to amend its ordinance re-

7   moving an exemption for the allowance of private, unattended winter displays in

8   

9   Palisades Park in the month of December in a content-based reaction to individuals

10   who objected to religious speech in the City's public spaces; out of an undifferenti-

11   ated fear and apprehension of public disturbance; in a manner that served no com-

12   pelling or significant governmental interest; in a manner that was not narrowly tai-

13   lored to achieve a compelling or significant governmental interest and that burdens

14   substantially more speech than necessary to achieve its scheme's important goals;

15   and in a manner that did not leave open ample alternative channels of communica-

16   tion.

17   

18         10.     Defendants Richard Bloom ("Bloom"), Gleam Davis ("Davis"), Rob-

19   ert Holbrook ("Holbrook"), Kevin McKeown ("McKeown"), Pam O'Connor

20   ("O'Connor"), Terry O'Day ("O'Day ") and Bobby Shriver ("Shriver") (together

21   with Defendant City of Santa Monica are collectively referred to herein as "De-

22   fendants") are members of the Santa Monica City Council, who were either absent

23   to vote or voted in favor of eliminating an exemption for private unattended "win-

10.8.1                                                          5

**Initial Verified Complaint**

ter displays" and thereby prohibiting the exhibition of all private, unattended displays in Santa Monica parks, including the Nativity scene displays.  Defendant Bloom is also mayor of Defendant City of Santa Monica.  Defendant Davis is also mayor pro tempore of the City of Santa Monica.  At all relevant times, Defendants Bloom, Davis, Holbrook, McKeown, O'Connor, O'Day and Shriver  were responsible for adopting, creating, implementing, and enforcing the policy decisions of the City, including its policy decision to amend its ordinance removing an exemption for the allowance of private, unattended winter displays in Palisades Park in the month of December in a content-based reaction to individuals who objected to religious speech in the City's public spaces; out of an undifferentiated fear and apprehension of public disturbance; in a manner that served no compelling or significant governmental interest; in a manner that was not narrowly tailored to achieve a compelling or significant governmental interest and that burdens substantially more speech than necessary to achieve its scheme's important goals; and in a manner that did not leave open ample alternative channels of communication.  At all relevant times, Defendants Bloom, Davis, Holbrook, McKeown, O'Connor, O'Day and Shriver were agents, servants, and/or employees of the City of Santa Monica, acting under color of state law as that phrase is used in 42 U.S.C. section 1983. Defendants Bloom, Davis, Holbrook, McKeown, O'Connor, O'Day and Shriver are sued in their individual capacities as well as in their official capacities.

10.8.1

6

Initial Verified Complaint

11.     Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as Does 1 through 100, and for that reason have sued them by their fictitious names.  On information and belief, Plaintiff alleges that each of these fictitiously named Defendants is responsible in some manner for some or all of the acts alleged herein.  Plaintiffs will amend this Complaint to set forth the true names and capacities of the fictitiously-named Defendants once ascertained.

12.     Plaintiffs are informed and believe, and thereon allege, that each of the Defendants sued herein, including those named herein as Does, are the agents, servants, employees, licensees, guarantees, indemnitors, invitees, or assignees of each other, and in doing the things herein alleged acted within the course and scope of such agency, employment, license, guaranty, indemnity, invitation, assignment and/or relationship and with the full knowledge, consent and approval of the remaining Defendants.

## STATEMENT OF FACTS

### I. Palisades Park

13.     Palisades Park is the City of Santa Monica's largest and busiest public park.  Acquired by the City in 1875 through private donations, the park is situated on a 26.4-acre bluff overlooking Santa Monica Bay and the Pacific Ocean.  It is familiar to residents of Southern California and a popular tourist destination. The park traverses a 1.6 mile-stretch of property adjacent to Ocean Avenue within the

Initial Verified Complaint

City's vibrant main business district.  Daily throngs of pedestrians feed into the park via surrounding attractions.  In short, Palisades Park is the best possible public location to reach the maximum number of people for constitutionally protected expressive purposes in Santa Monica.

## II. The Nativity Scene Tradition In Palisades Park

14.    For almost 60 years, a tableaux of life-size Christmas Nativity scene displays charmed visitors to Palisades Park over a three-week period in December. Its presence and prominence in Santa Monica civic life inspired the nickname "The City of the Christmas Story." The row of dioramas (at first nine of them, eventually 14) offered passersby a three-dimensional glimpse into the Gospel narrative and "the reason for the season" – the birth of Jesus, the Christ child.

15.    The idea for creating an annual Nativity display pageant in Palisades Park was conceived in 1953 by Joan Wilcoxon, an actress and the wife of an associate producer for Paramount Studios. Wilcoxon presented her idea to Herb Spurgin, the manager of the Santa Monica Chamber of Commerce. Spurgin, who would later serve as mayor of the City in 1963 and 1965 and as a City Council member for eight years, joined with Ysidro Reyes, a local businessman and Chamber member, to attract community support for the displays.

16.    Nine booths individually sponsored by the Chamber and various local churches were eventually built.  In December 1953, the scenes were inaugurated

with great fanfare.  By 1955, the number of Nativity scenes had increased from nine to fourteen. The unique tableaux concept showcasing key moments within the Nativity narrative, such as the Annunciation, the birth of the Savior, the visit of the Wise Men and the boy Jesus at work in Joseph's carpenter shop, distinguished the displays from the traditional single crèche motif commonplace in other locales.

17.     In the late 1950s and continuing into the 1960s, the Nativity scenes grew to become a popular Santa Monica tradition, attracting broad media coverage and requiring reserve police officers to direct the heavy traffic visitations generated. In those early years, the City played an active role in the pageantry, which included parades and a play.

18.     In the late 1970s and early 1980s, the American Civil Liberties Union, atheist Madalyn Murray O'Hair and the organization she founded, American Atheists, threatened to sue the City over its support of the religious pageant. In response, and to avoid litigation, the City negotiated a "compromise" with a local chapter of American Atheists.  (A true and accurate copy of a 12/12/81 Los Angeles Times news story is attached hereto as Exhibit 1 and incorporated herein by reference.) The deal struck between the City and American Atheists included the City's withdrawing its involvement in the Nativity scene event and permitting atheist groups to install displays during the Christmas season in Palisades Park. That the compromise did not sit well with O'Hair, who felt that "California can ru-

in everything for atheists…. If we go in as part of the Santa Monica display, <u>we only add to their [Christians'] right to be there</u>." (Emphasis added). <u>Id.</u> With the controversy resolved, the Chamber of Commerce assumed full responsibility for exhibiting the displays and underwriting their cost. <u>Id.</u>

19.     In 1983, Plaintiff Committee was organized for the purpose of raising donations and exhibiting the Nativity displays in Palisades Park each year.

### III.     The Displays

20.     In recent years, the Nativity scenes consisted of a sequential 14-scene story of Christmas with each scene housed in an 18-foot-long booth and portrayed by life-size costumed mannequins with props and painted backgrounds.  The scenes began with the Annunciation of Christ's coming birth to Mary by the arch-angel Gabriel, and continued through the Nativity until Jesus' return to Nazareth. Each scene was sponsored by a Committee member organization.  The scenes were interiorly illuminated and could be viewed from the street side.

### IV.     Regulatory Background

### A.     <u>Pre-2003 Display Policy</u>

21.     From 1953 to 2003, Defendant City had no official policy regarding the exhibition of private, unattended displays in Palisades Park.  On information and belief, Nativity displays were annually exhibited with the fiscal and logistical support of the City.

10.8.1

10

**Initial Verified Complaint**

22.    In 1983, in response to complaints from the American Atheists organ-ization, the City withdrew its participation in the Nativity display pageantry and exhibition.  On information and belief, under some form of "compromise" agree-ment, the atheist group was granted the right to exhibit displays.

23.    On  January 9, 1990, the City Council took public input from a local community member who expressed concern regarding the City's policy of allowing the display of Nativity scenes in Palisades Park. A motion to direct staff  to prepare a report addressing the City's then-current policy and its conformity to Constitu-tional  issues that were raised died by lack of a second. No Council action was tak-en.

24.    Beginning with its formation in 1983 and continuing through 2000, Plaintiff was routinely issued permits by Defendant City. On May 8, 2001, the City Council adopted a new Special Events Ordinance.  In October 2001, Plaintiff and Chabad of Santa Monica, the sponsor of the December Hanukkah menorah, were notified by the City, through its City Attorney, that the new ordinance prohibited private groups from installing displays in City parks and that no permits would be issued for the displays for 2001. However, to allow sponsors time to make other arrangements, the City authorized the displays to be exhibited in Palisades Park without permits in 2001.

10.8.1                                          11

**Initial Verified Complaint**

25.     The Committee objected to its ouster from the park, and discussion
and disagreement ensued over whether the new ordinance actually covered dis-
plays in parks.  Defendant City advised Plaintiff that the displays would be author-
ized for park exhibition without the need for a permit for December 2002.

**B.     2003 Ordinance Exempting Winter Displays**

26.     In March 2003, the Defendant City's Arts Commission, which advises
the City on matters of policy relating to art programs in the City, requested a study
addressing a revised display ordinance's impact on public art exhibitions and other
Arts Commission and Cultural Affairs Division programs.  Absent the time to re-
view, the Commission requested that organized displays, exhibitions and perfor-
mances be explicitly exempted.

27.     On April 8, 2003, the Council considered adopting a City policy gov-
erning the installation of displays and other objects in City parks and other public
property.   The policy change was based on the following rationale:

"Current circumstances suggest that the City Council should consider

formulating a policy on unattended installations for at least two reasons. City

staff recently received another inquiry about installing a large display on the

beach. At present, there are no guidelines from which to formulate a re-

sponse. Moreover, since the current Community Events Ordinance was

adopted, holiday displays have been installed with the City's knowledge but

**Initial Verified Complaint**

without permits because current law makes no provision for permitting them. Allowing them to continue on that basis poses certain legal risks, including losing the ability to regulate any private installations in Palisades Park.  Moreover, those who install the displays want clarification of their rights; and some residents, who live opposite or near the park, have expressed concerns about the displays.

    "Although the First Amendment significantly restricts the City's choices, there are options for Council consideration. As explained in the Beverly Hills case [American Jewish Congress v. City of Beverly Hills, 90 F.3d 379 (9th Cir. 1996)], the City could prohibit the private installation of unattended objects in parks and on other public property within the City. The City could also allow installations pursuant to an ordinance governing time, place and manner and establishing a permitting system including objective standards.  Exactly how far the City could go in the direction of regulating displays without risking its regulatory powers is not certain.  Legal staff would need to research any option or options of interest to the Council. For instance, if the City opted to allow displays only at a single location in a single park for a limited time period, such as the holiday season, staff would need to analyze the legality of that approach.

Initial Verified Complaint

1    "For now, one thing is very clear: the City cannot regulate the private

2    use of public space for expressive activities based upon content.  Thus, if a

3    holiday display zone were created, any display conforming to applicable, ob-

4    jective criteria would have to be allowed."

5

6    (A true and correct copy of the 4/8/2003 Staff Report is attached hereto as Exhibit

7    2 and incorporated herein by reference). The City Attorney also interpreted the

8    Beverly Hills decision as supporting a constitutional ban of all unattended displays

9    in City parks. (Id.).

10        28.    At its April 8 meeting, the Council discussed various aspects of the is-

11   sue, including the long-standing local tradition of holiday displays in Palisades

12   Park and the value of programs which include art displays in the parks. The Coun-

13   cil instructed City Staff to prepare a proposed ordinance prohibiting displays on

14   public property with the exception of seasonal displays in a portion of Palisades

15   Park, explore options for City operated art displays in parks and seek input from

16   the Recreation and Parks Commission and the Arts Commission.

17        29.    Responding to these directives, on July 22, 2003, City Staff offered a

18   proposed ordinance amending Chapter 4.55 of the Municipal Code, Parks Mainte-

19   nance Code § 4.55.060 ("the ordinance"), to allow the placement of unattended in-

20   stallations or displays in Palisades Park adjacent to Ocean Avenue during the

21   month of December in an area to be designated by Council resolution.  (A true and

22

23

24

25

26

27

28

10.8.1                                    14

**Initial Verified Complaint**

accurate copy of the 2003 ordinance is attached hereto as Exhibit 3 and incorpo-rated herein by reference.) The proposal made an exception to the general prohibi-tion against the installation of unattended structures and displays on public proper-ty.

30.     On October 14, 2003, City Staff proposed designated areas for dis-plays and providing information about the installation process. The proposed reso-lution specified that the designated spaces would be allocated "purely on a first-come, first-served basis, irrespective of the display content." (A true and correct copy of the 10/14/03 staff report is attached hereto as Exhibit 4 and incorporated herein by reference).  It provided information to those wishing to install displays, and established simple guidelines. After defining the exact locations, staff provided support for its recommendations as follows:

"These locations are large enough to ensure that multiple displays can be accommodated but small enough to ensure that other park uses can con-tinue. In particular, utilizing these locations will ensure that installations <u>do not interfere with the public's use of the walking and jogging paths and park areas typically used for picnics and gatherings</u>. Moreover, the proposed loca-tions are <u>roughly the locations that have been used for many years</u> and so are preferable <u>from a standpoint of tradition</u>. Finally, use of these locations will also <u>minimize impacts on residential neighbors</u>.  Of course, <u>the interests of</u>

**Initial Verified Complaint**

park users and neighbors will also be protected by the time limit for installa-
tions which restricts installations to one month during mid-winter, the time
of year when the park usage is lightest."

Exhibit 4. (Id.; emphasis added).

31.    Adopting the recommendations and explanations supporting them,
Defendant City passed the ordinance on September 9, 2003. Thus, the City ex-
pressly relied on tradition as a relevant factor in developing reasonable time, place
and manner regulations. Moreover, it acknowledged that the regulations satisfied
concerns over the use of the park by pedestrians and nearby residents.

32.    The 2003 amendments to the ordinance, as adopted, which added an
exemption for unattended installations or displays in Palisades Park, provided in
pertinent part:

"No person shall, in any park, erect, maintain, use or occupy any …
structure or unattended installation or display.  The following are exempt
from this prohibition:

"(a)    City structures and installations;

"(b)    Unattended installations or unattended displays in Palisades
Park adjacent to Ocean Avenue during the month of December in an area
designated by City Council resolution;

"(c)   Other displays or installations authorized by a Community

Event Permit issued by the City."

(Emphasis added).

33.   The language of the ordinances made no reference to religion, the

Christmas holiday, Christianity or any particular viewpoint.

34.   The resolution language attached to the 2003 ordinance stated in per-

tinent part:

"WHEREAS, for decades, private groups have installed displays in

Palisades Park, adjacent to Ocean Avenue, during December; and this long-

standing tradition is valued by many members of the community; and

"WHEREAS, the City has not sought to regulate the content of these

displays and recognizes its obligation to regulate displays in public forums,

including parks, in accordance with First Amendment standards applicable

to time, place and manner restrictions, including content neutrality.... NOW

THEREFORE...."

**C.    2009 Revisions To Administrative Guidlines**

35.   In 2009, an individual named Damon Vix ("Vix") applied for and re-

ceived space for a December display in Palisades Park. Vix installed a chain-link

fence cage-like structure displaying a sign bearing a spurious quote attributed to

Thomas Jefferson ("Religions are all alike – founded upon fables and mytholo-gies"). The flip side of the sign read, "Happy Solstice."

36.     In August 2010, the City substantially revised its "Administrative Guidelines for Unattended Winter Displays in Palisades Park." The revised Guide-lines established a first-come, first served application process effective for the 2011 season allotting displays within spaces assigned to each block. The Guide-lines also created a random drawing (lottery) process in the event multiple requests for any one space was received on the same day.  In November 2010 and January 2011, the Guidelines were revised to address additional administrative concerns.

37.     In 2010, Vix applied for and received space for 14 booths (one block). He erected only one booth, the same one displayed in 2009.  Vix emerged in press accounts as an outspoken critic of the Nativity display tradition. True and accurate copies of a 12/21/11 New York Times article and a 12/22/2011 Santa Monica Dai-ly Press article are attached hereto as Exhibits 5 and 6 respectively and incorpo-rated herein by reference. Although Vix had secured permission to exhibit 14 booths, he erected just one. As before, his exhibit featured anti-religious and secu-lar messages – not messages celebrating a traditional holiday.

38.     In 2011, Vix reportedly recruited or otherwise joined with 10 other individuals ("secular groups") to apply for the maximum number of spaces, forcing a lottery. In the random drawing, the secular groups were awarded 18 of the 21 al-

**Initial Verified Complaint**

lotted spaces, leaving nine empty. The others contained anti-religious messages on signs and banners. Chabad of Santa Monica was allotted one space for its menorah while Plaintiff received two spaces to display just three of its 14 Nativity scenes. Id.

39.    Vix was quoted stating that "the atheist groups had no real desire to set up displays, but wanted to counter the Nativity scenes in size and message." (Exhibit 6). By the February 15, 2011, deadline, 11 applications were received from Vix and others associated with him, each seeking the maximum allowable nine spaces. The Committee submitted one application for nine spaces, and Chabad of Santa Monica applied for one. With only 21 spaces available, a lottery was required.

40.    A random drawing held May 5, 2011, gave two of Vix's collaborators the maximum nine spaces each. The menorah sponsors won one space, and the Nativity displays, drawn fourth, won the two remaining spaces. Thus, Vix and individuals working with him won 18 of the 21 newly designated spaces. Vix installed the same booth he had installed the prior year.  He also put up signs bearing featuring quotes generally hostile to religion and equating it with various mythological figures.  A sign quoted John F. Kennedy ("I Believe in an America Where the Separation of Church and State is absolute"). Another sign quoted Justice Hugo Black's statement in Everson v. Bd. of Ed. of Ewing Twp., 330 U.S. 1, 15 (1947)

setting forth the meaning of the Establishment Clause ("The 'establishment of religion' clause of the First Amendment means at least this...."). That sign erroneously attributed the quote to "Brown v. Board of Education (1947)."

41.     Defendant City noted that the number of applications in 2011 "for the first time" in the history of the Nativity display tradition exceeded available spaces and that a majority went to applicants who did not use them to celebrate the holidays but to promote atheism. (A true and accurate copy of the 2012 Ordinance and Resolution, effective 7/26/12 is attached hereto as Exhibit 7 and incorporated herein by reference).

### D. 2012 Amendment To Ordinance Removing

### Winter Displays Exemption

42.     On February 28, 2012, the City Attorney recommended the City remove the exemption provided for in subsection (b) from the ordinance. The City Attorney informed the City Council that in 2011, for the first time, the number of applications had exceeded the available space, thereby triggering the "content-neutral" random drawing system.  The City Attorney drew a direct connection between the random drawing and the disparate outcome:  "As a result of the random drawing, most of the spaces went to applicants who installed displays that did not celebrate the Christmas story. Several displays advocated atheism.  The City received a large number of complaints, ranging from complaints about having any

Initial Verified Complaint

displays at all to complaints that only religious displays should be allowed." (A true and correct copy of the City Attorney's 2/28/2012 Staff Report to the City Council is attached hereto as Exhibit 8 and incorporated herein by reference).

43.    City Staff gave three reasons to justify adopting the most restrictive option:

"(1)    Many residents who complained about winter displays this year urged that they would rather preserve the aesthetic qualities of this designated landmark and look at the ocean vista than continue the displays;

"(2)    Operating the lottery system is both time consuming and costly for the City and likely to become increasingly so because applicants have indicated they will "flood" the lottery process; and

"(3)    Persons who favor particular displays have the option of installing them on private property."

Justifying the recommendation, the staff report noted that the City cannot:

"(1)    pick and choose which displays to allow based on the displays' message, content or identity of the speaker;

"(2)    favor one religious message over another religious (or anti-religious) message; or

"(3)    favor a particular religious display because it has become a tradition or because the organizers are based in Santa Monica."

(Id.).

City Staff also recommended "against attempting to select park displays based on religious or other content or based on 'tradition' because doing so is legally indefensible." (Id.).

44.     On Plaintiff's behalf, the Liberty Counsel wrote two letters to the City offering solutions to resolving the question of the constitutionality of the City's private, unattended display policy and offering legal support to enact a content-neutral policy that would preserve the Nativity scene tradition. (True and correct copies of the Liberty Council letters are collectively attached hereto as Exhibit 9 and incorporated herein by reference).

45.     On June 6, 2012, record counsel for Plaintiff, The Becker Law Firm, wrote to the Defendants urging further review and offering his assistance to forestall an unconstitutionally expedient decision to amend the ordinance.  (A true and correct copy of the letter is attached hereto as Exhibit 10 and incorporated herein by reference).

46.     The June 12, 2012, Staff Report outlined specific reasons for ending the winter display policy in Palisades Park.  The ordinance's purpose was to:

(1)     Resolve the controversy;

(2)     Eliminate legal risks;

Initial Verified Complaint

(3)     Conserve staff time and resources "necessary to operate a constitu-

tionally valid regulatory system";

(4)     Conform usage of Palisades Park to a "long-standing, City-wide

standard" prohibiting unattended displays in parks; and

(5)     Protect the views of the park and the ocean from Ocean Avenue"

without precluding the installation of displays on other non-governmental

property."

(A true and correct copy of the June 12, 2012, Staff Report is attached hereto as

Exhibit 11 and incorporated herein by reference).

47.     The City Attorney's June 12, 2012, Staff Report directly singled out

the "controversy" involving the Nativity displays: "[I]n order to resolve controver-

sy and conserve City resources, staff proposed . . . repealing the winter display ex-

ception. If adopted, that ordinance would effectively eliminate winter displays in

the park, including religious displays, such as the Nativity scenes." Id.

48.     On June 27, 2012, the City Council took public input before voting on

an amendment to the ordinance deleting the winter display exemption. Council

members took turns explaining their positions and why they would vote to amend

the ordinance and eliminate the exemption.  The City Council members' comments

invoked specific rationales based upon an assortment of fears and concerns. (A true

Initial Verified Complaint

and accurate copy of the 6/12/12 Certified Transcript of Proceedings is attached hereto as Exhibit 12 and incorporated herein by reference.)

49.     Some of the Council members expressed the fear the City would be unable to manage protests. Although the display exemption policy was limited to the exhibition of "winter displays" (presumably celebrating traditional December holidays), Council members expressed the belief that the City would be required to issue a permit to <u>any</u> whether or not he applicant's message conformed to the "winter display" limitation.

50.     In response to these unprecedented circumstances created by Vix and the secular groups aligned with him, City Council members expressed a desire to avoid a repeat of the 2011 holiday season and amended the City ordinance, removing the exemption for winter displays and effectively banning the Nativity displays for the first time since 1953. Each member present rationalized his/her vote against retaining the winter display exemption predominantly on the basis of fear of controversy:

- <u>Defendant McKeown's "Intensely Personal" Fear Of Sectarian Conflict</u>: "Well, this [has] engendered a fascinating exploration of constitutional law. But for many of us in our community it's intensely personal. […] [M]y personal ethnic and cultural history tell me how deeply divisive disagreement over religion can be, because I'm Irish. I'm a citizen of the Republic of Ire-

land. And I've seen what can happen. My family lost our farm in Northern

Ireland in County Armagh, because we were the wrong religion. I have driv-

en through Northern Ireland in the middle of July when they're celebrating

the Battle of the Boyne and seen signs outside those Northern Ireland cities

with the Red Hand of Ulster and other symbolism that tell me that I am not

welcome, because my color is not orange and my religion is not Protestant.

So I know where this can go and it was deeply troubling to me as it was to, I

think everybody in the diocese and many in the community to see the hostili-

ty that was expressed last winter season and frankly, some of the intolerance

I heard from both sides tonight."

(Exhibit 12, 24:24-25:17, Remarks of Defendant McKeon).

- Defendant Holbrook's Fear Of Harm To The Personal Safety Of Staff
  Members:

"I'd like you to place yourself in my place for a second and ask you, how

many of you have been threatened about this personally? It's happened to

our staff. They've received very serious threats against them, their wellbeing

and their lives."

(Id., Remarks of Defendant Holbrook, 26:4-8).

- Defendant Holbrook's Fear Of Controversy:

10.8.1

25

Initial Verified Complaint

"… [W]hy do we want to have a display in the park that is so controversial it gets on national television for the messages that are being put out there."

(Id., 31:1-4).

- Defendant O'Day's Fear Of "Conflict":

"… [W]e talked about how to separate the sides so that there would be an equal space but one that didn't create conflict."

(Id., Remarks of Council Member O'Day, 15:1-3).

"… [I]t's … gone in the direction of increased polarization and … demonization of the sides, and really a deepening and hardening of feelings on the sides … – and some real nastiness."

(Id., 15:7-11).

"… [W]hile the law doesn't require us to take the step that the staff has proposed here, and we are within our legal right to continue the program as we have done it, … I feel like we're setting up a ring for a competition in Palisades Park. And it's one that's getting nasty."

(Id., 15:16-23).

- Defendant O'Day's and Defendant Davis' Fear Of Offensive Speech Competing For Public Attention With The Nativity Scene Displays:

"[W]e received … legal advice.… [T]he turning point for me [was] … that if you allow displays in the park you also have to allow protests of the dis-

**Initial Verified Complaint**

plays. And in fact, protests of the very displays that are next to your display in the park. And we saw some of that last year.… [H]ere's my nightmare scenario [:] … [W]e have a Nativity crèche put up as we have had every year[,] and then beside it is a display that is the same Nativity crèche, but it's sort of the Texas Chainsaw Massacre version of it[,] and it would be tre-mendously offensive[,] and it would really deepen and harden … feelings."

(Id., 15:24-16:1-15).

"And you might say it's farfetched, but two years ago I think it was on East-er weekend at St. Monica's, we had the statue right out in front of the church decapitated."

(Id., 16:22-25).

"And I think it would be Pollyannaish to think that this is just a space for debate that it wouldn't turn nasty, that it would be a great place to enjoy the fruits of debate in this country."

(Id., 17:2-6).

"… [W]hile I think there's a sort of natural attractiveness to [opening up other parts of the park for other people with competing or different views], because that will make everyone happy, as Councilmember O'Day points out, it's very possible that what could be said in some of those displays many people would find offensive."

10.8.1
27

Initial Verified Complaint

1 (Id., Remarks of Defendant Davis, 19:24-20:5).

2      "I think what our experience last year showed that if we open up the park for

3      a content neutral lottery we're not going to be able to have the Nativity

4      scenes that people have cherished for the last 60 years; we're going to have

5      dozens, if not hundreds of people competing for those slots. And it's quite

6      possible that there would be none of the traditional nativity scenes and it

7      could be a park full of varying messages, all of which would be equally val-

8      id, all of which would be welcome in this community, but we would not

9      have achieved what I think so many of you want to achieve, which is pre-

10     serving the Nativity scenes."

11 (Id., 21:22-22:9).

12     "And so while it's regrettable to some extent, because [while this is] a tradi-

13     tion that many people have enjoyed, it is also unfortunately a tradition that

14     now we have been challenged on."

15 (Id., 23:6-9).

16     Dropping the exemption, subsection (b), the ordinance as presently enacted

17 reads in relevant part:

18          "No person shall, in any park, erect, maintain, use or occupy any tent,

19     lodge, shelter, structure or unattended installation or display. The following

20     are exempt from this prohibition:

21
22
23
24
25
26
27
28

10.8.1                                    28

**Initial Verified Complaint**

1          "(a)    City structures and installations;

2          "(b) Other displays or installations authorized by a Community Event

3    Permit issued by the City."

4

5    (Exhibit 7).

6          In addition to the purposes articulated by the City Attorney, a resolution pre-

7    amble to the ordinance supported the amendment as follows:

8

9          (1)    For many years, Nativity scenes have been displayed in Palisades

10   Park, a world-renowned historic landmark, during the winter holidays;

11

12         (2)    The Santa Monica Municipal Code Section 4.55.060 generally prohib-

13   its unattended displays in City parks;

14         (3)    In 2003, this section was amended to create an exception to the prohi-

15   bition so that winter displays would be allowed in Palisades Park;

16

17         (4)    The City has also adopted written regulations governing these dis-

18   plays;  in recent years, the Nativity scenes were installed pursuant to the ex-

19   ception as was a Menorah, winter solstice displays and displays advocating

20   atheism;

21

22         (5)    Last year, for the first time, not only did the number of requested dis-

23   plays exceed the available space, but multiple requests were received on the

24   same day for the same block;

25

26

27

28

10.8.1                              29
**Initial Verified Complaint**

(6)     To address that situation, the City implemented its content-neutral system for allocating display space, utilizing a random drawing;

(7)     As a result of the number of spaces requested by the applicants, only the first four names drawn were allocated space;

(8)     Most of the spaces went to applicants who did not utilize them to celebrate religious holidays, and many used the display space to advocate atheism;

(9)     The City received a large number of varied complaints about the displays; many complainants advocated for limiting displays to traditional or religious content, and many other complainants advocated for no displays at all because the displays block the scenic views of the park and ocean;

(10)   Because the number of applicants for display space has grown so large, the City cannot accommodate all those who wish to install displays without blocking much more or all of the park frontage and views;

(11)   Because the park is a classic public forum, the City cannot pick and choose between applicants based on the content of their proposed displays or the applicants' identity and therefore must either eliminate winter displays or operate a system that allocates to all "speakers" equal opportunities to use the available space, irrespective of the content of their message;

(12)   Operating the system this year was extremely time consuming for City staff due to the large number of applicants;

(13)   Staff has been notified that even more applications will be filed next year, which will make administration even more time consuming and costly;

(14)   Input from the public indicates that a large number of City residents would prefer to have no displays in the park;

(15)   Displays, including displays celebrating religious holidays, are often installed on non-governmental property;

(16)   Displays that have been or could be installed in Palisades Park may be installed on other, non-governmental property;

(17)   Eliminating winter displays in Palisades Park will conform usage of that park to the long standing, City-wide standard which prohibits unattended displays in parks, conserve City resources, and protect the views of the park and ocean from Ocean Avenue without precluding the installation of displays on other non-governmental property.

51.   Defendant City, through its City Attorney, has advised Plaintiff it is free to convey its religious views in Palisades Park utilizing modes, media and manner of expression it would approve.  They are as follows:

1)   Display a Nativity scene or scenes in any City park for the day. The display would need to be attended, and it would need to be removed from the park at night;

2)   Apply for a Community Event permit to use a City park or parks to hold a "Nativity display event" expected to attract more than 150 people (event permits for Palisades Park are limited to "moving" events, such as processions and walks.  This limitation is based on Palisades Park's "unique physical characteristics" and does not apply to other City parks, which are available for stationary events.);

3)   Display Nativity scenes on private property, such as church property.  (Council members and other civic leaders have suggested the idea of having different scenes at different churches and encouraging community members to walk, bike or drive between them, which would provide the community with the experience of a Posada.);

4)   Distribute literature;

5)   Organize a procession;

6)   Preach;

7)   Sing;

8)   Table (not explained); and

9)   Dramatize the Nativity story.

(A true and accurate copy of an e-mail from City Attorney Marsha Jones Moutrie to The Becker Law Firm is attached hereto as Exhibit 13 and incorporated herein by reference.)

**Initial Verified Complaint**

### V. Effect Of The Ordinance

52.    A December 22, 2011, news account attributed statements to Vix claimed the atheist groups sought display permits for Palisades Park motivated by a desire to evict the Nativity displays. The report stated:

> "The atheist groups had no real desire to set up displays, but wanted to counter the nativity scenes in size and message. The unused spots represent a statement as well, Vix said. 'We wanted them to leave it as a park. It's a better use of the property,' Vix said. 'What's going on is a spectacle, and it's been a spectacle for 57 years.' "

(Exhibit 6.)

53.    By amending the ordinance deleting the winter display exemption, Defendant City succumbed to a "heckler's veto" and has thereby given preference to a messages hostile to religion, particularly Christianity.

54.    The City's decision to change its policy to one of appropriate accommodation to one of inhibiting, marginalizing and suppressing religious speech has the effect of rewarding the heckler's veto.

55.    There are no government buildings within the vicinity of Palisades Park where Plaintiff would like to display its Nativity scenes.  Plaintiff would like to display its scenes in the same locations where it was found by the City to have no detrimental impact.

**Initial Verified Complaint**

56.     Defendant City, through its City Attorney, acknowledged that the display exemption contained in the 2003 ordinance was constitutionally valid. Exhibit 15, 5/22/2012 Certified Transcript of City Council Proceedings, 11:3-6 (". . . [W]e believe that you can certainly keep all the displays you currently have in the park. The system that we operated last year was, we believe, fully legal."); Exhibit 12, 6:9-13 ("We believe the current system is fully legal and we think there is nothing illegal about having the nativity scene displays as part of the displays that are in the park. So I don't think there's a dispute between any of us about that."); see also id., 15:16-23, Remarks of Defendant O'Day (". . . [W]hile the law doesn't require us to take the step that the staff has proposed here, and we are within our legal right to continue the program as we have done it. . . .").

57.     Furthermore, the policy exempting winter displays was supported by a legitimate, sincere secular purpose, (1) the promotion of holiday spirit and (2) the promotion of free expression.

## FIRST CLAIM FOR RELIEF

### (First Amendment—Free Speech Clause)

58.     Plaintiffs hereby incorporate by reference all stated paragraphs.

59.     By reason of the aforementioned policy, practice, custom, acts, and omissions, engaged in under color of state law, Defendants have imposed a content-based restriction on Plaintiff's speech in violation of the Free Speech Clause

Initial Verified Complaint

of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

60.    As a direct and proximate result of Defendants' violation of the Free Speech Clause of the First Amendment, Plaintiff has suffered irreparable harm, including the loss of its constitutional rights, entitling it to declaratory and injunctive relief and nominal damages.

## SECOND CLAIM FOR RELIEF

### (First Amendment—Establishment Clause)

61.    Plaintiff hereby incorporates by reference all above-stated paragraphs.

62.    By reason of the aforementioned policy, practice, custom, acts, and omissions, engaged in under color of state law, Defendants have violated the Establishment Clause of the First Amendment to the United States Constitution as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

63.    Defendants' policy, practice, and/or custom of prohibiting the display of Plaintiff's private nativity scene lacks a valid secular purpose, has the primary effect of inhibiting religion, and creates an excessive entanglement with religion in violation of the United States Constitution.

10.8.1

35

**Initial Verified Complaint**

64.     Defendants' policy, practice, and/or custom of prohibiting the display of Plaintiff's private nativity scene conveys an impermissible, government-sponsored message of disapproval of and hostility toward the Christian religion and our Nation's religious heritage. As a result, Defendants' policy, practice, and/or custom sends a clear message to Plaintiff that it is an outsider, not a full member of the political community and an accompanying message that those who disfavor the Christian religion and our Nation's religious heritage are insiders, fa-vored members of the political community in violation of the United States Consti-tution.

65.     As a direct and proximate result of Defendants' violation of the Estab-lishment Clause of the First Amendment, Plaintiff has suffered irreparable harm, including the loss of its constitutional rights, entitling it to declaratory and injunc-tive relief and nominal damages.

### THIRD CLAIM FOR RELIEF

### (Fourteenth Amendment—Equal Protection)

66.     Plaintiff hereby incorporates by reference all above-stated paragraphs.

67.     By reason of the aforementioned policy, practice, custom, acts, and omissions, engaged in under color of state law, Defendants have unconstitutionally deprived Plaintiff of the equal protection of the law guaranteed under the Four-teenth Amendment to the United States Constitution and 42 U.S.C. § 1983, in that

**Initial Verified Complaint**

Defendants, through their acts, policies, practices, and/or customs, prevented Plaintiff from expressing a private message in a public forum based on the content of his speech, thereby denying the use of this forum to those whose messages Defendants find unacceptable.

68.     As a direct and proximate result of Defendants' violation of the Equal Protection Clause of the Fourteenth Amendment, Plaintiff has suffered irreparable harm, including the loss of his constitutional rights, entitling him to declaratory and injunctive relief and nominal damages.

**WHEREFORE**, Plaintiffs ask this Court:

A)     to declare that Defendants have violated the First and Fourteenth Amendments to the United States Constitution, as set forth in this Complaint;

B)     to both preliminary and permanently enjoin Defendants' policy, practice, procedure, and/or custom of banning private unattended displays in Palisades Park, as set forth in this Complaint;

C)     to award Plaintiffs nominal damages against Defendants in their individual capacities for violating their constitutional rights pursuant to 42 U.S.C. § 1983 and other applicable law;

D)     to award Plaintiffs their reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988, California Code of Civil Procedure § 1021.5, and other applicable law;

Initial Verified Complaint

E)      to grant any and all other appropriate relief to which the Plaintiffs may be entitled including all "appropriate relief" within the scope of F.R.C.P. 54(c); and

F)      to grant such other and further relief as this Court should find just and proper.

Respectfully submitted this ___9___ day of October 2012.

**THE BECKER LAW FIRM**

By: _____

William J. Becker, Jr., Esq.

**PACIFIC JUSTICE INSTITUTE**

Michael S. Peffer, Esq.
*Co-Counsel for Plaintiff Santa Monica Nativity Scenes Committee*

10.8.1

38

**Initial Verified Complaint**

# EXHIBIT 1

Religion Notes
JOHN DART
*Los Angeles Times (1923-Current File);* Dec 12, 1981;
ProQuest Historical Newspapers Los Angeles Times (1881 - 1988)
pg. B11

## *Religion Notes*

# All 5 L.A. Atheist Leaders Quit in Dispute

By JOHN DART, *Times Religion Writer*

All five officers of the American Atheists' Los Angeles chapter have resigned in a personality dispute with national president Madalyn Murray O'Hair and her son Jon Garth Murray.

The disarray in the Los Angeles chapter, with 800 persons on its active mailing list making it the largest of 47 American Atheist chapters, prompted cancellation of its Winter Solstice dinner party set for Sunday.

O'Hair and Murray, national director of the Austin, Tex.,-based organization, were to be speakers at the event. Jon Murray is younger brother of Bill Murray, who broke more than a year ago with his mother and said he had become a believer.

Los Angeles director Richard James of Marina Del Rey said he resigned at chapter's Nov. 22 meeting because of "abusive" letters he received from Jon Murray and lack of support from O'Hair. Vice director Al Seckel and three other Los Angeles chapter officers then also resigned.

The mother-and-son leadership of American Atheists criticized the Los Angeles chapter in part for agreeing to a compromise with the city of Santa Monica on the latter's annual Nativity displays in city-owned Palisades Park.

John R. Edwards, then the Los Angeles chapter director and now state director, had taken up the city's offer to allow American Atheists to have its own display in Palisades Park this Christmas.

**'Can Ruin Everything'**

"California can ruin everything for atheists," O'Hair said by telephone. She said American Atheists have court cases in Rhode Island and Denver where Christmas displays on public land are being challenged as unconstitutional.

"If we go in (as part of the Santa Monica display), we only add to their right to be there," said O'Hair, who holds a law degree.

The controversy over the Nativity displays in Santa Monica began two years ago when O'Hair cited the city's financial support and involvement as violating church-state separation. After the city withdrew its support, the city attorney ruled the city could permit the Nativity scenes on park land if space was made available to all users. The atheist chapter was given approval for its display last June.

Edwards said the exhibit which would describe the pagan origins of the Dec. 25 holiday and would quote religious skeptics in history, is being readied for installation Thursday of next week. But, he added, a final decision is being delayed in view of the objections from chapter.

O'Hair maintained that she had been urging the Los Angeles chapter to sue the city but could not make that position clear to the chapter.

O'Hair said she believed that the organizational dispute would not hurt the Los Angeles chapter but James said that he was not so sure.

— — —

Founder-president **Bill Bright** of Campus Crusade for Christ, based in San Bernardino, said he was "extremely happy" over the U.S. Supreme Court ruling Tuesday that public universities which let secular student organizations meet in campus buildings must also make facilities available to student religious groups for discussions, worship services or prayers.

The justices, in an 8-1 vote, concluded that the University of Missouri at Kansas City had violated the First Amendment's guarantee of freedom of speech when it barred an evangelical Christian group from meeting regularly in a campus building.

Campus Crusade for Christ, for the most part, is able to use campus facilities at state colleges and universities where it has chapters. But Bright felt the ruling would "clarify the rights of religious groups" in cases where Campus Crusade and other campus ministries have encountered "university officials who either are misinformed concerning the law or have denied rights to others based on the officials' own viewpoints and beliefs."

— — —

Actress **Tippi Hedren**, international relief coordinator for Food for the Hungry, will receive the Human Rights Award from the Baha'i religious community of Los Angeles County in a ceremony Sunday at the Sheraton Town-House.

Other winners of the annual awards, besides the star of the movies "The Birds" and "Marnie," are M.E.N.D. (Meeting Each Need With Dignity), a Christian volunteer group in Pacoima providing for emergency needs; **Barrie Levy** of Culver City for work aimed at preventing violence against women, and Sugar Ray Robinson's Youth Foundation, an inner-city group.

**First Baptist Church of Pomona** launched its 13th annual 'Round-the-Table Carol Sing Friday night at the Los Angeles County Fairgrounds in Pomona, the first of seven performances that attract about 1,200 persons to each.

Although the performances, involving 1,000 singers and seasonal food fare such as fig pudding, are sold out, a church spokesperson said standby tickets are available for the remaining shows—at 2, 5 and 8 p.m. today and Sunday.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

# EXHIBIT 2

City Council Meeting 4-8-03                          Santa Monica, California

TO:          Mayor and City Council

FROM:        City Staff

SUBJECT:     Request To Consider Adoption of a City Policy on the Installation of  Displays and
             Other Objects in City Parks and on Other Public Property

Introduction

This staff report summarizes issues which have arisen relating to the placement of temporary displays in City parks and on other public property.   Staff requests that the Council discuss establishing a City policy and consider directing staff to prepare a proposed ordinance for future Council discussion.

Background

The Municipal Code currently gives scant guidance on the subject of unattended displays and installations in public parks and on other public property.   The Community Events Ordinance governs displays and installations occurring in the context of an "event," which is defined as a gathering of more than 150 people (or less if the event includes a structure which requires a separate permit).   However, the Community Events Ordinance does not address installations and displays outside that context.  The Parks Maintenance Code prohibits placing objects on foliage in parks but allows placement on grass, so long as the placement does not damage the grass.  (This means that temporarily placing a picnic blanket on the grass is lawful, but placing a large object on the grass for days is likely not.)  Additionally, the Parks Maintenance Code prohibits the erection of structures in parks except as authorized by the City.

The City has the authority to regulate private installations in parks and on other public property.

Such property is held for the common use and good; no individual has a right to monopolize it for private use.  On the other hand, displays are usually expressive; public parks, plazas, streets and sidewalks are public forums; and other public spaces may become forums as well.  Therefore, if a city allows unattended private displays in parks, it must do so in a manner consistent with First Amendment requirements.

The best and most applicable illustration of this principle in case law is supplied by the Ninth Circuit's decision in the Beverly Hills menorah case.   American Jewish Congress v. City of Beverly Hills, 90 F.3d 379 (9th Cir. 1996).  In that case, city policy prohibited the private installation of large, unattended objects in city parks.  Nonetheless, the city issued an events permit allowing a religious group to erect a menorah in a strip park adjacent to an arterial for approximately two weeks during the holiday season.  The city itself put up a holiday display of its own, consisting of lighted trees, one block  west of the menorah.   Other groups applied for permits to install a winter solstice display and a cross, but the city denied those applications.   The basis for these denials was unclear, because there were no articulated standards (likely because city policy precluded such installations).

The federal trial court decided the case in the city's favor, rejecting claims that the city had violated the Establishment Clauses of the First Amendment and California Constitution.  On appeal, the Ninth Circuit reversed.  The court observed that, although the city could constitutionally ban all unattended private displays in parks, it could not have a general policy prohibiting them but, on an ad hoc basis and without standards, select one group and allow it to erect a display.  This case stands for the proposition that if a city selectively allows unattended displays in parks or on other public space, it must do so pursuant to valid time, place and manner regulations which include express standards for the issuance of permits.

At present, Santa Monica has no standards for unattended displays and installations.  Historically,

there have been instances of unattended, privately owned displays in Palisades Park.  During the holiday season, three groups install unattended displays adjacent to Ocean Avenue.  In the past, these displays were permitted as community events.  However, the current Community Events Ordinance, adopted two years ago, neither authorizes nor prohibits them.

In addition to the holiday displays, the City sponsors a juried temporary art program which provides opportunities for local artists to create site-specific works which are temporarily installed at Clover Park.  Moreover,  the City has received requests to display private art works or other installations on the beach and on other public property.

-

Discussion

Current circumstances suggest that the City Council should consider formulating a policy on unattended installations for at least two reasons.  City staff recently received another inquiry about installing a large display on the beach.  At present, there are no guidelines from which to formulate a response.  Moreover, since the current Community Events Ordinance was adopted, holiday displays have been installed with the City's knowledge but without permits because current law makes no provision for permitting them.  Allowing them to continue on that basis poses certain legal risks, including losing the ability to regulate any private installations in Palisades Park.  Moreover, those who install the displays want clarification of their rights; and some residents, who live opposite or near the park,  have expressed concerns about the displays.

Although the First Amendment significantly restricts the City's choices, there are options for Council consideration.  As explained in the Beverly Hills case, the City could prohibit the private installation of unattended objects in parks and on other public property within the City.  The City could also allow installations pursuant to an ordinance governing time, place and manner and establishing a permitting system including objective standards.  Exactly how far the City could go in the direction of regulating displays without risking its regulatory powers is not certain.  Legal staff

7/13/12                                    f:\atty\muni\strpts\mjm\placingobjects

would need to research any option or options of interest to the Council. For instance, if the City opted to allow displays only at a single location in a single park for a limited time period, such as the holiday season, staff would need to analyze the legality of that approach.


  For now, one thing is very clear: the City cannot regulate the private use of public space for expressive activities based upon content. Thus, if a holiday display zone were created, any display conforming to applicable, objective criteria would have to be allowed.


## Recommendation

Staff recommends that the Council hear from the public, deliberate, obtain input from the Recreation and Parks and Arts Commissions, and thereafter consider giving staff direction to prepare an ordinance which can be discussed at the time it is returned to Council.


PREPARED BY:      Marsha Jones Moutrie, City Attorney

# EXHIBIT 3

City Council Meeting 9-9-03                                      Santa Monica, California

ORDINANCE NUMBER _____

(City Council Series)

AN ORDINANCE OF THE CITY COUNCIL OF THE
CITY OF SANTA MONICA AMENDING SANTA MONICA MUNICIPAL
CODE SECTION 4.55.060 REGARDING THE PLACEMENT OF
OBJECTS IN PARKS

WHEREAS, the City of Santa Monica is geographically small and is very densely populated; and

WHEREAS, a majority of City residents live in multi-family housing without adequate recreational space; and

WHEREAS, tens of thousands of workers and visitors come into the City each day, and, on weekends, the number swells to hundreds of thousands; and

WHEREAS, park space in the City is very limited; and

WHEREAS, residents and visitors make heavy use of the City's parks for a variety of recreational and other purposes; and

WHEREAS, park usage, although always heavy, is lightest in December; and

WHEREAS, the City strives to balance park usage to ensure that access to this limited public resource is fairly allocated and protected; and

WHEREAS, consistent with this goal, the City endeavors to keep park space open and available to the maximum number of community members and visitors and to avoid monopolistic uses of the parks; and

WHEREAS, for decades, private groups have installed displays in Palisades Park, adjacent to Ocean Avenue, during December; and this long-standing tradition is valued by many

members of the community; and

WHEREAS, the City has not sought to regulate the content of these displays and recognizes its obligation to regulate displays in public forums, including parks, in accordance with First Amendment standards applicable to time, place and manner restrictions, including content neutrality,

NOW, THEREFORE, THE CITY COUNCIL OF THE CITY OF SANTA MONICA DOES HEREBY ORDAIN AS FOLLOWS:

SECTION 1.  Santa Monica Municipal Code Section 4.55.060 is hereby amended to read as follows:

### Section 4.55.060.  Erection of structures.

No person shall, in any park, erect, maintain, use or occupy any tent, lodge, shelter, structure or unattended installation or display.  The following are exempt from this prohibition:

(a) City structures and installations;

(b) Unattended installations or unattended displays in Palisades Park adjacent to Ocean Avenue during the month of December in an area designated by City Council resolution; and

(c) Other displays or installations authorized by a Community Event Permit issued by the City.

If displays or installations pursuant to subsection (b) exceed the available, designated space, the City shall allocate the designated space on a first-come, first-served basis, irrespective of the content of the display or installation and irrespective of the identity of the person or persons responsible for the display or installation.

Persons displaying or installing pursuant to exemptions (b) and (c) above must comply with applicable safety standards, cover any attendant costs to the City and agree to hold the City harmless as to injury or loss resulting from the installation or display.  The City Manager may adopt administrative guidelines for allocating the space available for displays and installations.

SECTION 2.  Any provision of the Santa Monica Municipal Code or appendices thereto inconsistent with the provisions of this Ordinance, to the extent of such inconsistencies and no further, is hereby repealed or modified to that extent necessary to effect the provisions of this Ordinance.

SECTION 3.  If any section, subsection, sentence, clause, or phrase of this Ordinance is for any reason held to be invalid or unconstitutional by a decision of any court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Ordinance. The City Council hereby declares that it would have passed this Ordinance and each and every section, subsection, sentence, clause, or phrase not declared invalid or unconstitutional without regard to whether any portion of the ordinance would be subsequently declared invalid or unconstitutional.

SECTION 4.  The Mayor shall sign and the City Clerk shall attest to the passage of this Ordinance. The City Clerk shall cause the same to be published once in the official  newspaper within 15 days after its adoption.    This Ordinance shall become effective 30 days from its adoption.

APPROVED AS TO FORM:

_____

MARSHA JONES MOUTRIE
City Attorney

# EXHIBIT 4

9/30/12                    F:\atty\muni\strpts\mjm\objectplacmntreso

**Item 1-J**

City Council Meeting 10-14-03                                  Santa Monica, California

TO;          Mayor and City Council

FROM:        City Staff

SUBJECT:     Proposed Resolution Specifying Locations Available For Winter Displays In
             Palisades Park And Establishing Procedures Relating To Displays

-

-
Introduction
-

At its meeting of September 9, 2003, the City Council adopted Ordinance Number 2095 (CCS) which amended Chapter 4.55 of the Municipal Code (the City's "Park Maintenance Code") to allow the placement of unattended installations or displays in Palisades Park adjacent to Ocean Avenue during the month of December in an area to be designated by Council resolution.  This staff report proposes designated areas for displays, provides information about the installation process, and covers a proposed resolution.

Background

In addition to specifying that the City Council will designate the display areas by resolution, Ordinance Number 2095 (CCS) also specifies that the designated spaces shall be allocated purely on a first-come, first-served basis, irrespective of the display content.  Moreover, the ordinance provides that those installing displays must comply with applicable safety standards, cover any costs to the City resulting from the display, and hold the City harmless.   In the brief time period since Ordinance Number 2095 (CCS) was adopted, Community and Cultural Services staff has received inquiries relating to this year's display opportunities, the process and the requirements.  The proposals in this staff report, as adopted or modified by Council, are intended to establish parameters, provide information to those wishing to install displays, and establish

9/30/12                   F:\atty\muni\strpts\mjm\objectplacmntreso

simple guidelines which can be modified based on experience, if necessary.

<u>Discussion</u>

As to location, staff proposes designating the following areas: (1) Palisades Park between Santa Monica Boulevard and Arizona Avenue on the grassy area adjacent to Ocean Avenue (between the sidewalk and the decomposed granite pathway); and (2) Palisades Park between Arizona Avenue and Wilshire Boulevard on the grassy area adjacent to Ocean Avenue (two feet from the curb and up to, but not on, the decomposed granite pathway). These locations are large enough to ensure that multiple displays can be accommodated but small enough to ensure that other park uses can continue.   In particular, utilizing these locations will ensure that installations do not interfere with the public's use of the walking and jogging paths and park areas typically used for picnics and gatherings.   Moreover, the proposed locations are roughly the locations that have been used for many years and so are preferable from a standpoint of tradition.   Finally, use of these locations will also minimize impacts on residential neighbors. Of course, the interests of park users and neighbors will also be protected by the time  limit for installations which restricts installations to one month during mid-winter, the time of year when the park usage is lightest.

As to implementation, staff suggests a simple process which can be enhanced and formalized based on experience, if necessary. Any person wishing to install a winter display should notify the Open Space Management Division of Community and Cultural Services by putting their name on a list to be maintained by that Division for  purposes of effectuating the first-come, first-served requirement. As with Category 2 community events (which include installations), the contact with the Division could be made up to five business days and not more than one year prior to the beginning of the installation period.

When the person puts his or her name on the list, City staff will obtain his or her signature on the hold harmless form. Staff will also supply information about the requirement of covering any costs incurred by the City as a result of the display and any applicable guidelines for park usage,

including requirements contained in the Park Maintenance Code and other guidelines intended to reduce impacts upon neighbors. Finally, staff will direct the person to the Fire Marshal for information about any applicable fire safety requirements.

Based upon past experience, it is anticipated that these minimal procedures will be adequate. However, adjustments can be made by staff, based upon experience, if additional procedures or safeguards are shown to be necessary.

Financial/Budgetary Impacts

Based upon past experience with winter displays, it seems unlikely that the adoption of the attached resolution and implementation of these recommendations would cause any significant financial impacts.

Recommendation

Staff recommends that the City Council adopt the attached resolution.

PREPARED BY:   Barbara Stinchfield, Director of Community & Cultural Services
Elaine Polacheck, Open Space Manager
Trinie Garcia-Valdez, Community Use Administrator
Marsha Jones Moutrie, City Attorney
Barry Rosenbaum, Senior Land Use Attorney

ATTACHMENT:   Proposed Resolution

# EXHIBIT 5

HOME PAGE | TODAY'S PAPER | VIDEO | MOST POPULAR | TIMES TOPICS

Subscribe: Digital / Home Delivery | Log In | Register Now | Help

Search All NYTimes.com

The New York Times

# U.S.

WORLD | U.S. | N.Y. / REGION | BUSINESS | TECHNOLOGY | SCIENCE | HEALTH | SPORTS | OPINION | ARTS | STYLE | TRAVEL | JOBS | REAL ESTATE | AUTOS

POLITICS | EDUCATION | BAY AREA | CHICAGO | TEXAS

Arnold & Itkin LLP
ATTORNEYS AT LAW
Have You Or A Loved One
BEEN INJURED OFFSHORE?
RECEIVE A FREE CONSULTATION
NO RECOVERY. NO FEE. (888) 346.5024
Advertise on NYTimes.com

## Where Crèches Once Stood, Atheists Now Hold Forth



Damon Vix and his holiday message in Santa Monica, Calif. Mr. Vix, an atheist, worked to have nativity scenes replaced.

By JENNIFER MEDINA
Published: December 21, 2011

SANTA MONICA, Calif. — The elaborate Nativity scenes rose in a city park along the oceanfront here every December for nearly six decades. More than a dozen life-size dioramas depicted the Annunciation, Mary and Joseph being turned away at the inn and, of course, the manger.

**Related**

Times Topic: Atheism

**Connect With Us on Twitter**
Follow @NYTNational for breaking news and headlines.

Twitter List: Reporters and Editors

Enlarge This Image



Michal Czerwonka for The New York Times
"This is just our way of saying 'Merry Christmas,'" said Hunter Jameson.

This always angered Damon Vix, who worked off and on in Santa Monica and considers himself a devout atheist, so to speak. How could it be, he asked himself each year, that the city could condone such an overtly religious message?

So, a few years ago, he petitioned the city and received his own space, using it to put up a sign offering "Reason's Greetings." But this year, he wanted more. Mr. Vix gathered a few supporters and applied for dozens of in Palisades Park, a patch of green on a bluff overlo the sandy beaches that this city is famous for.

Suddenly, city officials realized they had far more reques for space than they could fulfill, they said, and created a lottery. When it was finished, the atheists had received a vast majority of the spaces. The Christian groups were

Log in to see what your friends are sharing on nytimes.com.
Privacy Policy | What's This?

Log In With Facebook

**What's Popular Now**

Beware a Beautiful Calm

Truth and Lies About Medicare

RECOMMEND
TWITTER
LINKEDIN
SIGN IN TO E-MAIL
PRINT
REPRINTS
SHARE

THE BEST EXOTIC MARIGOLD HOTEL

Advertise on NYTimes.com

**Today's Headlines Daily E-Mail**

Sign up for a roundup of the day's top stories, sent every morning.

Sign Up

See Sample | Privacy Policy

MOST E-MAILED | RECOMMENDED FOR YOU

1. AT WAR
   Darpa to the People: You Think It Up, We Make Sure It Shoots

2. Scouting Report

3. DESIGN
   Who Made That Tube Top?

MORE IN U.S. (1 OF 26 ARTICLES)

**In Midst of a Drought, Keeping Traffic Moving on the Mississippi**
Read More »



6. THE LEDE
   Bahrain Sentences Activist to 3 Years in Prison for 'Inciting' Protests

who helped organize the religious displays.

Enlarge This Image



Michal Czerwonka for The New York Times
A nativity scene at Palisades Park in Santa Monica.

forced to choose three scenes from their typical 14.

Now, the city is embroiled in a seasonal controversy it has somehow avoided for decades.

"We're trying to balance something that has been a real tradition here and also live within federal law," said Barbara Stinchfield, the director of community services for the city. "We were trying to accommodate all the groups that were interested in the most fair way we could."

Ms. Stinchfield has been somewhat surprised at the intensity of the debate — which has been a hot topic for days in local newspapers and on radio shows and blogs.

"People keep asking why we do what we do," she said, sounding a bit weary. "It's really a simple answer: the law regulates a park as a traditional public forum, and we're trying to do that."

Hunter Jameson, the president of the group that organizes the Nativity scenes, said he did not believe the city had done anything wrong. The most "extremely irksome" issue, he said, is that Mr. Vix and the other atheists seem most focused on pushing out the Christian scenes. Much of the space the atheists secured is sitting unused, and for the most part small white signs bearing secular quotations have replaced the Nativity scenes.

Under the city's rules, any group was allowed to apply for as many as 14 spaces. Because Mr. Vix had seven people applying for the maximum amount, they were more likely to get the spaces in the lottery.

"Rather than use it to put forth a message of their own, they've really shown that their goal is just an effort to take something away rather than give anything to the community," Mr. Jameson said. "They're trying to censor something that the community has clearly shown it appreciates."

Adding to his unhappiness, he said, is that none of the atheist applicants live in Santa Monica. (Mr. Jameson himself lives a few miles away, but attends church in the city.)

"The idea that religious speech is less protected than other free speech is an attack on the First Amendment, and the attempt of these people to block us is a real attack on our rights," Mr. Jameson said. "This is just our way of saying 'Merry Christmas.' "

Mr. Vix said he had encouraged the atheists to leave some of the spaces blank. If they put up as many messages as the Christians had, he said, there would be a backlash, and he predicted that the city would cancel the December tradition altogether. He also said the atheists had been trying only to receive the same amount of space that the churches had for years.

Mr. Vix said that from the time he first saw the displays in the early 1990s, he considered them a "blatant government support of religion."

"I strongly believe in government and have my whole life," he said, "and our founding fathers created the separation of church and state. If we don't exercise our rights, we lose them. So I really felt the need to highlight the inherent problem."

The Nativity scenes are not the only signs of religion this time of year. Rabbi Eli Levitansky, who helps to run the Chabad Jewish outreach programs in the area, said Santa Monica might have the "highest concentration of public menorahs" of any city in the country. (To keep score: there are 60 such menorahs scattered across the city's 8.3 miles.)

Rabbi Levitansky, who grew up in Santa Monica, does not see a problem with the Nativity scenes and said that most people he knew — religious and not — were upset about the

7. The Once and Future War



8. Afghan Attacks on Allied Troops Prompt NATO to Shift Policy



9. Downtown Comes Uptown

10. EDITORIAL
The Right to Counsel at Guantánamo Bay

PRESENTED BY

Log in to discover more articles based on what you've read.

Log In   Register Now   f  Log In      What's This? | Don't Show



Hip-Hop's rising star
ALSO IN ARTS »
Nakedness in dance, taken to extremes
Dreaming of a life as vivid as her art

nytimes.com                          ARTS



CURTAIN UP   The New York Times
The latest theater news
and reviews from Broadway
and beyond.            SIGN UP TODAY ►

Ads by Google                    what's this?

Apartments Santa Monica
Great Location & Luxurious Southern
California Apartments. Search Now!
www.ArchstoneApartments.com

changes this year. "To come in and create chaos for no reason whatsoever, other than to just take away from the joy of the holidays for other people, is shallow and an improper thing to do," he said.

Annie Laurie Gaylor, co-president of the Freedom From Religion Foundation, said the Santa Monica situation was "one of the cutest success stories of the season." This year, the Wisconsin-based group has put up its own version of a manger in the Wisconsin State Capitol, with Einstein, Darwin and Emma Goldman standing as the wise men and a black female doll as the featured infant.

The displays in Santa Monica are not nearly as elaborate. One of Mr. Vix's favorite signs sits right in the middle of the park, but few passers-by stopped one recent afternoon to read the quote from Robert Ingersoll, the 19th-century writer and orator:

"Happiness is the only good. The time to be happy is now. The place to be happy is here. The way to be happy is to make others so."

A version of this article appeared in print on December 22, 2011, on page A28 of the New York edition with the headline: Where Crèches Once Stood, Atheists Now Hold Forth.

SIGN IN TO E-MAIL

PRINT

REPRINTS

 Get 50% Off The New York Times & Free All Digital Access.

Get Free E-mail Alerts on These Topics

Christmas

Atheism

Christians and Christianity

Santa Monica (Calif)


Ads by Google                                        what's this?

**Law Firm Web Site Design**

Effective Custom Web Site Design &
Marketing. Email Us for Information
www.ScorpionDesign.com

INSIDE NYTIMES.COM                                                      ◄ | ►

| TRAVEL » | SUNDAY REVIEW » | ARTS » | MAGAZINE » | SUNDAY REVIEW » | FASHION & STYLE » |


Casting in Colorado, Away From the Crowds


Exposures: Corruption as a Way of Life in Russia




Gay Male Comics Await the Spotlight


Jason Pierre-Paul, the Defensive Wunderkind

**Observer: We Protest Too Little**
The folk hero Woody Guthrie will be honored at the Kennedy Center, but rabble-rousing, not respectability, was his goal.


Weddings & Celebrations

Home | World | U.S. | N.Y. / Region | Business | Technology | Science | Health | Sports | Opinion | Arts | Style | Travel | Jobs | Real Estate | Autos | Site Map

© 2011 The New York Times Company | Privacy | Your Ad Choices | Terms of Service | Terms of Sale | Corrections | RSS | Help | Contact Us | Work for Us | Advertise

# EXHIBIT 6

**Source:** Santa Monica Daily Press

Remove Images

# City Hall may alter lottery for spots after dustup over nativity scenes

by Ashley Archibald

December 22, 2011

PALISADES PARK — As Christmas Day moves ever closer, the tussle over nativity scenes that held a place of prominence in Palisades Park for nearly 60 years continues to grow in fervor and national interest, causing city officials to weigh the possibility of altering the lottery system used to select who gets to put up displays.



MAKING ROOM: The longtime nativity scenes in Palisades Park had to make way for other groups this holiday season.photo byDaniel Archuleta.

How that system evolves is the focus of much interest on both sides of the aisle, with Christians hoping to secure a permanent display in the park and atheists aiming to shut down the tradition altogether.

The council made changes to the system two years ago when competition for the spots first arose, and then again when the 13 applications appeared this year, said Mayor Richard Bloom.

"I think it's fair to say that, in retrospect, we could have done a better job," Bloom said. "Frankly, I don't know how that will make everybody happy."

The struggle began in early 2011 when City Hall held a lottery to determine who would have access to the 21 slots spread across two blocks of Palisades Park.

The lottery system was chosen to keep it fair, ensuring that City Hall could not exercise any preference, said City Attorney Marsha Moutrie.

Two applications filed by atheists included requests for a maximum of nine spaces each. The atheists won the lottery, leaving one space for Chabad Santa Monica, which traditionally puts up a menorah, and two spaces for a coalition group of Christian churches.

For the last 57 years, those churches have erected a 14-piece display in Palisades Park.

Proponents of the scenes formed the Save Our Nativity Scenes campaign, which kicked off on Sunday, Dec. 4 with an electric-light vigil and a petition asking the City Council to reinstate the decades-old tradition.

That petition has garnered hundreds of signatures, wrote Hunter Jameson, spokesman for the coalition, in an e-mail.

In addition to the signatures, comments have flooded in expressing their support of the displays, or recounting fond Christmas memories that included them, Jameson wrote.

"Many voice frustration that only three of the scenes are up in Palisades Park this year," Jameson wrote. "I would say

they are displeased that this unique Santa Monica tradition has been reduced to a shadow of its former self."

The petition and its backers hope to prove that the display should enjoy some protection as a popular display, and include the Chabad menorah, which has also been erected for many years, in the request.

"We are very glad that Chabad won a place in the lottery in Palisades Park," Jameson wrote. "Its menorah will be right next to our booths. That's fitting."

What's not fitting for Jameson is a group of people with few or no signs taking up space used for the Christian displays.

There's a reason for that, said Damon Vix, the face of the atheist sign campaign.

The atheist groups had no real desire to set up displays, but wanted to counter the nativity scenes in size and message. The unused spots represent a statement as well, Vix said.

"We wanted them to leave it as a park. It's a better use of the property," Vix said. "What's going on is a spectacle, and it's been a spectacle for 57 years."

The signs have also drawn ire for their appearance, which aren't as elaborate as the 14 nativity displays.

While the first one, a sign with a quote by founding father Thomas Jefferson bashing religion was meant to be unattractive — "It's a cage-like structure and I purposefully made it ugly because I think the nativity scenes are ugly," Vix said — the remaining signs were a practical matter.

"The city didn't buy or create a bunch for displays with props and wardrobe, signage and electricity," Vix said. "We had to do this all on our own. It cost a couple thousand dollars of my own money."

Ultimately, Vix and his fellows hope that the displays will be shut down completely and end what he sees as an unconstitutional support of religion by local government.

ashley@smdp.com

# EXHIBIT 7

City Council Meeting:  May 22, 2012                           Santa Monica, California

ORDINANCE NUMBER (CCS)

(City Council Series)

AN ORDINANCE OF THE CITY COUNCIL OF THE CITY OF
SANTA MONICA AMENDING SANTA MONICA MUNICIPAL CODE SECTION 4.55.060
RELATING TO ERECTION OF STRUCTURES AND WINTER DISPLAYS IN PALISADES PARK

WHEREAS, for many years, Nativity scenes have been displayed in Palisades Park, a world-renowned historic landmark, during the winter holidays; and

WHEREAS, the Santa Monica Municipal Code Section 4.55.060 generally prohibits unattended displays in City parks; and

WHEREAS, in 2003, this section was amended to create an exception to the prohibition so that winter displays would be allowed in Palisades Park; and

WHEREAS, the City has also adopted written regulations governing these displays; and

WHEREAS, in recent years, the Nativity scenes were installed pursuant to the exception as was a Menorah, winter solstice displays and displays advocating atheism; and

WHEREAS, last year, for the first time, not only did the number of requested displays exceed the available space, but multiple requests were received on the same day for the same block; and

WHEREAS, to address that situation, the City implemented its content-neutral system for allocating display space, utilizing a random drawing; and

WHEREAS, as a result of the number of spaces requested by the applicants, only the first four names drawn were allocated space; and

WHEREAS, most of the spaces went to applicants who did not utilize them to celebrate

religious holidays, and many used the display space to advocate atheism; and

WHEREAS, the City received a large number of varied complaints about the displays; and

WHEREAS, many complainants advocated for limiting displays to traditional or religious content, and many other complainants advocated for no displays at all because the displays block the scenic views of the park and ocean; and

WHEREAS, because the number of applicants for display space has grown so large, the City cannot accommodate all those who wish to install displays without blocking much more or all of the park frontage and views; and

WHEREAS, because the park is a classic public forum, the City cannot pick and choose between applicants based on the content of their proposed displays or the applicants' identity and therefore must either eliminate winter displays or operate a system that allocates to all "speakers" equal opportunities to use the available space, irrespective of the content of their message; and

WHEREAS, operating the system this year was extremely time consuming for City staff due to the large number of applicants; and

WHEREAS, staff has been notified that even more applications will be filed next year, which will make administration even more time consuming and costly; and

WHEREAS, input from the public indicates that a large number of City residents would prefer to have no displays in the park; and

WHEREAS, displays, including displays celebrating religious holidays, are often installed on non-governmental property; and

WHEREAS, displays that have been or could be installed in Palisades Park may be installed on other, non-governmental property; and

WHEREAS, eliminating winter displays in Palisades Park will conform usage of that park to the long standing, City-wide standard which prohibits unattended displays in parks, conserve City resources, and protect the views of the park and ocean from Ocean Avenue without precluding the installation of displays on other non-governmental property.


NOW, THEREFORE, THE CITY COUNCIL OF THE CITY OF SANTA MONICA DOES

HEREBY ORDAIN AS FOLLOWS:

SECTION 1.  Santa Monica Municipal Code Section 4.55.060 is hereby amended to read as follows:

4.55.060 Erection of structures.

No person shall, in any park, erect, maintain, use or occupy any tent, lodge, shelter, structure or unattended installation or display.  The following are exempt from this prohibition:

(a)   City structures and installations;

(b)   Unattended installations or unattended displays in Palisades Park adjacent to Ocean Avenue from November 27th through January 4th in an area designated by City Council resolution; and

(eb)   Other displays or installations authorized by a Community Event Permit issued by the City.

If displays or installations pursuant to subsection (b) of this Section exceed the available, designated space, the City shall allocate the designated space on a first-come, first-served basis, irrespective of the content of the display or installation and irrespective of the identity of the person or persons responsible for the display or installation.

Persons displaying or installing pursuant to the exemptions in subsections (b) and (c) of this Section must comply with applicable safety standards, cover any attendant costs to the City and agree to hold the City harmless as to injury or loss resulting from the installation or display.  The City Manager may adopt administrative guidelines for

allocating the space available for displays and installations.

SECTION 2.  Any provision of the Santa Monica Municipal Code or appendices thereto inconsistent with the provisions of this Ordinance, to the extent of such inconsistencies and no further, is hereby repealed or modified to that extent necessary to effect the provisions of this Ordinance.

SECTION 3.  If any section, subsection, sentence, clause, or phrase of this Ordinance is for any reason held to be invalid or unconstitutional by a decision of any court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Ordinance. The City Council hereby declares that it would have passed this Ordinance and each and every section, subsection, sentence, clause, or phrase not declared invalid or unconstitutional without regard to whether any portion of the ordinance would be subsequently declared invalid or unconstitutional.

SECTION 4.  The Mayor shall sign and the City Clerk shall attest to the passage of this Ordinance.  The City Clerk shall cause the same to be published once in the official newspaper within 15 days after its adoption.   This Ordinance shall become effective 30 days from its adoption.

APPROVED AS TO FORM:


_____

MARSHA JONES MOUTRIE
City Attorney

# EXHIBIT 8

**City Council Meeting: February 28, 2012**

**Agenda Item: 7-F**

To:          Mayor and City Council

From:        Marsha Jones Moutrie, City Attorney

Subject:      Ordinance Amending Santa Monica Municipal Code Section 4.55.060 Relating to
             Erection of Structures and Winter Displays in Palisades Park

-

-

## Recommended Action

Staff recommends that Council introduce for first reading the attached ordinance deleting the
Santa Monica Municipal Code (Code) language that allows unattended winter displays in
Palisades Park.

## Executive Summary

Winter displays have been erected in Palisades Park, along Ocean Avenue, for decades.
Generally speaking, the Code prohibits erecting unattended displays in City parks; but, an
exception was created for winter displays in Palisades Park. Because the park is a classic public
forum and displays are expressive, the City cannot allow or reject any particular display based on
the identity of the speaker or its content. If the City wishes to permit private unattended displays in
its parks, it must do so pursuant to valid time, place, and manner regulations. Last year, for the
first time, there were more requests for spaces than available spaces. Thus, to ensure viewpoint
neutrality, the City ran a lottery last year to allocate winter display space. Many residents and
others complained about the resulting allocation, which did not afford space for the same number
of nativity scenes as had been displayed in the past. Other residents suggested eliminating
displays altogether so that they could better enjoy the scenic view of the park and ocean. Because
the law does not permit awarding park space based on display content, staff recommends
eliminating the exception that allows for winter displays in the park and encouraging community
members to utilize private and institutional property for displays, including religious displays.

## Background

For decades, nativity scenes have been displayed in Palisades Park during the winter holidays. In
2003 the City Council adopted a law amending the code provisions prohibiting unattended
displays in City parks by creating an exception for winter displays in Palisades Park. S.M.M.C.
Section 4.55.060. In recent years, the nativity scenes were installed pursuant to the exception as
was a Menorah, winter solstice displays, and displays by atheists.


Last year, for the first time, requests for display space exceeded the space available. To address
this situation, the City established a content-neutral system for allocating display space, which
utilized random drawing. As a result of the random drawing, most of the spaces went to applicants
who installed displays that did not celebrate the Christmas story. Several displays advocated
atheism. The City received a large number of complaints, ranging from complaints about having
any displays at all to complaints that only religious displays should be allowed.

Case 2:12-cv-08657-ABC-E   Document 1   Filed 10/09/12   Page 69 of 169   Page ID #:208

7/13/12          Ordinance Amending Santa Monica Municipal Code Section 4.55.060 Relating to Erection of Structures ...

## Discussion

The displays in Palisades Park are expressive and are covered by First Amendment protections that prohibit the City from regulating based on content.  Therefore, the City cannot pick and choose which displays to allow based on the displays, messages,  content or identity of the speaker.  Nor can the City favor one religious message over another religious (or anti-religious) message.  Nor can the City favor a particular religious display because that display has become "a tradition" or because the organizers are based in Santa Monica.   Thus, the First Amendment case law affords only two viable options.  The City can continue to allow unattended winter displays in Palisades Park with space allocated by lottery or some other content neutral system.  Or, the City can eliminate the code exception that allows for winter displays in Palisades Park, thereby prohibiting all displays, and can encourage community members to consider using non-City property for religious and other displays.

Staff recommends the second alternative for three reasons.  First, many residents who complained about winter displays this year urged that they would rather preserve the aesthetic qualities of this designated landmark and look at the ocean vista than continue the displays.  Second, operating the lottery system is both time consuming and costly for the City and likely to become increasingly so because applicants have indicated they will "flood" the lottery process.  Third, persons who favor particular displays have the option of installing them on private property.

Alternatives

The City could continue to operate a lottery to allocate winter display space.  That alternative is not recommended for the reasons stated above.  Staff also recommends against attempting to select park displays based on religious or other content or based on "tradition" because doing so is legally indefensible.

## Financial Impacts & Budget Actions

Adoption of the ordinance would have no adverse financial impacts and would conserve City resources.

Ordinance

**Prepared by:**  Marsha Jones Moutrie, City Attorney

**Approved:** _____        **Forwarded to Council:** _____

Case 2:12-cv-08657-ABC-E   Document 1   Filed 10/09/12   Page 70 of 169   Page ID #:209

7/13/12          Ordinance Amending Santa Monica Municipal Code Section 4.55.060 Relating to Erection of Structures ...

Marsha Jones Moutrie                    Rod Gould
City Attorney                          City Manager


Attachments: A. Proposed Ordinance

# EXHIBIT 9



# LIBERTY COUNSEL

Post Office Box 540774
Orlando, FL 32854-0774
Telephone: 800•671•1776
Facsimile: 407•875•0770
www.LC.org

1015 Fifteenth St. NW, Suite 1100
Washington, DC 20005
Telephone: 202•289•1776
Facsimile: 202•289•7474

Reply to: Virginia

Post Office Box 11108
Lynchburg, VA 24506-1108
Telephone: 434•592•7000
Facsimile: 434•592•7700
liberty@LC.org

May 2, 2012

<u>**Via U.S. Mail and Facsimile**</u>
City of Santa Monica
City Council

    RE: Holiday Display Policy

Dear Mayor Bloom and Members of the Council:

    Liberty Counsel writes on behalf of the Santa Monica Nativity Scenes Committee, a private non-profit organization made up of local churches and religious assemblies, regarding the legality of holiday displays containing Nativity Scenes on City property, and options for the continuation of the private holiday display tradition in Santa Monica.

    By way of brief introduction, Liberty Counsel is a non-profit litigation, education and policy organization with offices in Florida, Virginia, Texas, Washington, DC, and Jerusalem, Israel, and with hundreds of affiliate attorneys located throughout the country. Liberty Counsel specializes in constitutional litigation, particularly free speech, religious freedom and church-state matters. We have had particular success in vindicating those rights in federal court.

    I understand that since 1953, approximately a dozen+ nativity scene displays have been erected annually along the road frontage of Palisades Park, and that since 1983, the displays have been sponsored by the Santa Monica Nativity Scenes Committee, a private local nonprofit organization. The nativity scenes have become a tradition that the vast majority of the community has looked forward to with great anticipation. Furthermore, as private speech, this tradition has enjoyed the highest constitutional protection, despite the protests of militant atheists in recent years.

    Over the years since the inception of the nativity scene tradition, the City had no formal policy in place, other than requiring parties interested in erecting displays to fill out a form and obtain a park-use permit, until 2003. The City's pre-2003 policy of permitting the Committee to request a permit to erect displays appears to be nearly

identical to a policy found constitutional in *Kriesner v. City of San Diego*, 788 F.Supp. 445 at 453 (S. D. California, 1991) (citing U.S. Supreme Court decision *Board of Trustees of Scarsdale v. McCreary*, 471 U.S. 83 (1985)).

> Each year a private committee petitioned the city for permission to display a creche in a public park located in the downtown business section. The committee erected and stored the display with its own funds, though it did use city lights. In 1983, the city denied the permit for fear that the display violated the Establishment Clause. The Second Circuit relied on *Widmar* and *Lynch* to reconcile the principles of free speech in public forum and the Establishment Clause. There was a secular purpose in pursuing an open-forum policy that allowed equal access for religious and non-religious speech. *Id.* at 725. There was no entanglement problem in administering the equal access policy. Citing *Lynch*, the Second Circuit found that the city's neutral accommodation to permit the display, even if it had indirect or incidental effect, did not violate the primary effect prong of the *Lemon* test.

Despite the constitutionality of its then practice, in 2003, the City adopted a new policy that prohibited unattended displays in Palisades Park, except for "unattended displays in Palisades Park adjacent to Ocean Avenue during the month of December" or in shorthand, "unattended December displays". The Committee continued its tradition of applying for, and receiving, a permit to erect nativity scenes under this new policy. This continued reasonably well through 2010. In 2010, the City made substantial changes to the rules for assigning unattended December display space, which took effect in 2011. The new rules included, for the first time, a provision for a lottery if applications exceeded the supply of spaces. An atheist residing outside Santa Monica recruited 10 other applicants, each of whom applied for the maximum number of spaces, which triggered the lottery provision. The lottery, while sound in theory, had at least a few flaws when put into practice – *e.g.,* any applicant could apply for up to nine spaces (out of the total 21 spaces). In 2011, two of the 11 members of the atheist group "won" 18 of the 21 spots, or 1¾ blocks of the two blocks available. These individuals "decorated" only nine of their 18 spaces, using mainly signs and banners, leaving the remaining nine spaces (one full block) empty, and thereby preventing others, including the Nativity Scenes Committee, from putting up any of their own decorations in the empty spaces. Notably, leaving the spaces empty violated the display rules in effect at that time. The spaces "decorated" by the atheists had virtually no holiday decorations, but consisted mainly of banners and signs including statements such as a spurious quote attributed to Thomas Jefferson that "Religions are all alike — founded upon fables and mythologies".

One local atheist alleged that "for 60 years, it's almost exclusively been the point of view of Christians putting up Nativity scenes for a whole city block." This individual ignored the fact that during this entire time, the annual Nativity Scene displays had occurred as private speech within the context of a limited public forum, available to all. He further ignored the fact that in Palisades Park, a Solstice Monument ("Gestation") has been on display since 1990. This monument is situated so that the sun appears exactly centered at the Winter Solstice. While the monument itself is arguably artwork, the Winter Solstice is celebrated at this location by numerous atheists and other non-monotheists in Palisades Park annually. Given 22 years since 1990 (equaling 264 months of permanent display for the Solstice Monument), and 59 years since 1953 for Nativity Scenes (but only displayed three weeks of the year) equaling a rounded up 59 months of temporary display, it is clear that atheists celebrating the Winter Solstice have

been given almost 4 ½ times more display time "accommodation" than those celebrating Christmas and Hanukkah within Santa Monica, despite the fact that the Winter Solstice roughly coincides with these Judeo-Christian holidays.

In light of opposition from merely a handful of opponents such as the atheist mentioned above, it is my understanding that the City has considered doing away with the "unattended December display" forum altogether. Such a course is an unnecessary action. Simple enforcement of previous years' regulation requiring the space to be decorated would have avoided the childish spectacle created by a few individuals intentionally depriving others of space, in direct violation of the display policy. Be that as it may, the City has at least three options that could prevent the perceived problems seen in past years, as well as withstand Constitutional scrutiny.

First, the City could always return to the status quo ante of having no written policy, and receive applications to decorate portions of Palisades Park for certain December holidays, such as Christmas and Hanukkah. The City could put forth simple, neutral criteria, limiting the forum to "holiday decorations" only, with no denigration of other belief systems. The City could approve space on a case by case basis, provided that it acted in a viewpoint neutral manner, allotting such space only upon actual application of private groups (such as the Santa Monica Nativity Scenes Committee, or others), and after review of the proposed submission for compliance with secular criteria such as aesthetics and the enhancement of the City's interest in holiday beautification of the Park. Such a largely deregulated approach would have the benefit of compliance with Supreme Court precedent as set forth in *Kriesner v. City of San Diego*, 788 F.Supp. 445 (S. D. California, 1991), would avoid a complex administrative process, and would mean that only those who particularly care about holiday decorations in the park would apply. So long as approval in practice was not limited to one particular represented holiday's décor proposal (complying with aesthetic criteria above), this would be a proper approach. Space granted need not be equal to the exact square foot, so long as a diversity of holidays were represented, based upon community interest. Liberty Counsel would defend a Constitutional application and practice of this policy.

Second, and stepping back from the current controversy for a moment, it is perfectly permissible for the City itself to sponsor a Winter Holiday display, including one or numerous crèches or Nativity Scenes, among other secular holiday decor. In doing so, the City need not provide a forum for all comers, but may permissibly engage in "government speech" in accordance with the Constitution. The United States Supreme Court has passed on the constitutionality of a publicly-sponsored Christmas holiday display in *Lynch v Donnelly*, 465 U.S. 668 (1984), and found that a publicly-sponsored religious symbol erected and maintained by city officials as part of a Christmas holiday display, together with secular symbols, is fully constitutional and in no way violates the Establishment Clause. The religious element of the display in *Lynch* was a government-erected crèche, otherwise known as a Nativity Scene.  The crèche was part of a larger Christmas holiday display, in which there were a variety of secular symbols, including a Santa Claus, reindeer pulling Santa's sleigh, candy-stripped poles, a Christmas tree, carolers, lights and a banner reading "Seasons Greetings".  The Court held that, viewed in the proper context of the Christmas holiday season, inclusion of a crèche in the display merely depicts the significant historical religious event long-celebrated in the

Western world and the historic origins of an event long-recognized as a national holiday. Any benefit to religion is indirect, and incidental, no more an advancement or an endorsement of religion than the Congressional and Executive recognition of the origins of the holiday itself or its annual commemoration as a legal holiday by governments at every level.

> It would be ironic, however, if the inclusion of a single symbol of a particular historic religious event, as part of the celebration acknowledged in the Western world for 20 centuries and in this country by the people, by the Executive Branch, by the Congress, in the Courts for two centuries, would so "taint" the City's exhibit as to render it violative of the Establishment Clause.  To forbid the use of this one passive symbol on – the crèche – at the very time people are taking note of the season with Christmas hymns and carols in public schools and other public places, and while the Congress and Legislatures open sessions with prayer by paid chaplains, would be a stilted over-reaction contrary to our history and to our holdings.  If the presence of the crèche in this display violates the Establishment Clause, a host of other forms of taking official note of Christmas and our religious heritage are equally offensive to the Constitution.

*Lynch*, 465 U.S. at 686.  In short, a government's commemoration of public holidays which have cultural significance, even if they also have religious aspects, is a legitimate secular purpose.  Thus, if the Santa Monica Nativity Scenes Committee wished to take responsibility for an annual donation to the City government that the City could incorporate into its public display, such a display would be government speech, not private speech. Such an approach would not only be Constitutional, it would also preserve City resources, by having private parties erect, dismantle and store a substantial portion of the City's holiday decorations. The Supreme Court has confirmed that governments may constitutionally engage in the speech of commemorating the Christmas holiday with a crèche (or numerous crèches), so long as they are a part of a larger display with secular elements. The City need only dedicate an equal amount of display space to such secular elements as are described above. The U.S. District Court for the Southern District of California even found that eight crèches in the park in San Diego, similar to those in Santa Monica, were "offse[t by] secular elements in the park, such as the large Christmas tree and the lights along the bridge and El Prado." *Kriesner v. City of San Diego*, 788 F.Supp. 445 at 454 (S. D. California, 1991). In finding the numerous San Diego park crèches constitutional, the court in *Kriesner* distinguished the displays in San Diego from the case of *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573 (1989), where a crèche with a "Glory to God in the Highest" banner located in the main staircase of the courthouse without other secular symbols violated the Establishment Clause, because the primary effect of the crèche in *Allegheny* was to advance religion, given the setting. *Id.* at 598. Such displays as set forth in *Lynch* and *Kriesner* do not violate the Establishment Clause, nor would their presence require the government to open its lawn up for alternative expressions by members of the general public, because the government has not opened up a public forum, limited public forum or designated public forum.  A government's acceptance of one or more donations does not compel it to accept any others or open up a forum for non-government speech.

Mayor Bloom and Council Members
May 2, 2012
Page 5

The third option available to the City (beside the options of deregulation or of pure government speech) is for the City to continue to make space available in Palisades Park for unattended December displays, but to modify the current policy in an even-handed manner that avoids the problems inherent in the current policy and practice.

In the context of a limited open forum, a city is not in violation of the Establishment Clause by opening a forum on an equal basis to a variety of groups. *Kriesner v. City of San Diego*, 788 F.Supp. 445 at 450 (S. D. California, 1991).

> The City has not violated the Establishment Clause by providing equal access to an open forum for a variety of groups, including religious organizations. The secular purpose behind the City's policy is to promote a diversity of ideas and cultures in an area easily accessible to the public. The primary effect of the City's policy neither advances nor endorses a particular religion. By allowing access to the forum on a first come, first served basis, the City merely provides an opportunity for individuals or organizations to engage in activities protected by the first amendment. The City also is not excessively entangled with the Christmas Committee. Other than promulgating a neutral and simplistic policy to allow for wide and easy access to the forum, the City's involvement with the Christmas Committee's display is nonexistent. Therefore, the City has not violated the establishment clause by allowing religious groups equal access to the Park.

Given the requirements set forth above, the City may open a more narrowly limited open forum that still "promotes a diversity of ideas and cultures", without creating a forum so broad as to be divisive, or open for any purpose whatsoever relating to an "unattended December display." The government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984); *see Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 648 (1981) (quoting *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771 (1976)). Since available space for unattended displays in a city park is finite and subject to reasonable time place and manner restrictions to promote the purpose of the forum, , the City can provide an opportunity for citizens to engage in activities protected by the First Amendment in the City's limited public forum.

The current policy governing unattended winter displays reads in applicable part:

Section 4.55.060. Erection of structures.

No person shall, in any park, erect, maintain, use or occupy any tent, lodge, shelter, structure or unattended installation or display. The following are exempt from this prohibition:

Mayor Bloom and Council Members
May 2, 2012
Page 6

    (a) City structures and installations;

    (b) Unattended installations or unattended displays in Palisades Park adjacent to Ocean Avenue during the month of December in an area designated by City Council resolution; and

    (c) Other displays or installations authorized by a Community Event Permit issued by the City.

    If displays or installations pursuant to subsection (b) exceed the available, designated space, the City shall allocate the designated space on a first-come, first-served basis, irrespective of the content of the display or installation and irrespective of the identity of the person or persons responsible for the display or installation.

    Persons displaying or installing pursuant to exemptions (b) and (c) above must comply with applicable safety standards, cover any attendant costs to the City and agree to hold the City harmless as to injury or loss resulting from the installation or display. The City Manager may adopt administrative guidelines for allocating the space available for displays and installations.

The City should strike current Section 4.55.060(b), and replace it with the following:

    (b) Unattended Holiday Decoration Forum. There is hereby created a Holiday Decoration Forum for private holiday decorations, subject to the following standards.
    1)    A limited public forum is hereby created for the purpose of holiday decorations only.
    2)    All decorations must be related to a December holiday.
    3)    Applications for decoration space must be hand delivered to the City in hard copy by the individual applicant. No applications on behalf of other parties will be accepted. Applicant must show photo ID. One space per applicant may be requested, on a first-come, first-serve basis, during a period of 14 business days beginning July 1. Upon conclusion of this period, applicants will be notified that they have obtained a space, or a lottery will be held if applications exceed available spaces.
    4)    If applications exceed the number of available spaces, a lottery shall be held in which applications shall be assigned a random number, for a drawing to be held on or before July 31.
    5)    All successful applicants who desire to locate their allotted spaces adjacent to one another shall be afforded contiguous spaces. Successful applicants to whom no other applicant expresses a desire for adjacent location will be allotted a single space, in order of the applicant's selection.
    6)    The unsuccessful applications shall be maintained in order of submission as alternates through the end of the display period, in the event a previously successful applicant is unable to fulfill the decoration requirements of this section.

Mayor Bloom and Council Members
May 2, 2012
Page 7

    7)     Upon notification that decoration space is available, the individual obtaining such space shall sign a statement committing to decorate at least 50% of the available decoration ground-space area within four (4) business days of the opening of the forum in late November.

    8)     Decoration of the space in accordance with these standards must be completed within four (4) business days. Failure to decorate will result in a forfeiture of that space, and the next person on the waiting list will be notified of its availability.

    9)     Signs and banners are permitted as part of the overall decoration, but will not count toward the percentage of decoration coverage. Signs or banners may only consist of a description of the decoration and its historical significance, the identity of decoration donors, or may state holiday greetings, such as "Merry Christmas, Feliz Navidad, Happy Hannukah, Happy Eid al Fitr, Season's Greetings, Happy Winter Solstice, Reason's Greetings, and like holiday greetings. No sign or banner may denigrate other holiday traditions or religious beliefs.

Liberty Counsel urges the City of Santa Monica to act to provide options for the continuation of the Nativity Scenes tradition in Palisades Park. Whether through deregulation, government speech, or provision for a narrower holiday decoration forum, this historic holiday decoration tradition in Santa Monica should be permitted to continue.

In light of this, should the City of Santa Monica accept the dedication of a nativity display or displays and include them in its own annual Christmas display, or if the City should adopt the modifications to its policy as set forth above, and should the City be called upon to defend these actions in court, Liberty Counsel stands ready to defend the City at no cost to the citizens of the City of Santa Monica.  We will provide pro bono representation and cover all the legal costs incurred by Liberty Counsel in providing such representation.

I look forward to speaking with you.

                          Sincerely,

                          LIBERTY COUNSEL

                          Richard L. Mast, Jr.[†]

CC

_____

[†] Licensed in Virginia

Mayor Bloom and Council Members
May 2, 2012
Page 8

Marsha Moutrie, City Attorney, City of Santa Monica
Hunter Jameson, Chairman, Santa Monica Nativity Scenes Committee

# LIBERTY COUNSEL

Post Office Box 540774
Orlando, FL 32854-0774
Telephone: 800•671•1776
Facsimile: 407•875•0770
www.LC.org

1015 Fifteenth St. NW, Suite 1100
Washington, DC 20005
Telephone: 202•289•1776
Facsimile: 202•289•7474

Post Office Box 11108
Lynchburg, VA 24506-1108
Telephone: 434•592•7000
Facsimile: 434•592•7700
liberty@LC.org

Reply to: Virginia

May 15, 2012

**Via Electronic Mail**
Marsha Moutrie, City Attorney
City of Santa Monica
1685 Main Street,
Santa Monica, CA
90401

RE: Holiday Display Policy

Dear Ms. Moutrie,

Thank you for your follow-up questions to points raised by my letter of May 6, 2012. Regarding whether other cities (Ninth Circuit or otherwise) have adopted a holiday decoration display policy: there are none to my knowledge.

You asked whether the Ninth Circuit decision in *Kreisner* factored into the analysis insofar as it rested on the assumption that San Diego allowed private displays on a first-come, first-served basis regardless of the identity of the speaker or the content of the speech. As you know, the Ninth Circuit framed the question as whether a city could permit a private group to erect a religious display in a public park during the Christmas season, and held that because the park is a traditional public forum removed from the seat of government, "the City may permit the display provided it does so in a non-discriminatory manner." *Kreisner v. City of San Diego*, 1 F.3d 775 (9th Cir. 1993), at 777. After describing a situation in San Diego remarkably similar to that of Santa Monica's at present, the Ninth Circuit described the procedural posture of the case as having been argued before a three-judge panel, and as having been remanded for factual findings to the district court (which found that the City granted permits on a first-come, first-served basis, and that permitting the display on public property did not violate the Establishment Clause of the United States Constitution). The Ninth Circuit affirmed this practice and finding.

In reaching its decision, the Ninth Circuit stated that "the City may not enforce a content-based restriction on private speech there without a compelling interest, and that any such restriction must be narrowly tailored to achieve that interest." *Kreisner* at 783 (citing *Perry Educ. Ass'n,* 460 U.S. at 45). The court further held that

City Attorney
May 15, 2012
Page 2

> if Balboa Park were a designated public forum, the fact that the City permitted certain types of expressive activity there would not require it to permit other forms of speech, such as large unattended displays. Traditional public forums, such as parks and public streets, however, are open to all manner of speech, subject only to reasonable time, place, and manner restrictions. No affirmative government action is required to open a traditional public forum to a specific type of expressive activity. *Id.*at 785.

This 1993 finding of the park being "unquestionably a public forum" is tempered by the 1996 distinctions drawn between a public forum in general and a forum for the erection of large, unattended structures, discussed *infra* in *American Jewish Congress.* In any event, the court ultimately held that the City had not violated the Establishment Clause by allowing the Christmas Committee to erect a religious display in the Organ Pavilion, and that the City remained free to impose reasonable time, place, and manner restrictions on speech in the Park, including religious speech, provided those regulations are content-neutral. The Court stated that it would not force the City to impose such restrictions based on the content of the Committee's speech, and that the City must treat the Committee as it would any other speaker in Balboa Park. *Id.* at 790. Thus, I would still argue that a reduction of the forum from allowing a broad class of displays relating to any purpose, to one specifically for holiday decoration purposes, on a first-come, first-serve basis, regardless of the identity of the speaker or content of the display, *so long as it related to the purpose of the forum* is entirely permissible. Content of speech is not the issue; decoration for a specific holiday – any December holiday – is. To the extent that the City is concerned, however, it would strengthen the City's position if the City were to designate one end of Palisades Park a "December Display Forum" where anything goes, and the other a "Holiday Decoration Forum", where décor relevance to a holiday is paramount.

You also asked our opinion regarding *American Jewish Cong. v. City of Beverly Hills,* 90 F.3d 379 (9th Cir.1996) insofar as it indicates that the city could not allow religious displays without also allowing displays protesting the religious displays. In *American Jewish Congress*, the Ninth Circuit considered a claim under the Establishment Clause of the First Amendment where the defendant city generally proscribed erection of unattended displays on public property, with a single exception that permitted the presence of a 27-foot menorah during the Chanukah season. *Id.* at 380-81. When the city denied permits to two applicants, who were respectively seeking to create a "winter solstice" scene and plant a Latin cross on public property, the court concluded that the unique exception to allow the menorah violated the Establishment Clause because it demonstrated a preference for the Jewish religion, *see id.* at 383, and because the ordinance vested city officials with unbridled discretion. *Id.* at 384 ("The City may not have a general policy banning unattended private displays, but, on an ad hoc basis with no standards to guide it, choose one religious group and permit it to erect a display while denying all other groups permission to erect displays."). In *American Jewish Congress,* the Ninth Circuit held that the "ad hoc and structureless nature of the

City Attorney
May 15, 2012
Page 3

City's permitting process leaves open the possibility of improper discrimination by the City." *Id.* at 385.

I would first emphasize that a "largely deregulated approach" as mentioned in my previous letter does not mean "unregulated" – it means only that such an approach would have a minimum of necessary guidelines, including basic requirements such as an application form, time frame for acceptance and rejection, time period for the display itself, a designated decision-maker to render a decision, etc.. In short, the largely "deregulated" approach cannot be "unregulated" – it cannot be ad hoc and structureless under the standard of *American Jewish Congress*. However, where the decision-maker has *guided* discretion, as was the case in *Rosenbaum v. City of San Francisco*, 484 F.3d 1142 (9th Cir. 2007) a sound ordinance case in which the police commissioner had guided discretion to issue permits for amplified sound for a variety of purposes, including public affairs interests, such an ordinance will be upheld. Where the protected activity – speech – is subject to reasonable time, location and purpose restrictions pursuant to the permitting process, such discretion is not unbridled discretion. *Id.* at 1160.

Next, I would respectfully assert that there are a number of dissimilarities that would make *American Jewish Congress* (hereinafter "*AJC*") largely inapposite to the facts at hand in Santa Monica. First, in *AJC,* there was the issue of a "permanent, concrete foundation" for the 27' tall, 5500 lb menorah, that was poured and permanently installed by Chabad. When the menorah was annually erected atop the permanent concrete pad, there were ceremonies centered around it that involved the ritual lighting of the electric candles and the speaking and singing of traditional Jewish prayers. Members of the City Council (which was also the body that approved the menorah's permit) participated in these ceremonies each year, and some of them served as "master of ceremonies." In *AJC,* the City had not (since 1986, until the filing of the lawsuit) granted a permit for a large unattended object to any individual or organization other than Chabad. The City had even explicitly *denied* permit requests for a cross and a winter solstice display.

In contrast, the City of Santa Monica has never allowed (nor has anyone suggested the idea for) the Nativity Scenes Committee to erect or emplace a permanent structure like the concrete pad in *AJC*, and there has never been the kind of officially-enforced sole access granted to a single religious organization as was present in *AJC*. The Committee is an organization made up of representatives from a variety of denominations, at least two faiths (Christianity and Judaism), and a secular organization, the Police Officers' Association. It cannot be seriously argued that the Committee is a religious organization similar to Chabad. Further, the Nativity Scenes have never been the sole display allowed in the park – they have always been accompanied by at least one Menorah, and in recent years, solstice and other displays. Santa Monica's facts lack the officially-endorsed religious ceremonial undertones the Court found problematic in *AJC*, and finally, the City has never expressly *denied* other requests for permits in the past. In short, there are none of the indicia of unconstitutional

City Attorney
May 15, 2012
Page 4

favoritism toward a particular religion that were present in *AJC* in relation to the nativity scenes.[1]

As the court noted in *AJC*, where the City's general policy was not to allow private structures to be placed within the City's parks at all, the City constitutionally could ban all unattended private displays, but if it allowed some unattended private displays, it could not grant an exception to one group. If the City wishes to permit some private unattended displays in its parks, it must do so pursuant to valid time, place, and manner regulations. *See Association of Community Organizations for Reform Now v. Municipality of Golden*, 744 F.2d 739, 746-49 (10th Cir.1984). The City may not have a general policy banning unattended private displays, but, on an ad hoc basis with no standards to guide it, choose one religious group and permit it to erect a display while denying all other groups permission to erect displays. *AJC* at 383. I would agree with you that under a broad display policy, the City of Santa Monica would be enjoined by *AJC* from not permitting protest displays. However, the court in *AJC* stated that "although Beverly Gardens Park is a 'public forum' in that it is a public park where private individuals have broad free speech rights, it is not an open forum for large, unattended private structures. The City acknowledges that 'the City's general policy is to only allow structures to be placed in the City's parks by the City.'" *AJC* at 384. Thus, although a limitation of protest speech would be improper under a broad forum policy allowing all types of "December displays", it would not be improper for the City of Santa Monica to limit the forum going forward to prevent large, unattended private structures that have nothing to do with a particular holiday. Space for holiday decoration is a finite resource, and the City can properly limit the use of the forum to decorations by private entities that are tied to a specific holiday, and which do not denigrate other holidays.

Even if the City remains unconvinced that a holiday decoration forum prohibiting denigration of other holidays would pass judicial scrutiny, that one aspect need not and would not defeat the constitutionality of the rest of the proposed ordinance as a whole, which would provide constitutionally-sound safeguards that would apply evenhandedly to all groups, regardless of identity or content of speech.

---

[1] However, I would posit that the solstice structure in Palisades Park, *Gestation*, is quite similar to the type of permanent structure prohibited under the facts of *AJC*, as it *is* a permanent emplacement of an unattended structure around which individuals conduct annual religious ceremonies on a religious holiday - the Solstice. Sun worship on the solstice has traditionally been and is a world-wide religious practice, and is specifically mentioned by the artist, who wants to "foster an understanding of the basis of all life on the planet: the cycle of the Sun." This interpretation is further strengthened by other statements of the artist relating to ongoing religious worship facilitated by the structure, a "nurturing sanctuary" with its central opening designed to frame the Sun perfectly only upon the Solstice, which "frames the *elements of water, sunlight, earth, and air*-the dynamic relationships that foster *creation, regeneration, and birth*. The form of the sculpture grows from this circular central opening into a structure that *allows visitors to enter the form and rest within its quiet embrace*." Emphasis added. All of these aspects pertain to specifically religious elements of animism and neo-paganism.
http://greenmuseum.org/content/work_index/img_id-105__prev_size-0__artist_id-13__work_id-20.html

City Attorney
May 15, 2012
Page 5

(b) Unattended Holiday Decoration Forum. There is hereby created an annual Holiday Decoration Forum from November 27 to January 4 for private holiday decorations, subject to the following standards.

1)    A limited public forum is hereby created for the purpose of holiday decorations only.

2)    All decorations must be related to a December holiday.

3)    Applications for decoration space must be hand delivered to the City in hard copy by the individual applicant. No applications on behalf of other parties will be accepted. Applicant must show photo ID. One space per applicant may be requested, on a first-come, first-serve basis, during a period of 14 business days beginning July 1. Upon conclusion of this period, applicants will be notified that they have obtained a space, or a lottery will be held if applications exceed available spaces.

4)    If applications exceed the number of available spaces, a lottery shall be held in which applications shall be assigned a random number, for a drawing to be held on or before July 31.

5)    All successful applicants who desire to locate their allotted spaces adjacent to one another shall first be afforded contiguous spaces, with each group of contiguous spaces being in a separate block if possible. Successful applicants to whom no other applicant expresses a desire for adjacent location will, after the contiguous spaces are assigned, be allotted a single space, in order of the applicant's selection.

6)    The unsuccessful applications shall be maintained in order of submission as alternates through the end of the display period, in the event a previously successful applicant is unable to fulfill the decoration requirements of this section.

7)    Upon notification that decoration space is available, the individual obtaining such space shall sign a statement committing to provide decoration(s) no later than December 14 that will in total cover at least 50% of the usable linear frontage on the street side of the decoration area and also will cover at least 15% of the usable ground-space decoration area.

8)    Decoration of the space in accordance with these standards must be completed no later than December 14. Failure to decorate will result in a forfeiture of that space, and the next person on the waiting list will be notified of its availability.

9)    Signs and banners are permitted as part of the overall decoration, but will not count toward the required 15% coverage of the usable ground-space decoration area.

City Attorney
May 15, 2012
Page 6

I hope this adequately addresses your concerns; should you have other questions, please don't hesitate to contact me.

Sincerely,

LIBERTY COUNSEL


Richard L. Mast, Jr.[†]

---

CC
Hunter Jameson, Chairman, Santa Monica Nativity Scenes Committee

---

[†] Licensed in Virginia

# EXHIBIT 10



**THE**
# BECKER
**LAW FIRM**

11500 Olympic Blvd., Suite 400, Los Angeles, CA 90064
Tel: (310) 636-1018  Fax: (310) 765-6328
Email: bbeckerlaw@gmail.com
Licensed in California and Colorado

June 6, 2012

**VIA E-MAIL AND CERTIFIED  U.S. MAIL**

The Honorable Richard Bloom
Santa Monica City Council
City of Santa Monica
City Hall
1685 Main Street, Room 209
Santa Monica, California 90401

Re:   **Ordinance Amending Santa Monica Municipal Code Section 4.55.060 Relat-**
      **ing to Erection of Structures and Winter Displays in Palisades Park**

Dear Mayor Bloom and Council Members:

The undersigned firms were recently retained by the Santa Monica Nativity Scenes
Committee ("Committee"), an organization that has worked faithfully with the City to
overcome opposition to the moss-gathered tradition of displaying Nativity scenes in a
municipal park during the Christmas holiday season. The City appears poised to take a
sledgehammer to the problem, vanquishing not just a cherished time-honored civic tradi-
tion but fundamental rights. We do not feel the City has fully considered its options, and
wish to forestall the Council's prematurely adopting an ordinance that will likely not pass
constitutional muster but instead result in unnecessary legal action.

Although Establishment Clause jurisprudence may appear to send mixed messages, when
applied against the facts before this body, the municipal practice of allowing private
speakers to convey the Christmas message through the motif of Nativity displays is con-
stitutionally supported and authorizes the City to perpetuate it. The proposed ordinance
imposing a complete ban on unattended displays promotes a government policy that dis-
favors religion and abridges fundamental constitutional rights.

By way of introduction, The Becker Law Firm specializes in political, intellectual and
religious viewpoint discrimination cases, and is currently plaintiff lead counsel in *Dar-
iano v. Morgan Hill Unified School District* (on appeal before the 9th Cir., 11-17858)
(student First Amendment political expression) and *David Coppedge vs. Jet Propulsion
Laboratory* (awaiting judgment, L.A.S.C. BC435600) (employment religious discrimina-
tion). Past litigated cases have involved religious viewpoint discrimination (*American
Freedom Alliance vs. California Science Center*, L.A.S.C. BC423687); religious symbols
on government seals (*David Horowitz ... Pilgrim Lutheran Church, et al. vs. County of
Los Angeles*, L.A.S.C. BC322268); religious leafleting in traditional public fora (*Jews for
Jesus vs. City of Los Angeles*, U.S.D.C., CD-CA 06-cv-7445) (park) and *Arabic Christian
Perspective vs. City of Dearborn* (Michigan), U.S.D.C., ED-MI 09-cv-12321) (side-

**THE BECKER LAW FIRM**

The Honorable Richard Bloom
Santa Monica City Council

June 6, 2012
2 | P a g e

walks), religious defamation (*Islamic Society of Arlington, Texas vs. Joe Kaufman*, Tarrant County, Texas District Court 348-226855-07); and student political (pro-life) expression (*T.A. vs. McSwain Union Elementary School Dist.*, U.S.D.C., ED-CA 08-CV-01986).

Co-counsel Law Offices of John Fitzmorris is a Santa Monica-based business litigation practice. Both Mssrs. Becker and Fitzmorris have strong community ties.

## I.        LEGAL ANALYSIS

The Council's decision on the proposed ordinance depends upon its will to maintain a tradition approved by the vast majority of residents and enjoyed by them along with throngs of visitors from throughout Southern California and beyond. The Ninth Circuit in *Kreisner v. City of San Diego*, 1 F.3d 775, 805 (9th Cir. 1993) made clear that a Nativity display can survive an Establishment Clause challenge when the City's stated purpose in permitting the display is to promote freedom of expression. *Id.*, at 782 (permitting open access to a public forum, including non-discriminatory access for religious speech, is a valid secular purpose). As explained more fully below, *Kreisner* is controlling authority the City can rely upon to justify the continued maintenance of its current and long-standing policy.

The greater issue is whether the City <u>lacks</u> the will to protect the Nativity display tradition for specious reasons (e.g, avoidance of "controversy").

From our analysis, the following options may be facially unconstitutional:

- The proposed ordinance eliminating private, unattended "winter" displays in Palisades Park;

- The existing lottery system;

- Any regulation intended to eliminate the right of the Committee to present its annual Christian message via the idiosyncratic and traditional motif of the Nativity display; and

- Any regulation that authorizes, encourages or induces groups with viewpoints hostile to the Committee's religious and/or Christmas message to impose a "heckler's veto" on that message.

**THE BECKER LAW FIRM**

The Honorable Richard Bloom
Santa Monica City Council

June 6, 2012
3 | P a g e

### A.      Stipulated Facts

For purposes of our analysis, we adopt the following material facts taken from the 5/22/2012 Council Report as undisputed:

- Privately owned and installed Nativity scenes have been displayed in Palisades Park by local churches for decades.

- The Municipal Code prohibits private unattended displays in City of Santa Monica (City) parks, but an exception to that general prohibition allows for winter displays in Palisades Park along Ocean Avenue, where there have been displays for decades during the holiday season.  Such displays are classified as expression and are protected by the First Amendment, which prohibits the City from favoring or disfavoring protected expression based on its content.

- If adopted, the proposed ordinance, an amendment to Section 4.55.060 of the Municipal Code repealing the winter display exception, would effectively eliminate winter displays in the park, including religious displays, such as the Nativity scenes.

- The City's articulated reasons for amending the ordinance to eliminate the display of unattended open air Nativity scenes are to (1) resolve "the controversy," (2) eliminate legal risks, (3) conserve City staff time and resources "necessary to operate a constitutionally valid regulatory system," (4) conform usage of Palisades Park to a city-wide "standard" prohibiting unattended displays in parks, and (5) protect the views of the park and the ocean from Ocean Avenue.

### B.      Legal Principles

Our conclusions derive from the following assumptions:

- Palisades Park is a quintessential "traditional" public forum (not a "limited" or "designated" public forum, or as the City Attorney's May 22, 2012, Council Report erroneously identified it, a "classic" public forum). *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983);

- The City may not by its own *ipse dixit* eliminate all private expression and thereby destroy the "public forum" status of Palisades Park, which historically has been a public forum, nor may the City transform the character of the property by the expedient of including it within the statutory definition of what might be considered a non-public forum parcel of property. *See United States v. Grace*, 461 U.S. 171, 180 (1983); *see also Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 761 (1995) ("The right to use government property for one's private expres-

**THE BECKER LAW FIRM**

The Honorable Richard Bloom
Santa Monica City Council

June 6, 2012
4 | P a g e

> sion depends upon whether the property has by law or tradition been given the sta-
> tus of a public forum, or rather has been reserved for specific official uses.");

- Under a traditional public forum analysis, the City has limited power to restrict private speech; the City may regulate private speech in a traditional public forum based only upon reasonable time, place and manner ("TPM") considerations;

- Applying strict scrutiny, TPM restrictions require the City's regulation (1) be content neutral; (2) be narrowly tailored to serve a significant government interest; and (3) leave open ample alternative channels of communication. *Perry Educ. Ass'n, supra;*

- Private religious speech enjoys as much protection in a traditional public forum as secular speech. *See Capitol Square, supra*, at 360 ("Our precedent establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression. [Citations] Indeed, in Anglo–American history, at least, government suppression of speech has so commonly been directed precisely at religious speech that a free-speech clause without religion would be Hamlet without the prince.");

- The First Amendment does not permit a heckler's veto, and thus forbids silencing speech based on the reaction of a hostile audience. (*See Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff Dept.*, 533 F.3d 780, 787 (9th Cir. 2008);

- Any system of prior restraint comes before a court bearing a heavy presumption against its validity. *Kreisner* at 805.

   **C.      Palisades Park Is A Traditional Public Forum.**

In *Lynch v. Donnelly*, the Supreme Court noted that a "crèche . . . depicts the historical origins of this traditional event [Christmas] long recognized as a National Holiday" and "[t]o forbid the use of this one passive symbol – the crèche – at the very time people are taking note of the season with Christmas hymns and carols in public schools and other public places, and while the Congress and legislatures open sessions with prayers by paid chaplains, would be a stilted overreaction contrary to our history and to our holdings." *Lynch v. Donnelly*, 465 U.S. 668, 680, 686 (1984) (emphasis added).

Similarly here, the proposed ban on the display of private Nativity scenes is contrary to our Nation's history and the values protected by our Constitution.

To determine the extent of free speech rights in this matter, the Supreme Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those

**THE BECKER LAW FIRM**

The Honorable Richard Bloom
Santa Monica City Council

June 6, 2012
5 | P a g e

wishing to use the property for expressive purposes. *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 800 (1985). Forum analysis has traditionally divided government property into three categories: traditional public forums, designated public forums, and nonpublic forums. *Cornelius* at 800. Once the forum is identified, the court must then determine whether the speech restriction is justified by the requisite standard. *Id.*

On one end of the spectrum lies the traditional public forum. Traditional public fora, such as streets, sidewalks, and parks, are places that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515 (1939). Next on the spectrum is the designated public forum, which exists when the government intentionally opens its property for expressive activity. *Perry Educ. Ass'n v. Perry Local Educators*, 460 U.S. 37, 44 (1983). As the Supreme Court stated, "[A] public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius*, 473 U.S. at 802. And at the opposite end of the spectrum is the nonpublic forum. The nonpublic forum is "[p]ublic property which is not by tradition or designation a forum for public communication." *Perry Educ. Ass'n*, 460 U.S. at 46.

In *Perry Educ.* Ass'n, *supra*, the Supreme Court recognized that public parks are "from time out of mind" traditional public fora:

> In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed.   At one end of the spectrum are streets and parks which "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." In these quintessential public forums, the government may not prohibit all communicative activity. For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. [Citation.] The state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

*Id.*, at 954-955 (emphasis added; citations omitted).

THE BECKER LAW FIRM

The Honorable Richard Bloom
Santa Monica City Council

June 6, 2012
**6 | P a g e**

Thus, there can be no doubt that Palisades Park is properly characterized as a traditional public forum.

### D.   The Proposed Ordinance Is Not Content-Neutral.

The first step in a traditional public forum analysis is to determine whether by banning all unattended displays in Palisades Park the City would be enforcing a content-neutral policy. We submit it would not for the following reasons:

(1)   The purpose for banning the displays is to avoid the controversy associated with a 60-year tradition of providing a forum for religious speech; and

(2)   The distinctiveness of the Nativity display motif leaves it without competition.  It is, in essence, a passive, theatrical diorama meant to be experienced in three-dimension.  As such, there is no other traditional message that mandates this particular motif as a representational form. It is an idiosyncratic form of expression that cannot be conveyed by substitution via any other representational form. Thus, by eliminating all displays where other messages can be expressed via transmission of sound through oral communication, in writing, as permanent structures or artwork, the Nativity display motif is a unique form of religious expression commemorating a universally recognized tradition.  The proposed ordinance would, on its face, appear to be neutral.  But where no other message by law or tradition depends on this unique representational form to satisfy its purpose or to convey its message, the purpose and effect of a policy banning all displays cannot rationally be understood to be content-neutral but only as a reaction to religious expression.

The evidence supporting reason no. 1 is found in the City's articulated rationales for an outright ban: (1) avoidance of the controversy that ensued last year in response to the lottery policy's failure to provide a content-neutral solution to constitutional challenges; (2) eliminating legal risks; (3) conserving government resources necessary to constitutionally administer speech policies; (4) conforming to a generalized standard; and (5) protecting ocean views from the street.

Rationale nos. 1 & 2 are content-based rationales.  Rationale 3-5 are *post-hoc* contrivances attempting to disguise the content-based rationales.

Support for our second reason is found in case law. To determine whether a restriction is content-based, the courts look at whether it "restrict[s] expression because of its message, its ideas, its subject matter, or its content." *Consol. Edison Co. of N.Y. v. Public Serv. Comm. of N.Y.*, 447 U.S. 530, 537 (1980). "Deciding whether a particular regulation is

**THE BECKER LAW FIRM**

The Honorable Richard Bloom
Santa Monica City Council

June 6, 2012
7 | P a g e

content-based or content-neutral is not always a simple task." *Snatchko v. Westfield LLC*, 187 Cal. App. 4th 469, 48 (2010), review denied (Oct. 20, 2010), as modified on denial of reh'g (Sept. 3, 2010). "Literal or absolute content neutrality is not required." *Id.* "Rather, the principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.*, citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (emphasis added; punctuation omitted). "Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech." *Id.*, (emphasis added; punctuation and citation omitted).

> **E.   The Right To Display A Nativity Scene As Religious Speech Is Protected Against Negative Reaction Intended To Suppress It.**

It should be understood that "[T]here is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Bd. of Educ. v. Mergens*, 496 U.S. 226, 250 (1990) (O'Connor, J.). Supreme Court precedent "establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression." *Capitol Square, supra*, at 760; *see also Widmar v. Vincent*, 454 U.S. 263, 269 (1981) ("[R]eligious worship and discussion ... are forms of speech and association protected by the First Amendment."). And the Supreme Court has "long recognized that [the First Amendment's] protection does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Consequently, displaying religious symbols, such as a private Nativity scene, is protected speech under the First Amendment. *Capitol Square* at 760 (holding that the private display of a cross was protected speech); *Am. United for Separation of Church & State v. City of Grand Rapids*, 980 F.2d 1538, 1542 (6th Cir. 1992) (holding that the private display of a menorah was protected speech); *Congregation Lubavitch v. City of Cincinnati*, 997 F.2d 1160, 1166 (6th Cir. 1993) (same).

"The right to free speech is constitutionally protected from censorship by hostile reaction, sometimes referred to in case law as a 'heckler's veto.'" *San Diego Unified Port Dist. v. U.S. Citizens Patrol* (1998) 63 Cal.App.4th 964, 970-71.

> The First Amendment forbids the government to silence speech based on the reaction of a hostile audience, unless there is a "clear and present danger" of grave and imminent harm. Otherwise, a vocal minority (or even majority) could prevent the expression of disfavored viewpoints – a result contrary to the central purpose of the First Amendment's guarantee of free expression. These constitutional principles mandate that government may

**THE BECKER LAW FIRM**

The Honorable Richard Bloom
Santa Monica City Council

June 6, 2012
8 | P a g e

> not disadvantage a person on the basis of his status or his views solely for
> fear that others may be offended or angered by them.... The Constitution
> does not allow government to subordinate a class of persons simply be-
> cause others do not like them. Constitutional rights may not be denied
> simply because of hostility to their assertion or exercise.

*Id.*, quoting *Cox v. Louisiana* 379 U.S. 536, 551 (1965) (citations and internal punctua-
tion omitted).

The 9th Circuit has held:

> If [a statute] would allow or disallow speech depending on the reaction of
> the audience, then the ordinance would run afoul of an independent spe-
> cies of prohibitions on content-restrictive regulations, often described as a
> First Amendment-based ban on the "heckler's veto." It is firmly settled
> that under our Constitution the public expression of ideas may not be pro-
> hibited merely because the ideas are themselves offensive to some of their
> hearers, or simply because bystanders object to peaceful and orderly
> demonstrations. <u>Thus, as the Supreme Court has made clear, the govern-
> ment cannot silence messages simply because they cause discomfort, fear,
> or even anger. In our system, undifferentiated fear or apprehension of dis-
> turbance is not enough to overcome the right to freedom of expression.</u>
> Any departure from absolute regimentation may cause trouble. Any varia-
> tion from the majority's opinion may inspire fear. Any word spoken ...
> that deviates from the views of another person may start an argument or
> cause a disturbance. But our Constitution says we must take this risk.

*Center for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff Dept.*, 533 F.3d 780,
787-88 (9th Cir. 2008) (emphasis added; citations omitted and internal punctuation omit-
ted).

Citing the Supreme Court case of *Forsyth County v. Nationalist Movement*, 505 U.S. 123,
134 (1992), the 9th Circuit has emphasized that:

> <u>"Listeners' reaction to speech is not a content-neutral basis for regulation"</u>
> – in other words, the First Amendment does not permit a heckler's veto.
> Forsyth County struck down an ordinance as unconstitutionally content-
> based because the statute based parade fees on the estimated cost of main-
> taining public order during the event. Because the size of the fee "de-
> pend[ed] on the administrator's measure of the amount of hostility likely to

**THE BECKER LAW FIRM**

The Honorable Richard Bloom
Santa Monica City Council

June 6, 2012
9 | P a g e

> be created by the speech based on its content," the ordinance unconstitu-
> tionally burdened speech that was "unpopular with bottle throwers."

*Id.* at 788 (emphasis added).

The City's articulated rationale concerning avoidance of "the controversy" constitutes a
direct admission that it wishes to silence religious speech to avoid the heckler's veto.
This is a significant point we have not seen made part of the record or history of debate.

Although government should not inhibit robust debate on matters of public concern, nei-
ther is it permitted to interfere with an event's particular message. In *Hurley v. Irish-
American Gay, Lesbian and Bisexual Group of Boston* (1995) 515 U.S. 557, 579, the Su-
preme Court held that government runs afoul of the Constitution by requiring private citi-
zens who organize a parade (an expressive act on public streets, i.e., traditional public
fora) to include among the marchers a group imparting a message organizers did not wish
to convey:

> The very idea that a noncommercial speech restriction be used to produce
> thoughts and statements acceptable to some groups or, indeed, all people,
> grates on the First Amendment, for it amounts to nothing less than a pro-
> posal to limit speech in the service of orthodox expression. The Speech
> Clause has no more certain antithesis. While the law is free to promote all
> sorts of conduct in place of harmful behavior, it is not free to interfere
> with speech for no better reason than promoting an approved message or
> discouraging a disfavored one, however enlightened either purpose may
> strike the government.

*Id.* (Emphasis added; citations omitted.)

Similarly, here, the City seeks either to combine "multifarious voices" (*id.*, at 569) by re-
quiring a free-for-all display policy that would effectively drown out the message ex-
pressed by the Nativity displays or to eliminate one particular voice by eliminating all
private speakers from constitutionally protected activity (throwing the baby out with the
bath water). Government censorship designed to appease a vocal group hostile to another
group's constitutionally protected message is inherently content-based. The City could
easily grant other groups permits on days that are not intended to disrupt the Christmas
message of the Nativity scenes. And on this point, we wish to emphasize that the City
could adopt a policy of allowing other groups to present their messages at any other time
of year. The message of the Nativity displays is intended to be a positive one. It does not
seek to tear down the ideas of those opposed to the secular holiday of Christmas or the
religious views of Christians. The goal of some opponents is to abolish religious speech

**THE BECKER LAW FIRM**

The Honorable Richard Bloom
Santa Monica City Council

June 6, 2012
**10** | P a g e

altogether, a goal which we have heard some misguided lay constitutionalists erroneously argue to be in conformity with First Amendment jurisprudence. The goal of other opponents – e.g., those who feel their religious or non-religious views are not equally treated – is to seek parity of rights. The solution to their objections is well within the power of the City to establish without trammeling the rights of the Nativity scene advocates.

    F.    **The Proposed Ordinance Does Not Serve A Significant Or Compelling Government Interest.**

Having established that the proposed ordinance is not content-neutral and that religious speech is entitled to protection against a heckler's veto, the next step in analyzing the constitutionality of the ordinance is to determine whether it is narrowly tailored to serve a significant or compelling government interest.

Both the Ninth Circuit and the Supreme Court have emphasized that merely invoking a government interest is insufficient to avoid abridgement of a First Amendment right. "The government must also show that the proposed communicative activity endangers those interests." *Klein v. City of San Clemente*, 584 F.3d 1196, 1202 (9th Cir. 2009), and see cited authority.

The Eighth Circuit analyzed various precedents to ascertain the meaning of the term "compelling state interest," acknowledging it is not easily defined. *Republican Party of Minnesota v. White*, 416 F.3d 738, 749 (8th Cir. 2005).

> In general, strict scrutiny is best described as an end-and-means test that asks whether the state's purported interest is important enough to justify the restriction it has placed on the speech in question in pursuit of that interest.… If an interest is compelling enough to justify abridging core constitutional rights, a state will enact regulations that substantially protect that interest from similarly significant threats.… A law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon speech, when it leaves appreciable damage to that supposedly vital interest unprohibited.

*Id.*, (citations and internal punctuation modified or omitted).

In the context of religious speech, the Supreme Court has held that government "may abridge religious practices only upon a demonstration that some compelling state interest outweighs the defendants' interests in religious freedom." *People v. Woody*, 61 Cal.2d 716, 718 (1964). Citing *Sherbert v. Verner*, 374 U.S. 398, 403 (1963), the court identified a two-fold analysis requiring a determination of (1) whether the application of the

**THE BECKER LAW FIRM**

The Honorable Richard Bloom
Santa Monica City Council

June 6, 2012
11 | P a g e

statute imposes any burden upon the free exercise of the defendant's religion, and (2) if it does, whether some compelling state interest justifies the infringement. *Id.*, at 719-20.

As the Supreme Court stated in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546-47 (1993), "Where government restricts only conduct protected by the First Amendment and fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling." Similarly, the City's undifferentiated fear of an Establishment Clause violation does not provide a compelling reason to justify their content-based speech restriction. *See Capitol Square, supra*, at 753 (holding that the Establishment Clause did not provide a sufficient basis for restricting private religious expression in a public forum); *Widmar v. Vincent, supra* (holding the fear of an Establishment Clause violation did not justify the speech restriction); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993) (same); *see also Am. United for Separation of Church & State, supra*, at 1538.

**<u>Avoidance of Controversy</u>**.  Consider the City's primary objective of avoiding controversy – "primary" because it features first on the list. Yet it is not the government's function to avoid controversy at the cost of fundamental rights.  Indeed, the Supreme Court has firmly rejected this rationale for interfering with speech. *See, e.g., Cornelius, supra*, at 811 (1985) ("Although the avoidance of controversy is not a valid ground for restricting speech in a public forum, a nonpublic forum by definition is not dedicated to general debate or the free exchange of ideas. The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purpose."), and *id.* at 811 ("purported concern to avoid controversy excited by particular groups may conceal a bias against the viewpoint advanced by the excluded speakers") cited approvingly by the California Supreme Court in *Clark v. Burleigh*, 4 Cal. 4th 474, 492 (1992); *see also id.* at 829 (Blackmun, J., & Brennan, J., dissenting) (interest in avoiding controversy not a compelling state interest), *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 563, 95 (1975), cited by dissent in Cornelius for proposition that exclusion of the rock musical Hair from a municipal theater to avoid controversy was not a compelling reason to censor speech in a traditional public forum ("As soon as municipal officials are permitted to pick and choose, as they are in all existing socialist regimes, between those productions which are 'clean and healthful and culturally uplifting' in content and those which are not, the path is cleared for a regime of censorship under which full voice can be given only to those views which meet with the approval of the powers that be.") and *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969), similarly cited in Cornelius dissent ("In order for [government] to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.")

**THE BECKER LAW FIRM**

The Honorable Richard Bloom
Santa Monica City Council

June 6, 2012
12 | P a g e

**Elimination of Legal Risks**.  The City Attorney's second rationale (eliminating legal
risks) is even less justified, in part because of its presumptuousness in suggesting that Na-
tivity supporters would never deign to mount a legal challenge. This is a particularly fal-
lacious rationale inasmuch as the proposed ordinance might actually invite litigation.

**Conservation of Resources**.  The third rationale given by the City Attorney supporting a
recommendation to ban all "winter displays" is to conserve City staff time and resources
"necessary to operate a constitutionally valid regulatory system." This rationale fails in
at least two respects. First, it neither explains nor details just how a significant govern-
ment interest would be implicated. See Sammartano, supra ("There must be evidence in
the record to support a determination that the restriction [on speech] is reasonable.") and
Berger, supra ("A governmental body seeking to sustain a restriction must demonstrate
that the harms it recites are real."). There are no record facts establishing that govern-
mental resources would be substantially burdened by enforcement of constitutional law,
and we cannot be sure they would not be de minimus.  The utilization of city staff to reg-
ulate the lottery system no doubt did challenge the City's resources, precisely because it
was an ill-conceived program.  Second, the rationale admits to an intent to not operate a
constitutionally valid regulatory system to protect First Amendment guarantees and thus
to abdicate a core function and fundamental purpose of government.

**Conforming to Practice Elsewhere**.  The fourth and fifth rationales simply do not state
objectively any possible significant or compelling interest. Conforming to a practice is
not a compelling basis for abridging constitutional rights. If conformity were a valid rea-
son to abrogate constitutional responsibility, one could not be sure where such a policy
would end.  Presumably, all city parks would have to be identical in every respect.

**Preserving Ocean Views from the Street**.  As for opening the street to ocean views, this
is a contrived rationale for interfering with a three-week display celebrating the season
and enjoyed by the community for more than half a century.  There are ample locations in
and around the park to sample the ocean view and even pedestrian bridges to the ocean
itself.  Permanent structures, including a statute of St. Monica, may also be pointed to as
ocean-view obstructions.   Moreover, this rationale exalts street-centered sightlines over
fundamental rights, suggesting neither a rational nor compelling purpose.

   **G.**   **The Proposed Ordinance Is Not Narrowly Tailored.**

Even assuming, *arguendo*, the proposed ordinance somehow serves a signifi-
cant/compelling government interest, it quite obviously is the most restrictive option
available.  "Additional restrictions such as an absolute prohibition on a particular type of
expression will be upheld only if narrowly drawn to accomplish a compelling govern-
mental interest." *United States v. Grace*, 461 U.S. 171, 177 (1983) (emphasis added).

**THE BECKER LAW FIRM**

The Honorable Richard Bloom
Santa Monica City Council

June 6, 2012
**13** | P a g e

As Justice Breyer stated in his concurrence in *Van Orden v. Perry*, 545 U.S. 677, 699 (2005), "[T]he Establishment Clause does not compel the government to purge from the public sphere all that in any way partakes of the religious. Such absolutism is not only inconsistent with our national traditions, but would also tend to promote the kind of social conflict the Establishment Clause seeks to avoid." Justice Breyer also observed that the removal of a religious symbol, based primarily on its religious nature would "lead the law to exhibit a hostility toward religion that has no place in our Establishment Clause traditions" and "create the very kind of religiously based divisiveness that the Establishment Clause seeks to avoid." *Van Orden* at 704 (emphasis added).

Avoidance of controversy or legal risk could be achieved through less restrictive means perhaps, but it should be evident that totalitarianism is the only practical way to overcome the detriment caused by such fears. Shifting or appropriating funds to pay for additional resources is one way to avoid the stricter abolitionary option. As for protecting views from the street, consider the trees.

      H.     **The Proposed Ordinance Does Not Leave Open Ample Channels of Communication.**

The Nativity display constitutes symbolic speech. Indeed, it offers a particularly relevant form of speech that symbolizes its significance in the historical fabric of the community. This is where perhaps a history lesson might be instructive.

On August 2, 1769, Father Juan Crespi, a Franciscan monk, spotted a river, which he named El Rio de Nuestra Senora de Los Angeles de la Porciuncula (River of Our Lady Queen of the Angels of Porciuncula), to commemorate the Jubilee of Our Lady of the Angels of Porciuncula held one day earlier. Porciuncula derived from an Umbrian word – portiuncula – for "very small parcel of land." The Franciscan Order of the Catholic Church was founded through the acts of an Italian christened Giovanni di Bernardone. Giovanni's father, a clothing merchant returning from a business trip to France in 1182 shortly after the child was born, was angered by his wife's choice of a forename and insisted that Giovanni be referred to as Francesco, meaning "Frenchy."

Francis (his Anglicized name) would later be known as St. Francis of Assisi, named after the Umbrian town of Assisi he hailed from. It was his church located near the town for which Father Crespi named the Los Angeles River.

The town and parish of Portiuncula sits roughly three-quarters of a mile from Assisi. Officially known as Santa Maria degli Angeli, it grew up around the basilica of Our Lady of the Angels and its adjoining monastery. It is the spot where St. Francis renounced world-

**THE BECKER LAW FIRM**

The Honorable Richard Bloom
Santa Monica City Council

June 6, 2012
**14 | P a g e**

ly possessions and committed himself to marrying "Lady Poverty" in the service of God
and where he died.

According to the City's own web site, Father Crespi also named Santa Monica after the
mother of St. Augustine.  St. Francis, as everyone should know, originated the Christmas
nativity scene inspired by a pilgrimage he made to Bethlehem, the place of Christ's birth.
Thus the connection between the Nativity scene and the City of Santa Monica has a
stronger basis for celebrating its Franciscan heritage than would most other communities.

As the Ninth Circuit has stated, "Even a purely religious symbol may acquire independ-
ent historical significance by virtue of its being associated with significant non-religious
events." *Ellis v. City of La Mesa*, 990 F.2d 1518, 1526 (9th Cir. 1993).  Arguably, the
founding of the City by Franciscans and naming it after a Catholic saint should be re-
garded as a historical fact rather than a religious act.

It would thus be inappropriate to challenge the Nativity motif as an invalid form of either
religious, historical or holiday expression.  Indeed, no alternative form of expression
would likely satisfy those who oppose it, and no alternative form of expression would
convey the Franciscan roots of the community better than the universally recognized
crèche. Moreover, any argument against the Nativity scene motif (e.g., blocks ocean view
access from Ocean Boulevard, are contrived and transparently hostile to the religious
message it conveys.

> **I.      The Ninth Circuit's Cases Of Kreisner v. San Diego And Am. Jewish
> Cong. v. City Of Beverly Hills Compel Santa Monica To Return Its
> Nativity Display Policy To Status Quo Ante Prior To The Adoption Of
> The Lottery Program.**

In the Ninth Circuit, *Kreisner*, *supra*, and *Am. Jewish Cong. v. City of Beverly Hills*, 90
F.3d 379 (9th Cir. 1996) address issues of concern previously expressed by the City At-
torney regarding whether the City's permitting policy exempting the annual Nativity dis-
play from a general policy prohibiting all open air unattended displays runs afoul of the
Establishment Clause.[2]

As we have argued above, the City is neither required to nor permissibly can simultane-
ously open up a traditional public forum to multifarious conflicting viewpoints that invite
a heckler's veto.  Indeed, it serves only to dilute the message of the permitted party to
allow hecklers to veto it and to drown out the significance of its message by surrounding

---

[2] The foundational facts behind both decisions were addressed by the Liberty Counsel, and we incorporate
them here.

**THE BECKER LAW FIRM**

The Honorable Richard Bloom
Santa Monica City Council

June 6, 2012
15 | P a g e

it with hostile messages intended only to deny it legitimacy. *See Kreisner* at 781 (leaving only diluted messages in public fora inhibits constitutional objectives).  And even though persons objecting to the Nativity displays are free to exercise their constitutional rights by leafleting or engaging in other passive, peaceful expression near a Nativity display, the City would be aiding and even promoting the heckler's veto by issuing permits for the surrounding areas.[3]  Hence, the predictable controversy emerging from last year's attempted lottery system and the reason why we believe the ordinance in its current form to be unconstitutional.

Because it utilized the test established by the Supreme Court for determining an Establishment Clause violation, we feel that *Kreisner* takes the more sensible approach of the two Ninth Circuit rulings.  In *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971), the Supreme Court adopted the following standard to be applied in such cases: (1) a statute must have a secular legislative purpose; (2) its principal or primary effect must be one that neither advances nor inhibits religion; and (3) it may not foster excessive government entanglement.  On the first prong, City of San Diego's stated purposes in granting permits for the Nativity display were to (1) promote holiday spirit, and (2) promote free expression. *Kreisner* at 782.  The Ninth Circuit panel found the second purpose to be sufficiently secular, stating, "The Supreme Court has made it clear that a policy of permitting open access to a public forum, including non-discriminatory access for religious speech, is a valid secular purpose." *Id.*, citing *Board of Education v. Mergens*, 496 U.S. 226, 249 (1990) and *Widmar v. Vincent, supra*, at 271.

On the second prong, the *Kreisner* panel held that "because the display is private speech in a traditional public forum removed from the seat of government it does not have the primary effect of advancing religion." *Kreisner* at 782 (emphasis added).  The court pointedly noted: "Religious speakers have the same right of access to public forums as others." *Kreisner* at 783.

On the third prong, the court found there to be no excessive governmental entanglement:

> The City of San Diego provides two forms of aid to the Committee. It grants the Committee's annual request for use of the Organ Pavilion, and to the extent that the display might consume more than $150 worth of electricity, it subsidizes the excess. Both forms of aid are indirect and de minimis; neither demonstrates that the City has an active, deeply involved relationship with the Committee.

---

[3] The City prohibits permitted events from being disrupted. Santa Monica Muni. Code § 4.68.100 (5/8/01).

**THE BECKER LAW FIRM**

The Honorable Richard Bloom
Santa Monica City Council

June 6, 2012
**16 |** P a g e

*Id.*, at 789. At the end of the day, the *Kreisner* panel recognized that the city had opened the park up to various groups without any showing of preferential treatment.
*Am. Jewish Cong. v. City of Beverly Hills* was decided three years after *Kreisner* by an *en banc* panel differently constituted. The case involved the placement of a 27-foot-tall Jewish menorah used during celebrations of the festival of Hanukkah in Beverly Gardens Park bolted to a permanent, concrete foundation that the city allowed Chabad of California, Inc., to install.

Unlike in *Kreisner*, the *Am. Jewish Cong.* panel did not bother to undertake a forum analysis, concluding without any explanation that "Although Beverly Gardens Park is a "public forum" in that it is a public park where private individuals have broad free speech rights, it is not an open forum for large, unattended private structures." *Am. Jewish Cong. v. City of Beverly Hills* at 384. This in our view was an erroneous finding, completely unsupported by any forum analysis and based on the single detail that the city's general policy was to only allow structures to be placed in the city's parks by the city. *Id.*, at 384. It fails to recognize that government has extremely limited power to restrict speech within a traditional public forum and must employ reasonable TPM criteria.

The *Am. Jewish Cong.* panel compounded its erroneous analysis with dicta that it "constitutionally could ban all unattended private displays in its parks." *Id.* For this proposition, it cited to dicta in Justice Souter's concurring opinion in *Capitol Square*, where he stated: "I also want to note specifically my agreement with the Court's suggestion that the State of Ohio could ban all unattended private displays in *Capitol Square* if it so desired." *Id.*, citing *Capitol Square* at 783 (Souter, J., concurring) (emphasis added). Justice Souter's reference linked to dicta in the majority opinion, in which the majority stated that "a ban on all unattended displays, which did not exist here, might be [a valid time, place manner restriction]." *Capitol Square* at 761 (emphasis added).

In short, the statement made by the Ninth Circuit in *Am. Jewish Cong.* amounts to nothing more than non-binding *triple dicta*, which ignores the central principle that government has extremely limited power to restrict speech in a traditional public forum. As we noted above, applying general tenets in the context of a particular case remains a delicate and fact-sensitive task, and in each case, the inquiry calls for line-drawing allowing no fixed, per se rule to be framed. Thus, *Am. Jewish Cong.* is unreliable authority for the proposition that a city can justify banning all unattended displays without taking into account proper TPM factors (i.e., content neutrality, strict scrutiny, alternative channels).

Additionally, as noted above, the right to use government property for one's private expression depends upon whether the property has by law or tradition been given the status of a public forum, or rather has been reserved for specific official uses. Nativity displays (as well as Memorial Day "Arlington West" veterans crosses on the beach near Santa

**THE BECKER LAW FIRM**

The Honorable Richard Bloom
Santa Monica City Council

June 6, 2012
**17 | P a g e**

Monica pier and no doubt other examples of unattended displays) have <u>by tradition</u> been given a public forum in Santa Monica. *Am. Jewish Cong.* is thus inapposite to the facts of this case, and the line drawn by the court is not, nor can it be, a fixed, per se rule. We additionally question the validity of an equal-access policy on a first-come, first-serve basis. *See Am. Jewish Cong.* at 384, citing authority. Christmas and Hanukkah universally have become institutionally acknowledged as traditionally celebrated in December. Thus, opening up a forum to everyone invites a heckler's veto scenario that has both the intent and effect of silencing the seasonal religious messages and makes no more sense than allowing Christmas decorations to be put up in July.

Moreover, we strongly disagree that a ban on all unattended displays would pass constitutional muster, particularly if motivated by a desire to avoid controversy or legal challenges.

## II.    CONCLUSION

The issue before the Council is not a light one to take because it involves fundamental constitutional rights. As citizens of the community, the Committee members share the expressions of many who have come before the Council to express their love of the Constitution. The Committee loves the Constitution no less, and wants to preserve its freedoms for everyone – including religious speakers. The Committee too cares about whether government becomes so entangled with religion that it favors one group over another, but is equally sensitive to whether its speech is being foreclosed due to the hostile reactions of committed ideologues.

For at least a half-century, the Nativity display was considered an asset of the City, not a hindrance, and certainly not a threat to liberty or the general welfare. As the Supreme Court wisely noted, government must take the measure of circumstances that threaten our civil liberties:

> The First Amendment does not prohibit practices which <u>by any realistic measure create none of the dangers which it is designed to prevent</u> and which do not so <u>directly or substantially involve the state in religious exercises</u> or in the favoring of religion as to have meaningful and practical impact. It is of course true that great consequences can grow from small beginnings, but the measure of constitutional adjudication is the ability and willingness to distinguish between <u>real threat and mere shadow.</u>

*Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203 (1963). (Emphasis added.)

**THE BECKER LAW FIRM**

The Honorable Richard Bloom
Santa Monica City Council

June 6, 2012
**18 | P a g e**

A community's heritage also is not something to be discarded simply to quell the hyper-sensitivities of those inspired to be troubled by that heritage or the traditions it bore. As a community, we are asked to support all number of popular factions, and to provide public streets and parks for parades, marathons and other events to advance their social, political, patriotic, anti-patriotic, religious and other agendas. A community is defined by the diversity of its voices, <u>including</u> those expressing their religious faith. To exclude their First Amendment access to public parks would mark an erosion rather than its expansion of liberty. Indeed, greater speech – not less – should be encouraged in the public square.

The Nativity display in Palisades Park serves a community of people stretching far beyond Santa Monica's borders – a community supportive of traditions, respect for the local heritage and, yes, even respect for religion and rights of the faithful. The Council must not surrender to the heckler who wishes to veto speech the First Amendment protects.

Based upon the analysis presented herein, we would request that this matter be returned to the City Attorney for further study and to permit us to assist the City in developing a proposal that would rescue the Nativity scene tradition and would face a realistic chance of surviving constitutional scrutiny. Because we have been retained on very short notice (after the May 22 hearing and first reading of the proposed ordinance), our analysis is necessarily incomplete and evolving.

We look forward to appearing at the June 12, 2012, hearing and having a chance to introduce ourselves and address any questions the Council members may have.

Very truly yours,

**The Becker Law Firm**

William J. Becker, Jr.

**Law Office of John Fitzmorris**
John Fitzmorris

cc:    Mr. Hunter Jameson
       Ms. Marsha Jones Moutrie, City Attorney
       Mr. Rod Gould, City Manager

WJB/gb

# EXHIBIT 11

**City Council Meeting:   June 12, 2012**

**Agenda Item: 5-A**

To:          Mayor and City Council

From:       Marsha Jones Moutrie, City Attorney

Subject:      Ordinance Amending Santa Monica Municipal Code Section 4.55.060 Relating to Erection of Structures and Winter Displays in Palisades Park

-
-

-

## Recommended Action

Staff recommends that City Council introduce for first reading the attached ordinance, which would delete from the Santa Monica Municipal Code (Municipal Code) language allowing private, unattended winter displays in Palisades Park.

## Executive Summary

The Municipal Code prohibits private unattended displays in City of Santa Monica (City) parks, but an exception to that general prohibition allows for winter displays in Palisades Park along Ocean Avenue, where there have been displays for decades during the holiday season.  Such displays are classified as expression and are protected by the First Amendment, which prohibits the City from favoring or disfavoring protected expression based on its content.  Thus, the City can allow private displays in its parks, or not, but it cannot pick and choose between them based on their content.

On February 28, 2012, in order to resolve controversy and conserve City resources, staff proposed an ordinance that would amend Section 4.55.060 by repealing the winter display exception.  If adopted, that ordinance would effectively eliminate winter displays in the park, including religious displays, such as the Nativity scenes.  At the request of community members, Council postponed consideration of the proposed ordinance to allow for community discussion of alternatives.  Staff now reiterates its proposal and recommendation that Council approve the attached ordinance.

## Background

Privately owned and installed Nativity scenes have been displayed in Palisades Park by local churches for decades.  And, in recent years, displays have also celebrated Hannakuh and solstice and have advocated atheism.

Last year, when requests for display space exceeded the space allotted for displays, the City operated a lottery in order to allocate display opportunities in an unbiased manner.  This was done to effectuate First Amendment requirements of neutrality and thereby avoid legal risks.   The random drawing resulted in most spaces being allocated to displays that opposed religion.

Controversy ensued.  Some argued that the "traditional" Nativity scenes, which had been in the

Case 2:12-cv-08657-ABC-E   Document 1   Filed 10/09/12   Page 107 of 169   Page ID #:246

7/13/12          City Council Meeting - Ordinance Amending Santa Monica Municipal Code Section 4.55.060 Relating to E...

park for sixty years, must somehow be preserved. Others favored the lottery system for allocating spaces but advocated standards for displays that would ensure aesthetic merit. Some opposed all private displays on public space. Many felt that the juxtaposition of religious and anti-religious displays was a distressing symbol of conflict inconsistent with values of peace and harmony that many associate with the holiday season.

The First Amendment severely restricts the City's options. Staff proposed the attached ordinance for three reasons. First, many residents who complained about winter displays this year urged that they would rather preserve the aesthetic qualities of this designated landmark and look at the ocean vista than continue the displays. Second, operating the lottery system is both time consuming and costly for the City and likely to become increasingly so because applicants have indicated they will "flood" the lottery process. Third, persons who favor particular displays have the option of installing them on private property. Since the ordinance was proposed, community members and others have had the opportunity to discuss options and further express their views to their government.

**Discussion**

The proposed ordinance, which would eliminate private, unattended winter displays in Palisades Park, would serve the purpose of resolving the controversy, eliminating legal risks, conserving the staff time and resources necessary to operate a constitutionally valid regulatory system, conforming usage of Palisades Park to the long standing, City-wide standard which prohibits unattended displays in parks, and protecting the views of the park and ocean from Ocean Avenue without precluding the installation of displays on other non-governmental property. At the February 28th meeting, staff summarized the case law, in an oral report, focusing on two southern California cases about cities' regulation of religious (and anti-religious) holiday displays in city parks. Since those cases form the basis of staff's recommendation, they are again noted here. *Kreisner v. San Diego*, 988 F.2d 883 (9th Cir., 1993), stands for the proposition that a City may permit private displays through a content-neutral permit allocation process. *Jewish Congress v. Beverly Hills*, 90 F.3d 3790 (9th Cir. 1996) stands for the proposition that a City, which allows religious displays in a park, cannot refuse to allow other displays in the park protesting the religious displays. Based on these cases, staff explained that the City cannot favor particular displays, including Nativity displays, and cannot prohibit displays that criticize other displays.

Since February 28th, staff has been in contact with representatives of the groups that installed the Nativity scenes and the anti-religious displays last winter. Both groups have received advice from attorneys. Both have informed staff that they will file more applications next year to increase their odds of being allocated more spaces. Staff has also been in contact with community religious

leaders, with attorneys, and with others.   In all, the various stakeholders made a number of suggestions, including: keep the displays but revise the lottery process; physically separate the religious and anti-religious displays to minimize conflict; eliminate all unattended private displays from the park, relocate private displays to private property.  Staff noted all suggestions, assessed legal threats, and considered all commentary.  Staff also encouraged all to share their thoughts with the Council.

In assessing the legal input, staff noted that its understanding of the law and the views expressed by other attorneys were not materially different.  The only significant difference is as to the legality of allocating different areas of the park for religious and anti-religious displays.  Staff believes that this approach would be legally problematic, at least in this circuit.

Overall, the community input and dialogue have not caused staff to change its recommendation or its thinking as to the alternatives and budgetary impacts.  Those remain the same as stated in the February 28th report.  Accordingly, the attached ordinance is again submitted and recommended for first reading.

Alternatives
Alternatively, Council could decide to maintain the exception for winter displays in the Municipal Code, in which case staff would, once again, operate a lottery in order to allocate winter display space.  Staff recommends against the alternative for the reasons stated in this and the previous report.

**Financial Impacts & Budget Actions**
There are no significant financial or budget impacts attendant upon approving and adopting the proposed ordinance.  Staff time that would otherwise be expended on the lottery system will be conserved and used to handle the growing number of Community Event applications.

**Prepared by:**  Marsha Jones Moutrie, City Attorney

**Approved:** _____     **Forwarded to Council:** _____


Marsha Jones Moutrie                        Rod Gould
City Attorney                               City Manager

Case 2:12-cv-08657-ABC-E   Document 1   Filed 10/09/12   Page 109 of 169   Page ID #:248

7/13/12                City Council Meeting - Ordinance Amending Santa Monica Municipal Code Section 4.55.060 Relating to E...

**ATTACHMENT:** <u>Proposed Ordinance</u>

# EXHIBIT 12

1

2

3

4

5

6

7

8

9

10               TRANSCRIPT OF TAPE-RECORDED

11                   MEETING OF THE

12            SANTA MONICA CITY COUNCIL

13               JUNE 12, 2012

14

15   REGARDING ITEM 5A, ERECTION OF STRUCTURES AND WINTER

16            DISPLAYS IN PALISADES PARK

17

18

19

20

21

22

23

24

25

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1    [Part 1]

2

3         MR. BLOOM:  And, uh, that takes us to item 5A.

4         MS. STEWART:  5A is the introduction and first

5    reading of an ordinance amending the municipal code

6    related to the prohibition of the erection of structures

7    and winter displays in Palisades Park. This citing was

8    continued from May 22nd. As of right now you have 31

9    requests to speak.

10        MR. BLOOM:  Ms. Moutrie. Let me -- actually, let me

11   add something about the -- the public hearing, if -- if

12   you don't mind, Ms. Moutrie.

13        MS. MOUTRIE:  Not at all.

14        MR. BLOOM:  Uh, we're -- we're resuming tonight on

15   this item. Uh -- uh, last time we heard, uh, the staff

16   report and we heard from members of the public who opted

17   to use their speaking time at their meeting and allowed

18   people who didn't speak then to speak tonight. .

19        Um, tonight we are going to hear from those members

20   of the public who have not yet spoken and also, we're

21   going to be hearing, as I understand, some supplemental

22   information from staff.

23        So if there are folks here who, uh, did speak at the

24   last council hearing and who would like to speak to the,

25   uh, supplemental information, only to the supplemental

1      information, um, we will open the public hearing --

2         I will open the public hearing for those additional

3      members of the public. Um, so those, uh -- uh, who spoke

4      last time can comment on the new information of the staff

5      report, uh, this evening and I think Ms. Moutrie will

6      identify that as she moves through her report. Thank you.

7         MS. MOUTRIE:  I'll try. Thank you, mayor. As

8      everyone knows, this, uh, proposal from staff to

9      eliminate the exception, which allows for unattended

10     winter displays in the park, this proposal by staff has

11     generated a lot of controversy and a lot of comment.

12     We've had a very wide range of comments from a number of

13     sources.

14        Some of them have been very intense. We have even

15     received, uh, threats over this, both physical and legal.

16     I'm most comfortable talking about the legal ones. So I'm

17     going to focus on that. Last month we had the unusual

18     event of receiving not one, but two opposing letters from

19     law firms on K Street in Washington, D.C.

20        I don't recall that ever happening in my 18 years

21     here before. And then this -- and they were taking

22     opposing views. And then this month we've, um, received

23     an 18-page letter from local counsel, uh, Attorney Becker

24     who I hope is here with us tonight. He is currently

25     representing the nativity scene's committee and has

1    submitted his legal arguments for your, uh, consideration

2    as well.

3        So we have a lot of expression of concerns and a lot

4    of claims -- to address some of those, I'd like to

5    provide some additional information, which I hope will

6    both inform your discussion tonight, uh, help the

7    community with its comments and also, we'll need to build

8    a record for this matter.

9        I'd like to start with some pictures that we, uh,

10   have given Ms. Stewart that are just pictures of the

11   displays that were in the park. Ms. Stewart has copies

12   available for the public to look at if they'd like to and

13   I'll just hand this around, uh, after I finish speaking.

14       You all know what it looks like, but we need -- may

15   need to make a record of what it looks like. I also

16   wanted to report just initially that we have located one

17   case that I wanted to mention. I had mentioned two before

18   I had talked about the cases that were litigated in San

19   Diego and Beverly Hills relating to displays in parks.

20       This one is out of the circuit. This one is called

21   Knights of Columbus v. Town of Lexington. It's from the

22   First Federal Circuit, but I wanted to mention it to you,

23   because it's so close to, on all fours, it's -- uh, with

24   our case. It's very, very like our situation that hardly

25   ever happens.

4

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1          So it's -- it's worth noting that there is a case in

2     which a town had -- for many years had nativity scene

3     display on its town green. That display had been there

4     for decades and decades, uh, and for a long time there

5     wasn't much controversy. And then in more recent years a

6     number of groups, including, uh, antireligious groups had

7     requested the opportunity to place displays on the town

8     green.

9          And the town studied the situation and evaluated its

10     legal options and eventually the town council opted to

11     just prohibit unattended displays on the town green. The

12     Knights of Columbus, which had been putting up the

13     nativity scenes sued the town. It was litigated and the

14     town prevailed.

15          Many of the sub-issues litigated in the case were

16     very similar to the concerns that have been raised here.

17     And so I'd like to just make the community aware of that

18     decision and to tell anybody who would like to see a copy

19     you could get one from our office if you want to or you

20     can look it up yourself.

21          It's a 272 F .3d 25. That's a 2001 case, again from

22     the First Federal Circuit, which we believe, uh, is yet

23     further authority supporting, uh, the position that staff

24     is advocating.

25          Now, I'd like to quickly address some of the


5

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1    concerns that have been raised to see if we can lay

2    anything to rest or at least provide more information for

3    you.

4         A couple of the, uh, lawyers who have waited with

5    comments, uh, in opposition to staff's proposal have

6    claimed that it is -- we need to understand that it's

7    completely legal to continue the present display system

8    in the park. We totally agree.

9    ~~We believe the current system is fully legal and we~~

10   think there is nothing illegal about having the nativity

11   scene displays as part of the displays that are in the

12   park. So I don't think there's a dispute between any of

13   us about that. Where there is some disagreement is our

14   research indicates that the city can certainly legally

15   ban all unattended private displays in the public parks

16   if you choose to do that.

17        We believe that would be legal as well and we

18   believe that there are several cases that supports that.

19   And we do not believe that there are any to the contrary.

20   Next, as you probably know, because we've talked about it

21   before, but I'll just go over it in view of the level of

22   controversy.

23        If the city wishes to allow and regulate private

24   unattended displays in the park we can do that, but we

25   have to do so pursuant to a valid time, place and manner

6

1    restriction, which means that our restriction has to be

2    content neutral.

3        We believe our current system is content neutral and

4    we believe that adopting the proposed ordinance would

5    also be a content-neutral approach. So to be more

6    specific, our first come-first serve policy is upheld by

7    the case law.

8        Um, there has been some disagreement with some of

9    the commentators who have written in to the city who

10   claim that we have the auth- -- power legally to ban

11   displays that are protests in the park.

12       We don't believe that we believe as a matter of law

13   that the First Amendment actually stringently protects

14   the rights of people to protest in the park and to

15   protest other displays in the park.

16       Uh, we have -- we believe that the proposed

17   ordinance would be upheld in court for a number of

18   reasons, including that we believe it would leave, uh,

19   open alternative measures -- alternative ways of

20   communicating views in the park.

21       I noticed that, uh -- uh, Attorney Becker, who wrote

22   into the city had defended one case that had to do with

23   leafleting in parks. We fully agree that leafleting in

24   parks is legal and one of the things people wishing to

25   express religious views in any of the city parks can do

1    is they can talk; they can leaflet. But there are other

2    opportunities as well.

3        Nativity scenes could still be, uh, displayed in

4    Santa Monica if the proposed ordinance were passed. They

5    could be displayed in various ways. They could be

6    displayed as part of a community event pursuant to our

7    community event system. They could be, uh, displayed in

8    numerous areas of the city, including parks during the

9    daytime so long as they were attended.

10       They could, of course also be displayed on private

11   property in the city. So the proposed ordinance before

12   you tonight is by no means a -- a, uh -- as some have

13   suggested, it is by no means an attempt to oust religion

14   from the city or to oust the Christmas story or nativity

15   scenes from the city and it would not have that affect.

16       We also believe that the proposed ordinance would be

17   upheld in court, because we believe it serves, uh,

18   legitimate governmental interests. In fact, they are

19   substantial governmental interests. The proposed

20   ordinance would help preserve the aesthetic qualities of

21   Palisades Park.

22       The proposed ordinance would, by eliminating

23   unattended displays in the park, bring Palisades Park's

24   uses into conformity with all the other parks in the

25   city, as we've mentioned a number of times, unattended

8

1    displays are prohibited in all the parks. This was one

2    exception for Palisades Park for a small part of the

3    year.

4         Perhaps even more important, though adopting the

5    proposed ordinance would, uh, conform our usage of the

6    park to our local coastal plan, which requires us to

7    preserve views in Palisades Park.

8         It would also bring, uh, the usage of that park into

9    full conformance with our community events ordinance. Our

10   community events ordinance doesn't allow stationary

11   events in Palisades Park, it only allows moving events,

12   such as walks, marches in that park.

13        And so the current exception for unattended winter

14   displays is actually out of whack with our own community

15   events ordinance. Uh, it's really under one of the

16   categories I also mentioned, but I just want to emphasize

17   something that you already know, the city is under

18   parked.

19        And the specific, uh, purpose to which Palisades

20   Park is currently dedicated under our -- our current

21   schemes is -- is for, uh, passive use and walking. Uh,

22   the limitation in the community events ordinance, which

23   prohibits stationary events there is in keeping with the

24   purpose to which you've dedicated that park.

25        And then the other -- the other, uh, reason that we

9

1       think a court would find that we have a substantial

2       interest in this ordinance is the administrative

3       difficulties that we have with administering the -- the

4       present system, which has become increasingly difficult

5       because of the growing number of applications we are

6       getting, the intensified competition for the limited

7       space that you've made available for winter displays and,

8       uh, Karen Gittsburg's [ph] here to talk a little about

9       that.

10      MS. GITTSBURG:  Thank you. Good evening. Um, as, uh,

11      Ms. Moutrie mentioned, there's been a very significant

12      expansion in the number of applicants for the winter

13      display space. And to just give you some context, prior

14      the -- to 2011 we received between two and four

15      applications per year for winter displays and they could

16      all be accommodated within the park.

17      Now, with more applicants the competition for space

18      is much more intensive. There are a number of tasks we

19      had to perform in establishing the current system,

20      including some of the following.

21      We modified the winter display guidelines several

22      times, we held numerous internal meetings to establish a

23      fair and equital [sic] pro- -- equitable process for

24      managing the lottery and we responded to questions from

25      applicants regarding the lottery process throughout the

10

1    way.

2          Prior to administering the lottery all applications

3    needed to be thoroughly screened for completeness. We

4    worked with the applicants to obtain accurate and

5    complete site plans. We coordinated with other affected

6    city divisions and we had numerous communications, um,

7    with each of the applicants.

8          In short, the lottery process is very time-consuming

9    and we are told that should the process continue some

10   intend to flood the process to increase the chance of

11   getting spaces through the lottery. So the process will

12   become even more time-consuming.

13         We had to expand the staff resources to, uh -- uh,

14   to work on it. In the past when there were only a few

15   applicants two staff members handled the process easily

16   along with their other duties.

17         Last year with the increased number of applications

18   and the lottery system for staff from the event section

19   of the community recreation division worked on this

20   effort. It took hundreds of hours of staff time and this

21   doesn't even include the staff in public landscaping,

22   public works and planning in community development who

23   are involved in a range of tasks associated with the use

24   of the turf, the electrical needs and parking

25   requirements.

1    The increased number of displays has had significant

2    impacts on the park as well. There is less recreational

3    space available to the general public and this is at a

4    time when we all know that the demands on the park are

5    constantly increasing.

6        Um, more displays means the view obstructions have

7    increased as well. And finally, as, uh, Ms. Moutrie

8    mentioned, the park is recognized throughout the world

9    for its unique linear design, its beautiful views, its

10   rich and diverse landscaping and the increased number of

11   applications and resulting increase in displays has

12   resulted in a cluttering of the park impacting these

13   aesthetic qualities.

14       We're concerned that these impacts will only

15   increase. Thank you.

16

17   [Part 2]

18

19       MR. BLOOM:  That closes our public hearing and the

20   matter is now before the council. Mr. O'Day?

21       MR. O'DAY:  Could I just take a point of order? Um,

22   I want to mention since I'd, uh, left our last meeting

23   early that I did watch the testimony, uh, during, uh, the

24   meeting on video between these two and have participated

25   in, uh -- in that way throughout the course of this, um,

1    discussion.

2         MR. BLOOM:   Thank you. I have no names in the queue.

3    Mr. O'Day?

4         MR. O'DAY:   All right. So with that I'll -- uh, I

5    guess I'll open up. I appreciate everyone who's come out

6    on this topic over the many nights that we've done this

7    and -- and over the many years that we've discussed this

8    program.

9         Um, and I -- I -- I tell you, I approach this

10   evening, uh, truly saddened to be at this point. And I'm

11   -- I'm sad, because of -- of a number of things. For one,

12   I enjoy those nativity scenes, um, and my church at St.

13   Monica's participates in, um -- in those scenes each

14   year.

15        And in fact, I took my girls out to see them, uh,

16   when they were very young and I -- I found it a great

17   teaching opportunity for them and a great night out too,

18   uh, one that was free, which isn't always so common

19   anymore as we know in the city.

20        Um, and I'm -- and I say this also as a person who

21   has struggled with my own faith in my life. In fact, who

22   does struggle, uh, each day really, uh, with faith. And -

23   - and despite seeing some of the problems with last

24   year's display I also saw something I really loved, which

25   was a debate, uh, about religion and its place in our

13

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1    city and -- and in public discourse.

2        And, uh -- and maybe specifically, because I'm a

3    person who struggles with faith every day, um, I like

4    that, maybe because I'm a person who likes public

5    debates. Be careful if you're one of those people, you

6    may find yourself on this side of the dais one day.

7        Um, and -- and I think that this is what Frank

8    Gruber [ph] pointed out in his comments tonight, um, and

9    it's, uh, part of what makes us all Americans and does

10   tie us together.

11       But I'd like to register my strong disagreement with

12   Mr. Becker that -- um, that Ms. Moutrie or anyone on our

13   council or city staff, uh, dug in the sand on this. On

14   the contrary, um, we faced this choice last year and we

15   grappled with it very early this year and, uh, we

16   postponed our decision and discussion on this when the

17   churches asked for more time to try to work out creative

18   solutions.

19       Uh, we postponed it again from the meeting last, uh,

20   week or two weeks ago. And the reason for all of that was

21   -- delay was to find some kind of creative accommodation

22   that would, uh, satisfy all -- everyone involved. And we

23   came out with ideas about expanding the amount of space

24   and changing the kind of lottery system that we used or

25   the allocation system.

1     Uh, we talked about how to separate the sides so

2     that there would be an equal space, uh, but one that

3     didn't create conflict. And unfortunately, what I've seen

4     during this time is not a coming together and not landing

5     on creative solutions, but rather, uh, increased

6     attention and passion.

7     You might say that's good, but unfortunately, it's

8     also, uh, gone in the direction of increased polarization

9     and if you'll allow me to say demonization of the sides,

10    um, and really a deepening of -- of har- -- and hardening

11    of feelings on the sides and -- and some real nastiness.

12    And I think that's too bad. You know, looking at

13    that I don't think you need a crystal ball or the Holy

14    Spirit, uh, to figure out where this is headed, um, in

15    our park and where this path is going to lead us.

16    Um, while the law doesn't require us to take the

17    step that the staff has proposed here, and we are within

18    our legal right to continue the program as we have done

19    it, um, I feel like we're setting up a ring for a

20    competition in Palisades Park. And it's one that's

21    getting nasty. And that is certainly not in the Christmas

22    spirit, um, and -- and this is how I've come to make my

23    decision on this topic tonight.

24    Um, we received, of course, legal advice that

25    everyone, um, who participated in this discussion and

1    also saw which was, uh, the turning point for me and that

2    is that if you allow this -- if you allow displays in the

3    park you also have to allow protests of the displays.

4         And in fact, protests of the very displays that are

5    next to you -- uh, to your display in the park. And --

6    and we saw some of that last year. Like I said, some of

7    it was interesting and -- and kind of compelling for

8    having public debate.

9         But here's my nightmare scenario is that we have a

10   nativity crèche, um, put up as we have, uh, had every

11   year and then beside it is a display that is the same

12   nativity crèche, but it's sort of the Texas Chainsaw

13   Massacre version of it and it would be tremendously

14   offensive and it would really deepen and harden these

15   feelings.

16        And I disagree with the speaker who told us that we

17   don't care about our religious community in Santa Monica.

18   I do. I deeply care about our religious community. I care

19   about the broader community beyond that religious

20   community as well and I don't think a display like that

21   would be in any of our interests during the holidays.

22        And you might say it's farfetched, but two years ago

23   I think it was on Easter weekend at St. Monica's, we had,

24   uh, the statue right out in front of the church

25   decapitated. And so we celebrated Easter weekend with a

1   shroud over that statue.

2       And I think it would be Pollyannaish to think that

3   it's just doesn't -- that this is just a -- a space for

4   debate, uh, that -- that, uh -- that it wouldn't turn

5   nasty, that it would be, um, a great place to -- to, uh,

6   enjoy the fruits of -- of debate in this country. Um, so

7   I'm sad.

8       I'm sad that, uh, we're here. I feel like, uh -- um,

9   I'm sad for that woman who spoke earlier and I'm sorry I

10  didn't catch your name who said that she felt her voice

11  was being, um, squashed as -- as a result of what is

12  proposed here tonight. I'm going to vote in favor of the

13  staff, um -- staff, uh, recommendation.

14      Um, but I have hope and the hope is that the, um --

15  while we didn't land on a creative accommodation for

16  Palisades Park and while Palisades Park is certainly an

17  incredibly unique place in all of the world, I would say,

18  uh, there's a lot of really nice places to put up

19  displays in Santa Monica on private land.

20      I think that there are also other great ways to

21  celebrate the holidays and your faith or your decision

22  to, uh, not have faith, um, in Palisades Park that are

23  not about putting up unattended displays.

24      And so I'd encourage solutions along those lines as

25  I think we've come to a place where we unfortunately

17

1    can't have these unattended displays in Palisades Park.

2    Um, I'd like to offer to help anyone to work to find a

3    good private land to display all of the nativities and

4    others, uh, who want to band together.

5         And also, on the other side, any of those other s- -

6    - um, displays where private land could be found, either

7    together or through a tour of the community that could be

8    guided and mapped.

9         Um, and also, to think through those other ways

10   that, like we have done in the old days of door to door

11   caroling and caroling in parks and all kinds of other

12   ways that you could express yo- -- um, your views during

13   the holiday season in the park itself. Thank you.

14        MR. BLOOM:   Thank you. Mayor Pro Tem Davis.

15        MS. DAVIS:   Well, I -- I think this has been

16   difficult for everybody. Um, certainly, it has aroused a

17   lot of passion both within and without the community. And

18   -- and I want to make a couple of things clear, because I

19   disagree with what some of the speakers said.

20        Um, for example, they said that we were somehow

21   planning on, uh, squashing or quashing their right to

22   express their religious beliefs. That is absolutely not

23   true.

24        I think every member of this council firmly believes

25   in the constitution, which gives every person in this

18

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1    room the right to go into Palisades Park or to stand on

2    private land and say, I'm a Christian, I'm a Buddhist,

3    I'm a Muslim. They certainly can do that.

4        We are not talking here about banning the nativity

5    scenes. What we are talking here is about banning

6    freestanding unattended displays. We're not banning the

7    scenes because they're the nativity scenes or because

8    they're not the nativity scenes.

9        What we're talking about is whether or not we should

10   allow displays that deliver any sort of message in

11   Palisades Park and that's really the question that we're

12   faced with. Now, unfortunately, this has come up in the

13   context of the nativity scenes and the competition for

14   the spaces where the nativity scenes historically have

15   been placed.

16       But the fact of the matter is, and we did last year

17   with our lottery, attempt in a very content neutral way

18   to try and allocate those, uh, spaces on a content

19   neutral basis and in fact, we did so. Unfortunately, it

20   was unsatisfactory to everybody and what I hear from the

21   community that supports, um, the nativity scenes is what

22   they want is the original nativity scene all, I think is

23   14 dioramas in the park.

24       And what they want to do is then open up other parts

25   of the park for other people with competing or different

19

1   views. And while I think there's a sort of natural

2   attractiveness to that, because that will make everyone

3   happy, as Councilmember O'Day points out, it's very

4   possible that what could be said in some of those

5   displays many people would find offensive.

6       And we would back to where we started, because

7   people would say, well, I love having the nativity

8   scenes, but I hate having chainsaw nativity scene, as

9   Councilmember O'Day characterized it, right next door.

10  And so the issue isn't what content should we allow in

11  the park or who should we offend or not offend or who are

12  we trying to let speak or not speak.

13      What we're trying to decide is whether or not it

14  makes sense or whether we as a city, on a content neutral

15  basis, can allow freestanding displays in the park

16  without unduly imposing on our city staff, without unduly

17  imposing on all the people who want to visit the park,

18  not necessarily to view freestanding displays, but to

19  enjoy walking through the park.

20      If we allow a greater number of displays the amount

21  of park space will be significantly reduced. But I do

22  want to make a couple of things clear.

23      Um, I -- I really do think that there seems to be

24  this notion that what we're trying to do here is suppress

25  some sort of speech versus another sort of speech and

20

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1     that is absolutely not the case. This is a multi-faith

2     community and alto, a community that includes of no

3     faith. And they are all welcome here.

4         They were all welcomed to come here this evening.

5     Uh, they were all treated with respect as they should

6     have been. Nobody's First Amendment rights will be

7     trampled by the action of banning freestanding displays

8     in Palisades Park.

9         Everyone will continue to be free from worship or

10    free to not worship, however they see fit even if we

11    don't allow the displays in the park. I'm very

12    sympathetic to the notion, those have been here 60 years

13    and I understand for many people they are a much beloved

14    tradition.

15        But the fact of the matter is that we have many

16    traditions that as the law has evolved we have had to let

17    go simply because they favor one voice over another. And

18    in this particular instance, what we're facing is a

19    situation where we don't have a part that's big enough to

20    probably accommodate every voice that would like to be in

21    the park.

22        I think what our experience last year showed that if

23    we open up the park for a no- -- content neutral lottery

24    we're not going to be able to have the nativity scenes

25    that people have cherished for the last 60 years, we're

1   going to have dozens, if not hundreds of people competing

2   for those slots.

3       And it's quite possible that there would be none of

4   the traditional nativity scenes and it could be a park

5   full of varying messages, all of which would be equally

6   valid, all of which would be welcome in this community,

7   but we would not have achieved what I think so many of

8   you want to achieve, which is preserving the nativity

9   scenes.

10      The law doesn't allow us to do that. The law doesn't

11  allow us to draw a circle around the nativity scenes and

12  plunk them down and say, these are protected and allowed

13  to exist sim- -- because even though they may not be

14  proselytizing a religion, although I think some people

15  interpret them as doing so, the fact of the matter is

16  that we need to make the park available to all messages

17  on an equal basis.

18      And that's really where the administrative and the

19  aesthetic issues have arisen. So I certainly encourage

20  everyone in the room to continue to exercise their

21  freedom to express their religious or non-religious

22  belief, whether it's in their church, or their synagogue,

23  or their mosque, or their temple. I encourage them if

24  they want to put nativity scenes on private property they

25  are absolutely free to do so.


22

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1          If they want to stand in Palisades Park and give

2     their testimony about their belief and their god they are

3     certainly free to do so. We are not shutting down speech

4     in Palisades Park. What we are talking about is removing

5     freestanding, uh, unattended displays.

6          And so while it's regrettable to some extent,

7     because I know this, as -- as I said, a tradition that

8     many people have enjoyed, it is also unfortunately a

9     ~~tradition that now we have been challenged on.~~

10         And so we need to adopt what is in the best interest

11    of the city and what complies with federal and other

12    applicable law. And as a city the one thing that we all

13    as councilmembers do is take an oath to uphold the

14    Constitution. And then the question becomes, what does

15    the Constitution require us to do?

16         I think the city attorney has sought to see -- uh,

17    sought middle ground and has been unable to find one that

18    she advises us really meets all the constitutional

19    requirements and at the same time addresses the issues of

20    clutter in Palisades Park, the tremendous amount of staff

21    time that goes into the lottery and ultimately, the fact

22    that if we did try and come up with some compromise at

23    the end of the day my senses based on the testimony here

24    tonight from all members of the community that it would

25    be a compromise that would be in effect the perfect

23

1   compromise, because nobody would like it.

2       It would not preserve the nativity scenes in their

3   current tradition nor would it give other voices the

4   opportunity to be heard in a sense that they felt was

5   equal.

6       And so really for my mind, when faced with those --

7   uh, this situation it's regrettable, I think to lose the

8   traditions. It's -- change is always hard, but I think

9   what we need to do as a community is come together,

10  recognize that we all need to respect each other's

11  beliefs, that we all have the right to express those

12  beliefs, both in public for, like Palisades Park and on

13  private property.

14      And that what we need to do here is decide whether

15  or not we want to have displays regardless of what they

16  say in Palisades Park. And I think given all the facts

17  that we've been presented with as well as the legal

18  advice from the city attorney I'll move the staff

19  recommendation.

20      MALE 1:  Second.

21      MR. BLOOM:  Uh, we have a motion and second on the

22  table now. Uh, we'll proceed now with Councilmember

23  McKeown.

24      MR. MCKEOWN:  Well, this is engendered a fascinating

25  exploration of constitutional law. But for many of us in

24

1      our community it's intensely personal. In my personal

2      ethnic and cultural history tell me how deeply divisive

3      disagreement over religion can be, because I'm Irish.

4          I'm a citizen of the Republic of Ireland. And I've

5      seen what can happen. My -- my family lost our farm in

6      Northern Ireland in County Armagh, because we were the

7      wrong religion.

8          Uh, I have driven through Northern Ireland in the

9      middle of July when they're celebrating the Battle of the

10     Boyne and seen signs outside those Northern Ireland

11     cities with the Red Hand of Ulster and other symbolism

12     that tell me that I am not welcome, because my color is

13     not orange and my religion is not Protestant.

14         So I know where this can go and it was deeply

15     troubling to me as it was to, I think everybody in the

16     diocese and many in the community to see the hostility

17     that was expressed last winter season and frankly, some

18     of the intolerance I heard from both sides tonight.

19         Although, I must say I am convinced by the testimony

20     I heard tonight and emails I got that the winter displays

21     are an important tradition in our community and have deep

22     significant meaning for many people in Santa Monica and

23     in the region and may even bring people in to shop in

24     Santa Monica.

25         That may be true. Um, however, what I also know is

25

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1    that we are bound by the Constitution to allow free

2    speech without respect for content.

3        And that should we continue with that tradition the

4    way we have there is no way for us as a city to prevent

5    some very unpleasant things from beginning to happen. And

6    as I say, my own personal history tells me just how

7    unpleasant those things can get. So I'm going to vote

8    tonight to continue the tradition.

9        I'm going to try and make sure tonight that the

10   winter displays of whatever faith can be, uh, seen in our

11   city, that they can be an attraction for people to come

12   to Santa Monica, that they can be legitimately separated

13   from displays meant to disparage or disagree in a

14   disrespectful way.

15       And I believe the way to do that is to support the

16   staff recommendation and to allow those displays to

17   continue on private property where you may do what you

18   want and not have to worry about the fact that the booth

19   next to you is going to be from somebody who disagrees

20   with you.

21       So I hear you and in some ways I agree with you. I

22   know that the vote I'm about to cast is not the vote you

23   hoped you'd hear, but I think it's a vote that's going to

24   let this tradition continue in a meaningful way for you

25   and your families and your children whereas if we

26

1     continue the way we are, being Irish I know where it

2     goes. Thank you.

3          MR. BLOOM:  Dr. Holbrook.

4          DR. HOLBROOK:  I'd like you to, uh, place yourself

5     in my place for a second, uh, and ask you, how many of

6     you have been threatened about this personally? It's

7     happened to our staff. They've received very serious

8     threats against them, their wellbeing and their lives.

9          Uh, one word that hasn't been mentioned tonight is

10    the courts. The courts in the United States of America

11    constantly have changed law and they have changed the law

12    and interpreted the law differently than it was in 1953

13    or '55 or '65 or anywhere else.

14         And the l- -- courts have changed the law and

15    they've really made us subject to the laws that exist

16    today and when you speak to us and you say, you know, we

17    wish you would do this there is some things we can do and

18    some things we can't do.

19         A lot of the -- what's been said tonight has just

20    been flat out incorrect. Some of it has been correct.

21    Some of the things that have been suggested were that, uh

22    -- that we, uh, have a -- go ahead with a lotto and that,

23    um, people would win spaces for displays and then we

24    could group the churches, whichever ones won, that they

25    won one through 14 spaces or they won three spaces.


27

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1       We could group those three together and other people
2  could -- we can't do that. That's against the law. You
3  can't group because of the content of the message, you
4  can't do it. If you do you're subject to, uh, lawsuits if
5  somebody files them.
6       And if we get a lawsuit, uh, I don't think any of
7  you are willing to put up about $250,000 that we would
8  have to pay if we lost the lawsuit, uh, the attorney's
9  fees for the people who sue us.
10      And that's what we're talking about. When I look
11 back at last winter's holiday displays at the end of that
12 period there was a lot of -- a lot of very disappointed,
13 upset and unhappy people with the way it turned out and -
14 - and they blamed us for it.
15      You know, it's -- like it happens when you're in
16 government, it's always our fault. And my belief is next
17 year it'll be worse. Some people have suggested, well,
18 let everybody have a space. How many blocks of Palisades
19 Avenue are we to give up? About four or five blocks from
20 the pier at the Montana Avenue with displays.
21      And I can promise you this, we had a display 20
22 years ago on private property on Wilshire Boulevard and
23 I'm not going to tell you what it is if you don't
24 remember, but it was so egregious that people were
25 literally slamming on their brakes as they went by the

28

1    display.

2         And if that wound up in Palisades Park I guarantee

3    that everybody in this room would be horrified. I don't

4    care if you believe in God or you don't or somebody else

5    or you're an atheist you would be personally horrified if

6    that display showed up in the park and some others that

7    didn't win last fall showed up in the park you'd be

8    horrified.

9         And so I wonder, why do we want to subject ourselves

10   to that? Why not just, you know, have a holiday season

11   and just, you know, wish somebody a merry Christmas? How

12   many of you have wished somebody a merry Christmas and

13   didn't know they were Jewish and that person just wished

14   you one back and you went on, take care, have a merry

15   Christmas and say hi to your wife and family?

16        Because we all want to be of good will to one

17   another, want to be nice to one another and we don't take

18   it as personal is somebody doesn't recognize to have the

19   religion we happen to be. I happen to be a religious

20   person and I grew up with these things.

21        You know, I've lived here more than 70 years. So I

22   go way back before this tradition ever began and I can

23   remember when we had a Christmas parade. I remember when

24   we had homecoming for the high school parade.

25        I remember one thing after another we used to do in

29

1     Santa Monica and we used to have a float and a rose
2     parade. We don't do things like that today, because it
3     just doesn't fit where we are today and what we're doing
4     today.
5          However this turns out, if we decide that these
6     displays can no longer be done in the public park and
7     they need to put them on private property or whatever you
8     decide to do I hope that we could all still be people of
9     good will towards one another.
10          Um, you're not aware of all the testimony we receive
11     through e-mail, hundreds of emails from all over the
12     country.
13          And some of them are very strident, very mean and it
14     really, really wears on us, because we get emails from
15     all over the place telling us, you're trying to take God
16     out of Santa Monica or you're trying to put somebody else
17     in Santa Monica or you're trying to change the way people
18     believe in Santa Monica, you're ruining Christmas for my
19     family.
20          Well, I'm telling you I'm a person that has faith
21     and my faith is not going to be rattled. I will still
22     have faith and, uh -- and I -- and I appreciate other
23     people for what they believe or do -- don't believe,
24     that's entirely up to you.
25          But I personally am not going to lose my faith

30

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1    because we decide we can't do this any longer. It's just

2    that why do we want to have a display in the park that is

3    so controversial it gets on national television for the

4    messages that are being put out there.

5        What if they put up the Holocaust message that never

6    existed, never existed. And people have done that before.

7    Why don't they put up a statular- -- statute of Hitler

8    and say, this poor misunderstood leader.

9        You know, as a Christian I would find that a

10   horrible thing. As a non-Christian people who -- who

11   understand history and World War II would certainly

12   believe that's a horrible thing to do. Yet those are the

13   kind of things we can expect to happen if -- if, uh, this

14   continues the way it's going now.

15       We're -- we're thinking maybe 200 or 300

16   applications this year if we have a lotto system. So, uh,

17   the mayor hasn't spoken yet. I'm anxious to hear what he

18   has to say. But this is really a serious, serious problem

19   and I hate to see, uh, the community hurt, uh, by the

20   kind of displays that may show up this next fall if we

21   continue. Go ahead, mayor.

22       MR. BLOOM:  Thank you. Well, I -- I'd like to begin

23   by thanking everyone who has participated in our

24   discussion today, the, uh -- the prior discussion.

25       The, uh, eloquence from -- from those of you in the

1     community who spoke and, uh, from my colleagues, uh --

2     uh, on the dais, uh -- uh, the, um -- the research and

3     the thought and the work that has gone into this by

4     staff, um, has been incredible.

5          And you've all been involved in the highest form of

6     First Amendment expression, that thing that we prize most

7     in this country and that, uh, in many respects is what

8     the dialogue has been about and -- and a concern, uh, by

9     most of the people, I think who are involved in the

10    discussion about the loss of an ability to express, um,

11    or by others, uh -- uh -- uh -- uh -- uh -- uh -- uh, a

12    sense that, uh, certain, uh -- uh, religious expression

13    ought not be allowed in -- in the park.

14         But I -- I -- I think the level of the discourse has

15    been generally very high and yes, we have heard some, uh

16    -- uh, some -- some extraordinary negativity and some

17    very bad things, but, uh -- but generally speaking, I --

18    I -- I really, uh, think it's been a -- a difficult, but

19    a great discussion.

20         And I was very touched by, uh -- uh, many of the

21    comments. Uh -- uh, one that kind of stuck with me, and I

22    wrote down, uh, was something that, uh, Sarah Levatanski

23    [ph] said, uh -- uh, that, uh, I think she was, uh,

24    cautioning us against silencing expression in the -- in

25    the park.


32

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1       And the -- the staff recommendation does, in fact

2   close a forum and -- and, uh, in -- in -- in effect, uh,

3   does silence some expression in the park, but it does not

4   silence expression in the park generally.

5       There is, uh -- go any day out to Palisades Park and

6   it is a vibrant and -- and lively place. There are

7   people, uh, having private conversations and having some

8   very, very public conversations, uh -- uh, sometimes with

9   ~~megaphones and a little bit louder than I'd -- that I'd~~

10  like to hear.

11      But there are a lot of opinions being expressed out

12  there. Uh, we will not be silencing expression by, uh,

13  any action that we take here today and I think that we

14  are frankly, faced with a decision between, uh -- uh --

15  uh, two choices.

16      One is to, again, hold the lottery. Our, uh, counsel

17  has told us that that is a perfectly acceptable and

18  legal, uh, option for us and the other option being, uh,

19  eliminating unattended displays.

20      Uh, I would note that I don't think there was a

21  single person who wrote to us or who came to either of

22  the very lengthy hearings on -- on this who actively

23  advocated for continuing the lottery system and that, uh

24  -- uh, to me says a lot.

25      Um, and -- and I think that the comments by my

33

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1    colleagues about, uh -- um, the failures of -- of -- of

2    the -- the lottery that we tried are, uh -- are -- are

3    very real. I wish that wasn't so. We really wanted that

4    to -- that system to work.

5         We thought, you know, wh- -- when -- when -- when we

6    discussed it and -- and passed it we thought -- we

7    thought we were on to something, but it, uh -- uh -- uh,

8    it -- it -- it wasn't and it wasn't meant to be. And I

9    don't think that it is a, uh -- a realistic, uh -- um,

10   solution for -- uh, for any of us at this point.

11        And so I too am go- -- am going to support the staff

12   recommendation. I wish that there was another, um,

13   alternative that -- that, uh -- that was workable that

14   passed, uh -- uh -- uh, a constitutional muster. I

15   realize that, uh, other people disagree on that subject

16   and I think that, uh -- uh, this being a -- the great

17   country that it is, um, we will have disagreements like

18   this.

19        And, uh -- uh -- uh, we will un- -- undoubtedly be

20   hearing more about those disagreements, because I think

21   everyone is expecting, um -- uh, litigation in this

22   matter. I frankly don't want to encourage that.

23        I'm not happy about it. I hope it doesn't happen,

24   um, but if it does it will, uh, again, continue the

25   discourse that we're -- that we're having and, uh, we may

1    yet come back again to, uh -- uh -- uh, to have more

2    discussion. As there's no further comments I think we're

3    -- we're ready to vote.

4         PUBLIC:  Why can't the city vote on it?

5         MR. BLOOM:  This -- sir?

6         PUBLIC:  Why did -- why people [inaudible] --

7         MR. BLOOM:  Sir -- sir, you are -- you are out of

8    order. The, uh -- uh, the public has already had an

9    opportunity to speak.

10        PUBLIC:  Then [inaudible] the vote.

11        MR. BLOOM:  And we will now proceed to the council

12   vote.

13        MS. STEWART:  Councilmember Holbrook?

14        MR. HOLBROOK:  Yes.

15        MS. STEWART:  Mayor Pro Tem Davis?

16        MS. DAVIS:  Yes.

17        MS. STEWART:  Councilmember O'Day?

18        MR. O'DAY:  Yes.

19        MS. STEWART:  Councilmember McKeown?

20        MR. MCKEOWN:  Yes.

21        MS. STEWART:  Mayor Bloom?

22        MR. BLOOM:  Yes. That brings this item to a

23   conclusion and we will move on to item --

24        PUBLIC:  [inaudible] to see God [inaudible] --

25        MR. BLOOM:  -- 7a.

1          MS. STEWART:  7A is the second reading and adoption

2     of an ordinance.

3          MR. BLOOM:  Why don't we take a, uh, two-minute

4     break, uh, while the council chambers clear.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

```
 1

 2

 3        I, Chris Naaden, a transcriber, hereby declare under

 4   penalty of perjury that to the best of my ability the

 5   above 36 pages contain a full, true and correct

 6   transcription of the tape-recording that I received

 7   regarding the event listed on the caption on page 1.

 8

 9        I further declare that I have no interest in the

10   event of the action.

11

12        July 17, 2012

13        Chris Naaden

14

15

16                              X_____

17

18   (Santa Monica City Council, Item 5A, 6/12/12)

19

20

21

22

23

24

25
```

37

# EXHIBIT 13



William Becker <bbeckerlaw@gmail.com>

---

## Nativity: Phone Call

---

**Marsha Moutrie** <Marsha.Moutrie@smgov.net>                    Mon, Jun 25, 2012 at 5:30 PM
To: William Becker <bbeckerlaw@gmail.com>
Cc: Barry Rosenbaum <Barry.Rosenbaum@smgov.net>

Dear Mr. Becker,

Here is the information you requested about alternative avenues that would be available to your client for displaying Nativity scenes and otherwise expressing their views about Christmas if the ordinance recently approved on first reading becomes law.   As you know, the ordinance would eliminate an exception (for unattended winter displays) to the City's general prohibition against unattended displays in City parks.  However, that action did not eliminate other, alternative avenues, which are available to your clients and all others.  You asked us for a list of those alternatives.  Here is a partial list.

Your clients could display a Nativity scene or scenes in any City park for the day.  The display would need to be attended, and it would need to be removed from the park at night.  (All City parks are closed during late night hours.)

Additionally, if your clients wish to use a City park or parks to hold a Nativity display event that will attract more than 150 people, they could apply for a Community Event permit.  (I want to note that Event permits for Palisades Park are limited to "moving" events, such as processions and walks.  This limitation is based on Palisades Park's unique physical characteristics and does not apply to other City parks, which are available for stationary events.)

Third, your clients could display Nativity Scenes on private property, such as church property.  (Council members and other civic leaders have suggested the idea of having different scenes at different churches and encouraging community members to walk, bike or drive between them, which would provide the community with the experience of a Posada.)

Additionally, your clients are, of course, free to express their views on Christmas and the Christmas story in Palisades Park and in other public spaces in a variety of other ways.  They can, for instance, distribute literature, organize a procession, preach, sing, table, dramatize the Nativity story, and otherwise communicate their beliefs and views.  Thus, following the adoption of the ordinance ending the Winter Display exception, all persons remain free to express their views in Palisades Park, and in other parks, City streets and elsewhere,  through a wide variety of means.

We hope this information answers your question about some alternative avenues of communication. If you have questions about it, please feel free to contact us.

You also encouraged us to provide feedback on the legal theories you expressed in your recent letter. Here are a few general thoughts. You appear to rely heavily on a line of cases that exemplifies this proposition: a regulation that is enforced based upon a listener's reaction to speech may not be content neutral. We think that the ordinance would fall well outside the prohibition established by that line of cases. Additionally, the ordinance is facially neutral. It does not discriminate between types of unattended structures or between the messages they convey. All unattended private displays would be disallowed. And, we believe the record shows that the ordinance advances substantial governmental interests. For example, it restores shared public use of limited park space. (As you know, we are required to balance competing public use of traditional public forums.) The ordinance also protects the unique aesthetic qualities of Palisades Park, particularly its spectacular views. And, the ordinance reduces administrative costs attendant upon operating a growing lottery for limited display space.

We also understand that you believe the Beverly Hills case was incorrectly decided. We disagree. But, in any event, it is the law. You mentioned that you hope to make new law with this case. Of course, you would have to do that in the Ninth Circuit and reasonable minds likely differ on the likelihood of your future success. We believe that the City Council's action conforms to the law as it presently exists. Indeed, we believe the Ninth Circuit would likely find that this issue is already settled, particularly in light of decisions of the Supreme Court, the Ninth Circuit, and other circuits.

We hope that this information communicates our basic thinking about the First Amendment claims you have raised.

Best,

Marsha Moutrie

**From:** William Becker [mailto:bbeckerlaw@gmail.com]
**Sent:** Thursday, June 21, 2012 4:29 PM
**To:** Marsha Moutrie
**Subject:** Nativity: Phone Call

Dear Ms. Moutrie,

Thank you for taking time to discuss the Nativity Scenes matter with me today. I look forward to receiving an e-mail from your office responding to my points and providing me with information relating to city policies.

9/30/12                                    Gmail - Nativity: Phone Call

William J. Becker, Jr., Esq.

──

**The Becker Law Firm**

**Protecting Political, Intellectual and Religious Freedom**
11500 Olympic Blvd., Suite 400 | Los Angeles, CA 90064
Tel: (310) 636-1018 | Toll Free: (866) 649-6057 | Fax: (310) 765-6328



**Confidentiality Notice:** This electronic mail message (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521, is confidential and may be legally privileged.  If you are not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying of this communication is strictly prohibited.  Please reply to the sender that you have received the message in error, or please call the sender at (310) 636-1018 and then delete this email from your system.  Thank you.

# EXHIBIT 14

1

2

3

4

5

6

7

8

9

10          TRANSCRIPT OF TAPE-RECORDED

11              MEETING OF THE

12         SANTA MONICA CITY COUNCIL

13              MAY 22, 2012

14

15   REGARDING ITEM 7B, ERECTION OF STRUCTURES AND WINTER

16              DISPLAYS IN PALISADES PARK

17

18

19

20

21

22

23

24

25

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

1      MALE 1:  [inaudible] in the future.

2        MR. BLOOM:  Thank you. Our next item is, uh, 7B.

3        MS. STEWART:  7B is the introduction and first

4      reading of an ordinance relating to the prohibition of

5      the erection of structures and winter displays in

6      Palisades Park. So for right now we have --

7        MR. BLOOM:  Thank you. Can I ask those of you who

8      are exiting to please do so silently.

9        MS. STEWART:  You have 48 requests to speak.

10       MR. BLOOM:  We have 48 requests to speak. Some

11     people will be, I think entering the room from outside

12     and we do apologize to you that the meeting has lasted so

13     long. It happens now and then. Uh, but it's 11:30 p.m.

14     and -- and, uh, I'd like to --

15       MR. SHRIVER:  Motion to continue past 11:00.

16       MR. BLOOM:  All those in favor?

17       MS. DAVIS:  Aye.

18       MR. BLOOM:  Aye. I'd like to, um --

19       MR. SHRIVER:  Any oppose?

20       MR. BLOOM:  -- just before -- yeah.

21       MR. SHRIVER:  Do you want to ask if there are any

22     that oppose?

23       MR. BLOOM:  Yeah. I'll bet there's one of those.

24       MR. SHRIVER:  One opposed.

25       MALE 2:  Two.

2

1        MR. BLOOM:  All right.

2        MR. SHRIVER:  Two opposed?

3        MALE 2:  Yeah.

4        MR. SHRIVER:  Oh, two opposed. Very good.

5        MR. BLOOM:  All right. All right. The opposition

6    [inaudible].

7        MR. SHRIVER:  Then those are growing. I'm excited.

8        MR. BLOOM:  All right. In -- in terms of moving

9    forward we have the option of hearing testimony only, but

10   we do need to have some staff report, uh, preceding that,

11   uh, I think to set the stage for test- -- for -- for

12   public comment. Councilmember Shriver?

13       MR. SHRIVER:  I just -- well -- well, could -- could

14   we, uh, say to people that there will be another hearing

15   and they could testify rather than staying -- waiting

16   here until 2:00 in the morning.

17       If they want to come back they could and therefore,

18   maybe tonight we would hear only from those people who

19   feel absolutely they want to be heard tonight. There's a

20   much better chance of, uh, getting to bed this --

21   tonight. Could we suggest that to people?

22       MR. BLOOM:  We can. Uh, as we always do, we would,

23   uh -- we would do that --

24       MR. SHRIVER:  So then you will be able to speak

25   another night --

1         MR. BLOOM:  -- if we decide to go that --

2         MR. SHRIVER:  -- if you don't speak tonight.

3         MR. BLOOM:  Right. But wait, Councilmember Shriver,

4    uh, let's make su- -- let's -- let's decide that that's

5    what we're going to do first. I don't know if that's the

6    sense of the council or not. Um, does -- uh, well,

7    essentially what --

8         MR. SHRIVER:  [inaudible] it's up to them.

9         MALE 2:  How many [inaudible] are there?

10        MR. BLOOM:  We have about 40.

11        MR. O'DAY:  Yeah. Forty [inaudible] would take an

12   hour and a half.

13        MR. SHRIVER:  Good. All right. All right. Then --

14   then if they don't want to speak tonight they'll be invi-

15   -- they can come back.

16        MR. BLOOM:  That's right.

17        MR. SHRIVER:  So if we say that to them -- yes.

18        MR. BLOOM:  Our -- our -- our -- our process in

19   these situations, which do come up from time to time is

20   generally to allow people who want to speak tonight to

21   speak, but that's your opportunity. You don't get to come

22   back and speak again when the -- when, uh, the issue

23   comes back, which I think in this case would be soon, uh

24   --

25        MALE 2:  Right.

1       MR. BLOOM:  -- because I know staff is anxious to

2    have a decision one way or another on the issue.

3       MALE 2:  Right.

4       MR. BLOOM:  So if that's the -- uh, if I'm not

5    hearing an objection to that, uh -- uh, to taking that

6    approach, staff, is that something that we can make work?

7    All right. Uh --

8       MALE 2:  [inaudible]

9       MR. BLOOM:  We are not going to -- we're not --

10   we're not going to deliberate tonight for all kinds of

11   good reasons. Uh, we will hear from the public. We'll

12   hear a staff report and when I say we'll hear from the

13   public we will hear from those members of the public who

14   would like to speak to us tonight.

15      And you'll just tell me whether you do or you don't,

16   but if -- again, if you do speak tonight that will be

17   your opportunity to be heard on this issue. When it comes

18   back we will be continuing the meeting and only those

19   people who have not spoken will speak at the -- at the

20   continued hearing.

21      You can speak tonight or you can speak at that time,

22   only once. Ms. Moutrie?

23      MS. MOUTRIE:  Thank you. Because of the hour and

24   because there are -- I'm sure there are a number of

25   people who want to speak tonight I'm going to make this

5

1    brief knowing that you'll ask questions if you need

2    additional information.

3        So the topic tonight is winter displays in Palisades

4    Park. As you know, unattended displays in the park are

5    classified, according to law, as expressive activities.

6    And so our ability to regulate displays -- unattended

7    displays and other displays in the park is limited by

8    First Amendment restrictions.

9        Because of the First Amendment restrictions we don't

10   have an array of choices, we have a few choices, a few

11   general -- two -- two general choices. One general choice

12   is that we can allow winter displays without regard to

13   their content, because we can't sensor First Amendment

14   expression in the park or we can prohibit winter displays

15   in the park.

16       As you also know, but just to refresh everyone's

17   memory, the general rule of law in Santa Monica is that

18   unattended displays are prohibited in all of our parks.

19       The winter displays in Palisades Park have been, uh,

20   there during recent years pursuant to an exception to

21   that general prohibition which allows winter displays at

22   that location, Palisades Park along Ocean Avenue for a

23   brief period in the wintertime.

24       We last talked about this subject in February. We

25   brought you a staff report, which in view of the limited

6

1    legal options available to you, recommend that

2    elimination of the winter di- -- display exception for a

3    number of reasons, which were stated in that staff report

4    and again in tonight's staff report.

5         After hearing from the public in February you

6    decided to honor the requests made by many members of the

7    public that they be given more time to consider options

8    to see if other solutions might be found despite the

9    ~~rather rigid legal constraints. And so you -- you awarded~~

10   more time as requested.

11        And during that time, the interim between your

12   consideration of this issue in February, and now we have

13   heard from a number of people and I want to thank the

14   many members of the community who have weighed in, in

15   particular, we received fairly extensive commentary from

16   a couple of sources.

17        And because -- because those two sources spent so

18   much time and effort on their input I want to call them

19   out and mention them and thank them for -- for the

20   effort.

21        MR. BLOOM:  And may I ask you to pause, uh, Ms.

22   Moutrie for just one moment? Because I should've asked, I

23   want to make sure that there are members of the public

24   who actually do want to speak tonight. I'd hate to learn

25   later that --

7

1          FEMALE 1:  Oh, yeah.

2          MR. BLOOM:  Yes. Okay. Great. Great. Okay. That's

3     what I wanted to know, uh, because if you were all going

4     to get up and just take off after this then --

5          MS. MOUTRIE:  Right. We'd --

6          MR. BLOOM:  -- there wouldn't have been a point --

7          MS. MOUTRIE:  -- we'd take off with you.

8          MR. BLOOM:  -- to having the staff report. Thank

9     you.

10         MS. MOUTRIE:  Right. So I was saying that there were

11    a couple of, uh, community members who afforded

12    considerably more input that I wanted to pause on for a

13    moment. Mr. Jameson [ph] and, uh, the lawyer working with

14    Mr. Jameson's group, Mr. Mast [ph] wrote at length to you

15    and also c- -- uh, corresponded and communicated orally

16    with us.

17         And additionally, we had -- you had a fairly, uh,

18    lengthy writing from Frank Gruber and I want to comment

19    briefly on both of those since both offered, uh, rather

20    more detailed suggestions. Mr. Jameson and his group's

21    attorney, Mr. Mast, um, made two basic suggestions. Mr.

22    Mast, in particular suggested creating a limited forum

23    for December holiday displays.

24         This is, uh, a forum in the park that would be based

25    on the content of the displays. We believe it would be

8

1    legally problematic for that matter for that reason,

2    because it would be based on the content, which would be

3    holiday display content.

4         But even if that were not a problem probably the

5    greater problem would be that even if you could create a

6    limited public forum within a quintessential public forum

7    and limit it to winter displays you would also -- it's

8    clear, I think in the Ninth Circuit at least that you

9    would also have to allow displays that were in protest of

10   those winter holiday displays.

11        The other suggestion -- the other class of

12   suggestions -- there were a lot of details, but generally

13   speaking, the other class of suggestions made by Mr.

14   Jameson and Mr. Mast was that you basically retain the

15   current system, which allows winter displays without

16   regard to content, but that you make modifica- -- certain

17   modifications in how that system for allocating this

18   space is administered and that you also add some, uh,

19   restrictions on the physical nature of the displays.

20        In brief summary, and I can spend more time later

21   answering questions if you want me to either tonight or

22   the next time we discuss this subject, we think some of

23   those suggestions would be fine. We think others are

24   legally problematic.

25        But again, I want to pause on that, because Mr.

9

1    Jameson and Mr. Mast are pointing out that there's an

2    opportunity to keep the system you have and revise it.

3    And you could revise it, but what you can't do is revise

4    it in a manner that is intended to favor one -- the

5    content of one set of displays over others.

6        Also, I would like to add that given the record that

7    we've now created on this topic, it's very risky, I think

8    legally to -- to try to design a system that looks

9    general on paper on its face, but it's actually an -- an

10   ob- -- objective, but is actually intended to favor one

11   set of displays.

12       I think we've -- there's a vast record here that

13   indicates that a large number of the members of the

14   community would like to keep the nativity displays in the

15   park, which have been there for so many years and that's

16   very understandable that they would.

17       Um, so I caution against adopting a system that is

18   designed to do that, um, indirectly for legal -- again,

19   only for legal reasons, which is Mr. Rosenenbaum's -- Mr.

20   Rosenbaum and my only job is to give you advice about the

21   law in this area.

22       So let me move on to Mr. Gruber's suggestion. Mr.

23   Gruber, who wrote to you more recently, advocated

24   against, uh, closing this forum -- the winter display

25   forum, because, as he points out correctly, the law in


10

1    the United States favors more opportunities for speech,

2    not less and that's exactly right.

3         No one disagrees with that. And similarly, the -- we

4    believe that you can certainly keep all the displays you

5    currently have in the park. The system that we operated

6    last year was, we believe, fully legal.

7         The only reason that we made a suggestion to -- to

8    s- -- to change it was it appears to have been

9    unsatisfactory to a number in the result -- to a number

10   of members of the community. So that's a very brief staff

11   report and I can answer questions if you have them later.

12   But if I stop now you'll have a chance to hear from more

13   members of the public.

14        MS. STEWART:  Do we have any questions from the

15   council?

16        MR. HOLBROOK:  No. I'm just going to, um, mention

17   that my schedule won't let me stay, uh, late and I'm

18   going to watch this evening's testimony from the public

19   on the video and, uh, join us when we deliberate next

20   time. Thanks.

21        MALE 2:  Yeah.

22        MS. STEWART:  Okay. Any other questions, statements?

23   All right. Then we'll begin the public comment and let

24   the mayor call the names.

25

11

1

2

3          I, Chris Naaden, a transcriber, hereby declare under

4     penalty of perjury that to the best of my ability the

5     above 11 pages contain a full, true and correct

6     transcription of the tape-recording that I received

7     regarding the event listed on the caption on page 1.

8

9          I further declare that I have no interest in the

10     event of the action.

11

12          July 17, 2012

13          Chris Naaden

14

15

16                              X_____

17

18     (Santa Monica City Council, Item 7B, 5/22/12)

19

20

21

22

23

24

25

12

NOBLE TRANSCRIPTION SERVICES - 714.335.1645

# EXHIBIT 15

Case 2:12-cv-08657-ABC-E   Document 1   Filed 10/09/12   Page 166 of 169   Page ID #:305

7/13/12          City Council Meeting - Ordinance Amending Santa Monica Municipal Code Section 4.55.060 Relating to E...

**City Council Meeting:   June 12, 2012**

**Agenda Item: 5-A**

To:          Mayor and City Council

From:        Marsha Jones Moutrie, City Attorney

Subject:       Ordinance Amending Santa Monica Municipal Code Section 4.55.060 Relating to Erection of Structures and Winter Displays in Palisades Park

-
-
-

### Recommended Action

Staff recommends that City Council introduce for first reading the attached ordinance, which would delete from the Santa Monica Municipal Code (Municipal Code) language allowing private, unattended winter displays in Palisades Park.

### Executive Summary

The Municipal Code prohibits private unattended displays in City of Santa Monica (City) parks, but an exception to that general prohibition allows for winter displays in Palisades Park along Ocean Avenue, where there have been displays for decades during the holiday season. Such displays are classified as expression and are protected by the First Amendment, which prohibits the City from favoring or disfavoring protected expression based on its content. Thus, the City can allow private displays in its parks, or not, but it cannot pick and choose between them based on their content.

On February 28, 2012, in order to resolve controversy and conserve City resources, staff proposed an ordinance that would amend Section 4.55.060 by repealing the winter display exception. If adopted, that ordinance would effectively eliminate winter displays in the park, including religious displays, such as the Nativity scenes. At the request of community members, Council postponed consideration of the proposed ordinance to allow for community discussion of alternatives. Staff now reiterates its proposal and recommendation that Council approve the attached ordinance.

### Background

Privately owned and installed Nativity scenes have been displayed in Palisades Park by local churches for decades. And, in recent years, displays have also celebrated Hannakuh and solstice and have advocated atheism.

Last year, when requests for display space exceeded the space allotted for displays, the City operated a lottery in order to allocate display opportunities in an unbiased manner. This was done to effectuate First Amendment requirements of neutrality and thereby avoid legal risks. The random drawing resulted in most spaces being allocated to displays that opposed religion.

Controversy ensued. Some argued that the "traditional" Nativity scenes, which had been in the

park for sixty years, must somehow be preserved.  Others favored the lottery system for allocating spaces but advocated standards for displays that would ensure aesthetic merit.  Some opposed all private displays on public space.  Many felt that the juxtaposition of religious and anti-religious displays was a distressing symbol of conflict inconsistent with values of peace and harmony that many associate with the holiday season.

The First Amendment severely restricts the City's options.  Staff proposed the attached ordinance for three reasons.  First, many residents who complained about winter displays this year urged that they would rather preserve the aesthetic qualities of this designated landmark and look at the ocean vista than continue the displays.  Second, operating the lottery system is both time consuming and costly for the City and likely to become increasingly so because applicants have indicated they will "flood" the lottery process.  Third, persons who favor particular displays have the option of installing them on private property.  Since the ordinance was proposed, community members and others have had the opportunity to discuss options and further express their views to their government.

## Discussion

The proposed ordinance, which would eliminate private, unattended winter displays in Palisades Park, would serve the purpose of resolving the controversy, eliminating legal risks, conserving the staff time and resources necessary to operate a constitutionally valid regulatory system, conforming usage of Palisades Park to the long standing, City-wide standard which prohibits unattended displays in parks, and protecting the views of the park and ocean from Ocean Avenue without precluding the installation of displays on other non-governmental property.  At the February 28th meeting, staff summarized the case law, in an oral report, focusing on two southern California cases about cities' regulation of religious (and anti-religious) holiday displays in city parks.  Since those cases form the basis of staff's recommendation, they are again noted here. *Kreisner v. San Diego*, 988 F.2d 883 (9th Cir., 1993), stands for the proposition that a City may permit private displays through a content-neutral permit allocation process. *Jewish Congress v. Beverly Hills*, 90 F.3d 3790 (9th Cir. 1996) stands for the proposition that a City, which allows religious displays in a park, cannot refuse to allow other displays in the park protesting the religious displays.  Based on these cases, staff explained that the City cannot favor particular displays, including Nativity displays, and cannot prohibit displays that criticize other displays.

Since February 28th, staff has been in contact with representatives of the groups that installed the Nativity scenes and the anti-religious displays last winter.  Both groups have received advice from attorneys.  Both have informed staff that they will file more applications next year to increase their odds of being allocated more spaces.  Staff has also been in contact with community religious

leaders, with attorneys, and with others.   In all, the various stakeholders made a number of suggestions, including: keep the displays but revise the lottery process; physically separate the religious and anti-religious displays to minimize conflict; eliminate all unattended private displays from the park, relocate private displays to private property.  Staff noted all suggestions, assessed legal threats, and considered all commentary.  Staff also encouraged all to share their thoughts with the Council.

In assessing the legal input, staff noted that its understanding of the law and the views expressed by other attorneys were not materially different.  The only significant difference is as to the legality of allocating different areas of the park for religious and anti-religious displays.  Staff believes that this approach would be legally problematic, at least in this circuit.

Overall, the community input and dialogue have not caused staff to change its recommendation or its thinking as to the alternatives and budgetary impacts.  Those remain the same as stated in the February 28th report.  Accordingly, the attached ordinance is again submitted and recommended for first reading.

Alternatives
Alternatively, Council could decide to maintain the exception for winter displays in the Municipal Code, in which case staff would, once again, operate a lottery in order to allocate winter display space.  Staff recommends against the alternative for the reasons stated in this and the previous report.

**Financial Impacts & Budget Actions**
There are no significant financial or budget impacts attendant upon approving and adopting the proposed ordinance.  Staff time that would otherwise be expended on the lottery system will be conserved and used to handle the growing number of Community Event applications.

**Prepared by:**  Marsha Jones Moutrie, City Attorney

**Approved:** _____         **Forwarded to Council:** _____

_____         _____
Marsha Jones Moutrie                      Rod Gould
City Attorney                                   City Manager

Case 2:12-cv-08657-ABC-E   Document 1   Filed 10/09/12   Page 169 of 169   Page ID #:308

7/13/12          City Council Meeting - Ordinance Amending Santa Monica Municipal Code Section 4.55.060 Relating to E...

**ATTACHMENT:** <u>Proposed Ordinance</u>