UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SANTA MONICA NATIVITY SCENES COMMITTEE, | ) ) ) | CASE NO.: CV 12-8657 ABC (Ex) |
| Plaintiff, | ) ) | ORDER DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION |
| v. | ) ) | |
| CITY OF SANTA MONICA, et al., | ) ) | |
| Defendants. | ) ) | |

    Pending before the Court is Plaintiff Santa Monica Nativity

Scenes Committee's Motion for Preliminary Injunction, filed on October

10, 2012.  (Docket Nos. 5, 17.)  Defendants City of Santa Monica and

City Council Members (collectively the "City") opposed on October 29,

2012 and Plaintiff replied on November 5, 2012.  The Court heard oral

argument on Monday, November 19, 2012.  For the reasons below, the

motion is DENIED.[1]

_____

    [1]Because the Court denies Plaintiff's motion, Plaintiff's request
to waive the bond requirement (Docket No. 6) is DENIED AS MOOT.

## BACKGROUND[2]

In this case, Plaintiff mounts a constitutional challenge to a decision by the City of Santa Monica to repeal an exception to its general ban on private "unattended displays" that operated to permit certain unattended "Winter Displays" in the City's Palisades Park every December.

Called the "crown jewel" of the City's park system, Palisades Park is a heavily utilized narrow strip of park land bordering downtown Santa Monica and overlooking the Pacific Ocean. (Ginsberg Decl. ¶¶ 6—7.)  The City's Landmarks Commission has designated it as a landmark and the City's Local Coastal Program Land Use Plan requires that its views be protected.  (Id. ¶ 8; City's Request for Judicial Notice ("RJN"), Ex. R at 193—94.)

For decades during December a series of life-size displays depicting the Christmas Nativity scene was erected in Palisades Park. (Compl. ¶ 14.)  Between 1955 and 2010, this tableau was comprised of 14 separate display booths, each of which was eight feet tall by eighteen feet wide by six feet deep.  (Jameson Decl. ¶ 11.)  The erection of the displays took hours and required 10 to 15 workers. (Id. ¶ 30.)

These displays were allowed each year, despite several relevant enactments of regulations by the City dealing with private unattended structures on public park land.  For example, in 1994 the City adopted Ordinance No. 1749, which governed the utilization and maintenance of City parks and effectively banned all unattended displays in City

---

[2]Plaintiff has filed objections to certain evidence submitted by the City in opposition to Plaintiff's motion.  The Court has considered those objections and they are OVERRULED.

parks.  (City's RJN, Exs. G, H at 18—28.)  Likewise, in 2001, the City adopted Ordinance No. 2008, the City's Community Events Ordinance, which governs displays and installations in the context of a community event, although those events are generally defined as limited-duration gatherings of no more than 150 people and do not include unattended displays erected for longer than one day.  (Id. Ex. I at 36—37; Ginsberg Decl. ¶ 9.)

After concerns arose about the lack of standards for unattended displays, on September 9, 2003, the City adopted Ordinance No. 2095, which specifically prohibited unattended displays, with exceptions for City-owned installations and structures, installations authorized by a Community Events Permit, and unattended displays or installations in Palisades Park during the month of December (called "Winter Displays").  (City's RJN, Ex. L; Ginsberg Decl. ¶ 10.)  Should the number of requested displays exceed the available space in Palisades Park, Ordinance No. 2095 provided that space would be allocated on a first-come, first-served basis regardless of the content of any displays or the applicant's identity.  (City's RJN, Ex. L at 80.)  The City Council believed that this system permissibly regulated private unattended displays within constitutional bounds consistent with American Jewish Congress v. City of Beverly Hills, 90 F.3d 379 (9th Cir. 1996) (en banc).  (City's RJN, Ex. J at 67.)  On October 14, 2003, the City adopted Resolution No. 9898(CCS), which authorized the installation of Winter Displays at (1) Palisades Park between Santa Monica Boulevard and Arizona Avenue on the grassy area adjacent to Ocean Avenue and (2) Palisades Park between Arizona Avenue and Wilshire Boulevard on the grassy area adjacent to Ocean Avenue. (Ginsberg Decl. ¶ 11; City's RJN, Ex. M.)

Between 2003 and 2009, the City encountered few problems managing the application process.  On average during this period, the City received two to three applications for Winter Displays, and the displays occupied a single block, leaving the second block unused. (Ginsberg Decl. ¶ 23.)  In 2010, however, the City for the first time received three applications for Winter Displays that occupied the entire two blocks allocated to displays in Palisades Park. (Id. ¶ 13.)  According to Plaintiff's Complaint, one of those applications was from Damon Vix, an outspoken critic of the Nativity Scenes erected in Palisades Park. (Compl. ¶ 37.)  He obtained space for 14 booths, but only erected one display, which contained a chain-link fence and structure displaying a quote from Thomas Jefferson that "Religions are all alike — founded upon fables and mythologies." (Id. ¶¶ 35, 37.)

Fearing that even more applications would be filed on the first calendar day of the filing period in 2011 based on the first-come, first-served process, City staff devoted significant resources to developing a lottery system to handle multiple applications filed on the same date. (Pietrzak Decl. ¶ 5.)  Staff also divided the area for displays in Palisades Park into 21 distinct "spots," and applicants could request up to nine spots in an application. (Id. ¶¶ 5—6, Ex. A.)  As anticipated, Staff received 13 applications on the first day of the filing period in 2011, and one application received prior to that date was treated as having been received on the first day. (Id. ¶ 6.)  Of those, 13 applications were deemed "complete" and all but one requested the maximum number of nine spaces. (Id.)  Plaintiff's application was among them; as were applications from Vix and Dale Vix, apparently Damon Vix's brother. (Reply 17—18.)  Plaintiff alleges that Vix "recruited" other secular groups to apply for the

maximum number of spots to increase their chances in the lottery, and several of the applications were for secular displays, such as those celebrating the Winter Solstice.  (Compl. ¶ 38; Reply 17—18.)

A lottery was conducted, which resulted in only four applications receiving spots: two applicants each received all nine spots requested; one applicant received the one spot requested; and one applicant requested nine spots but received only the remaining two. (Pietrzak Decl. ¶ 7, Ex. D.)  Plaintiff alleges that, overall, "secular" groups obtained 18 of the 21 available spots, which they used for "anti-religious" messages and signs.  (Compl. ¶ 38.) Plaintiff received two spots and Chabad of Santa Monica received one space for a menorah.  (Id.)

The City claims that this 2011 application process required two additional staff members and at least 245 hours of staff time over several months, including reviewing applications and corresponding with applicants, conducting the lottery, responding to applicant and public inquiries,[3] reviewing and approving site plans, and coordinating with other City departments.  (Pietrzak Decl. ¶ 8.) Other departments also expended time on the application process.  (Id. ¶ 11.)

The 2011 displays were again up to eight feet tall, which cluttered the park and obstructed views.  (Ginsberg Decl. ¶ 17, Ex. B.)  The City contends that, although the winter display exception was created in 2003, it did not impact the park and staff until 2010 and 2011, when the allocated area was entirely used.  (Id. ¶ 18.)  This

___

[3]The City received 120 public comments, many of which the City claims were hostile, and even included threats to the staff's personal safety.  (Pietrzak Decl. ¶ 9.)  As a result, staff spent considerable time tracking and addressing correspondence as it was received.  (Id.)

full use reduced the shared usable area of Palisades Park, resulted in more extensive damage to the turf and plantings, and greater obstruction of views. (Id.)  At the end of 2011, staff were told to expect even more applications for 2012.  (Id.)

As a result of the City's experience in 2010 and 2011, the City Council held hearings in February, May, and June 2012 on repealing the exception for Winter Displays in Palisades Park.  (City's RJN, Exs. O, P.)  In those hearings, City Council Members expressed concerns about the dispute among applicants wanting to erect religious displays like Plaintiff's and applicants who wished to erect non-religious (and potentially anti-religious) displays.  For example, Council Member McKeown was "troubl[ed]" by the "hostility" and "intolerance . . . heard from both sides" (Becker Decl., Ex. 7 at 25); Council Member Holbrook noted that some displays were "controversial" and staff had received threats from unidentified individuals (id. at 27, 31); and Council Member O'Day noted that there had been conflict on both sides of the issue and that some of the non-religious displays might be offensive (id. at 15—16).  A June 12 Staff Report also noted that, "in order to resolve controversy and conserve City resources," City staff proposed repealing the exception for Winter Displays, noting that some individuals wanted to preserve the "traditional" Nativity scenes, others favored the City's lottery system but with a requirement that displays have aesthetic merit, and yet others felt that "the juxtaposition of religious and anti-religious displays was a distressing symbol of conflict inconsistent with values of peace and harmony that many associate with the holiday season." (Becker Decl., Ex. 9 at 1—2.)

However, the City Council also articulated concerns for the

displays' aesthetic impacts on the park, the reduction in available
park space for other recreational uses, the use of City resources for
the application process, and for the legal implications of altering
the first-come, first-served application process short of banning all
unattended displays. (Id., Ex. 7 at 3—12; see also Ginsberg Decl. ¶¶
13—17 (explaining that the 2010 and 2011 displays increased clutter,
blocked views, reduced usable park space, interrupted regular traffic
patterns, and killed grass).) The City Council members also noted the
availability of alternative avenues for speech, including leafletting
or talking to others in Palisades Park, erecting displays pursuant to
a Community Event Permit, erecting displays that are attended, or
erecting displays on private property. (Becker Decl., Ex. 7 at 8.)
Eventually on June 26, 2012, the City adopted Ordinance No. 2401,
which amended the Municipal Code to eliminate the exception for Winter
Displays and banned all unattended private displays in Palisades Park.
(City's RJN, Ex. Q.)

    Plaintiff has filed suit alleging violations of the First
Amendment Free Speech and Establishment Clauses and the Fourteenth
Amendment equal protection clause. Although Plaintiff's Complaint
seeks generally to enjoin the City's ban of private unattended
displays, Plaintiff actually does not want the City to revert to the
combined first-come, first-served and lottery system that existed in
2010 and 2011; instead, Plaintiff seeks to force the City to "restrict
[Winter Display] permit applications to applicants desirous of
celebrating the seasonal holidays and to deny applications that
violate such an objective." (Mot. 25; see also Docket No. 26-3
(Proposed Order) ¶ 4 (requesting injunction preventing the City from
"accepting all applications for winter displays that do not serve the

purpose of recognizing winter customs, traditions and celebrations"),

¶ 5 (requesting injunction forcing the City to adopt procedures that

"maintain content and viewpoint neutrality" while also "confining

applications for private unattended displays during the month of

December in Palisades Park to the theme of winter customs, traditions

and celebrations").)

### LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that

he is likely to succeed on the merits, that he is likely to suffer

irreparable harm in the absence of preliminary relief, that the

balance of hardships tips in his favor, and that an injunction is in

the public interest." Winter v. Natural Res. Defense Council, Inc.,

555 U.S. 7, 20 (2008); Marlyn Nutraceuticals, Inc. v. Mucos Pharma

GmbH & Co., 571 F.3d 873, 877 (9th Cir. 2009). This recitation of the

requirements for a preliminary injunction did not completely erase the

Ninth Circuit's "sliding scale" approach, which provided that "the

elements of the preliminary injunction test are balanced, so that a

stronger showing of one element may offset a weaker showing of

another." Vanguard Outdoor, LLC v. City of Los Angeles, 648 F.3d 737,

739 (9th Cir. 2011). "In one version of the 'sliding scale,' a

preliminary injunction could issue where the likelihood of success is

such that serious questions going to the merits were raised and the

balance of hardships tips sharply in [plaintiff's] favor." Id. at 740

(internal quotation marks omitted; brackets in original). This

"serious questions" test survived Winter. Id. Therefore, "serious

questions going to the merits and a hardship balance that tips sharply

in the plaintiff's favor can support issuance of an injunction, so

long as the plaintiff also shows a likelihood of irreparable injury

and that the injunction is in the public interest." <u>Id.</u> (internal
quotation marks omitted).

Importantly, a preliminary injunction may be denied on the sole
ground that the plaintiff has failed to raise even "serious questions"
going to the merits. <u>Id.</u> If the Court so concludes, it need not
address the other preliminary injunction factors. <u>Id.</u>

### DISCUSSION

Plaintiff asserts that the City's ordinance banning all
unattended displays in Palisades Park violates both the Free Speech
and Establishment Clauses of the First Amendment. As a result,
Plaintiff seeks to compel the City to allow Plaintiff's Nativity
display and other displays from applicants "desirous of celebrating
the seasonal holidays," while also "deny[ing] applications that
violate such an objective." As discussed below, the City's ban on all
unattended displays is constitutionally valid and, even if it were
constitutionally suspect, the relief Plaintiff seeks is unavailable
because it would compel the City to engage in impermissible content-
based and viewpoint discrimination in a traditional public forum.

### A.   Free Speech Claim

In order to determine whether the City's ban on unattended
displays violates the First Amendment, the Court must determine (1)
whether the speech at issue is protected; (2) the nature of the forum;
and (3) whether the restriction on the speech satisfies the requisite
standard. <u>Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.</u>, 473
U.S. 788, 797 (1985). Here, the City does not dispute that
Plaintiff's Nativity display constitutes protected speech and that
Palisades Park is a quintessential traditional public forum, so the
Court's analysis focuses on the third requirement — whether the City's

1  ban satisfies the requisite level of scrutiny.[4]

2           1.   Content-Based or Content-Neutral Regulation

3      At the outset, Plaintiff claims that the City's ban is an invalid

4  content-based regulation, whereas the City claims that the ban is a

5  valid content-neutral time, place, and manner restriction.  In a

6  traditional public forum, a content-based regulation is subject to

7  exacting scrutiny — the government must have a compelling interest and

8  the restriction must be narrowly tailored to achieve that interest.

9  Kreisner v. City of San Diego, 1 F.3d 775, 783 (9th Cir. 1993).  On

10  the other hand, a content-neutral regulation is subject to valid time,

11  place, and manner regulation, which must be narrowly tailored to serve

12  a significant government interest and leave open ample alternative

13  channels of communication.  One World One Family Now v. City & Cnty.

14  of Honolulu, 76 F.3d 1009, 1012 (9th Cir. 1996).

15      "In determining whether an ordinance is content-neutral, our

16  principal inquiry is 'whether the government has adopted a regulation

17  of speech because of disagreement with the message it conveys.'"

18  Colacurcio v. City of Kent, 163 F.3d 545, 551 (9th Cir. 1998).

19  Content neutrality exists if the ordinance is "aimed to control the

20  secondary effects resulting from the protected expression, rather than

21  at inhibiting the protected expression itself."  Id. (internal

22  quotation marks omitted).  "A regulation is content-neutral if it is

23  'justified without reference to the content of the regulated speech,'"

24  and "[a] finding that the restriction of First Amendment speech is a

25  'motivating factor' in enacting an ordinance is not of itself

26

27      [4]Plaintiff has not clarified whether its challenge to the City's
ban is facial or as-applied.  In this circumstance, the distinction
does not matter because the ban is valid both on its face and as

28  applied to Plaintiff.

1  sufficient to hold the regulation presumptively invalid." Id.

2      If a regulation is content-neutral on its face, the Court may

3  inquire into the "full record" to determine "whether evidence

4  indicates that the purpose of the ordinance is to suppress speech or

5  ameliorate secondary effects." Id. at 552.  "In so doing, [the Court]

6  will rely on all 'objective indicators of intent,' including the face

7  of the statute, the effect of the statute, comparison to prior law,

8  facts surrounding enactment, the stated purpose, and the record of

9  proceedings.'" Id.  However, "an otherwise constitutional statute

10 will not be invalidated on the basis of an 'alleged illicit

11 legislative motive,'" and the Court will not inquire into whether an

12 illicit motive exists.  City of Las Vegas v. Foley, 747 F.2d 1294,

13 1297 (9th Cir. 1984).

14      The City's ban on all unattended displays is unquestionably

15 facially neutral — it applies to all unattended displays regardless of

16 content or identity of speaker.  See Knights of Columbus, Council No.

17 94 v. Town of Lexington, 272 F.3d 25, 31 (1st Cir. 2001) (finding

18 complete ban on private unattended displays in city park was facially

19 neutral).  So Plaintiff focuses on the purpose behind the ban, which

20 it claims was the City's acquiescence to a "heckler's veto."  "A

21 'heckler's veto' is an impermissible content-based speech restriction

22 where the speaker is silenced due to an anticipated disorderly or

23 violent reaction of the audience." Rosenbaum v. City & Cnty. of San

24 Francisco, 484 F.3d 1142, 1158 (9th Cir. 2007); see also Ctr. for Bio-

25 Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dept., 533 F.3d 780,

26 787 (9th Cir. 2008) ("If the statute . . . would allow or disallow

27 speech depending on the reaction of the audience, then the ordinance

28 would run afoul of an independent species of prohibitions on content-

restrictive regulations, often described as a First Amendment-based ban on the 'heckler's veto.'").

To support its claim that the City's ban was in reaction to a "heckler's veto," Plaintiff points to the comments by some City Council members expressing concerns about the dispute between applicants wanting to erect religious displays like Plaintiff's and applicants who wished to erect non-religious (and frequently anti-religious) displays. But this record does not demonstrate that a "heckler's veto" transformed the City's facially neutral ban into a content-based regulation.

First, this case does not fit within the concept of a "heckler's veto" because it involves competing speech rights, not suppression of a message because of the audience's reaction to it. Those who opposed Plaintiff's displays — the claimed "hecklers" — also applied for spaces to erect Winter Displays and the City was constitutionally obligated to treat those applications equally to Plaintiff's, even if they resulted in opposition messages. Am. Jewish Cong. v. City of Beverly Hills, 90 F.3d 379, 385 (9th Cir. 1996) (en banc) (finding rejection of application for unattended displays impermissible when it was in protest of the plaintiff's display because "[p]rotest speech is fully protected by the First Amendment."). That put the City on the "horns of a dilemma: it could not constitutionally pick and choose among competing applications, but granting them all likely would compromise the aesthetic and historic elements of [Palisades Park]." Knights of Columbus, 272 F.3d at 29—30. The City opted to ban all private unattended displays, which is a content-neutral, permissible solution to the problem the City faced, as discussed more fully below. Am. Jewish Cong., 90 F.3d at 385 ("The City constitutionally could ban

unattended private displays in its parks.").

Further, a content-neutral law does not become a content-based law simply because it was motivated by those on one side of the debate.  See Vlasak v. Super. Court of Cal. ex rel. Cnty. of Los Angeles, 329 F.3d 683, 689 (9th Cir. 2003) ("'[T]he contention that a statute is 'viewpoint based' simply because its enactment was motivated by the conduct of the partisans on one side of a debate is without support.'").  Thus, even if the City Council was motivated by a desire to resolve the dispute created by the conflicting applications for Winter Displays, it did so without singling out Plaintiff's speech for regulation, while allowing others to erect displays with other messages.

Even if the "heckler's veto" theory could apply here, the record does not demonstrate that the City Council was motivated to ban all unattended displays because of the reaction by those opposed to Plaintiff's message.  The legislative record reflects some disappointment, uncertainty, and frustration by City Council Members about the dispute over unattended displays in Palisades Park.  But those subjective beliefs alone are insufficient to demonstrate that the ban on unattended displays was content-based.  See Foley, 747 F.2d at 1297.  The City Council's frustration with the dispute was far from conclusive that the City wanted to ban Plaintiff's displays because of any reaction to their message.  To the contrary, much of the City Council's frustration appears to have been directed to both sides of the debate, such as Council Member McKeown's comment that he was "troubl[ed]" by the "hostility" and "intolerance . . . heard from both sides."  Those comments were consistent with the City Council's decision to adopt a blanket ban that prohibited the erection of all

unattended displays, regardless of the messages conveyed.  In addition, these views were accompanied by expression of several other valid concerns about aesthetic impacts and administrative burdens created by the unprecedented demand for Winter Displays in 2010 and 2011.  See Colacurcio, 163 F.3d at 551—52.  There is nothing in the record to suggest that the City was giving effect to audience reaction to Plaintiff's displays in order to ban them because of their content.

The conclusion that this is not a "heckler's veto" case largely resolves the other factors outlined in Colacurcio that might suggest that the ban on unattended displays was content-based.  Id. at 552 (looking to the "'face of the statute, the effect of the statute, comparison to prior law, facts surrounding enactment, the stated purpose, and the record of proceedings.'").  As explained, the statute is neutral on its face and in its effect because it bans all unattended displays, regardless of content or identity of applicant.  A comparison to the prior law yields no suggestion that the blanket ban is content-based: from 2003 to 2011, the ban on unattended displays in Palisades Park exempted Winter Displays, which were allowed based on a content-neutral first-come, first-served rule.  The record reflects that this system had become unsustainable given the increased demand for space in 2010 and 2011, requiring the City to eliminate the Winter Displays exception entirely.

The Court has already reviewed the stated purpose of and facts surrounding the elimination of the Winter Displays exemption, and nothing suggests that the City eliminated the exception due to the content of Plaintiff's displays.  Plaintiff claims that the aesthetic interests and administrative burdens identified by the City were only post-hoc rationalizations because the Nativity scenes had been

14

displayed for decades without the impacts that the City now claims exist.  But until 2010, only the Nativity scenes, which did not use the full space allocated for Winter Displays, had been erected pursuant to the Winter Displays exception.  After experiencing the total impact of a competitive application process and the result of fully utilized space in Palisades Park, the City could readily conclude after the 2011 holiday season that those negative impacts outweighed the benefit of maintaining the Winter Displays exception.[5]

As the First Circuit explained in finding a total ban on unattended displays in a public forum under similar facts was content-neutral:

> In the instant case, there is nothing in the record that evinces a content-based animus against the creche.  On the contrary, the [town] proposed the new regulation [banning all unattended displays] only after requests for permits for alternative religious displays began to sprout. Mindful of the strictures of the Establishment Clause, the [town] reasonably assumed that it must treat all applications for religious displays alike, regardless of the message conveyed. Fearing a flood of applications and a corresponding cluttering of the [park], the [town] devised a regulation prohibiting all unattended structures.  This is a far cry from an invidious singling-out of the creche.

Knights of Columbus, 272 F.3d at 32.  In fact, the City's long history of allowing Plaintiff's Nativity scene undermines the suggestion that

---

[5]Plaintiff questions the legitimacy of some of the applications the City received in 2011, faulting the City for not "ensur[ing] that each applicant would respect the winter theme," or "ensur[ing] [applicants] were providing legitimate information and that they represented legitimate, if not actual, organizations."  (Reply 17—18.) In other words, according to Plaintiff the City should have inquired into the content of the displays and the identities of the applicants, which would create significant danger of impermissible content-based decisions.

1   the City was hostile to Plaintiff's message.  Id. at 32 n.3 (noting

2   that the town's allowance of the creche showed receptivity to the

3   display, although it did not create entitlement to future preferential

4   treatment).

5        In sum, Plaintiff has failed to demonstrate that the City

6   eliminated the Winter Displays exemption "because of disagreement with

7   the message [Plaintiff's display] conveys."  Colacurcio, 163 F.3d at

8   551.  The City's elimination of the Winter Displays exception and

9   enforcement of a complete ban on unattended displays is therefore

10   content-neutral.

11            2.  Content-Neutral Time, Place, or Manner Regulation

12        Because the City's ban on unattended displays in Palisades Park

13   is content-neutral, it is permissible if it is "narrowly tailored to

14   serve a significant governmental interest" and "leave[s] open ample

15   alternative channels of communication."  One World, 76 F.3d at 1012.

16   Before turning to these requirements, it is important to note that

17   this case does not blaze a trail through uncharted territory.  The

18   Supreme Court, this Circuit sitting en banc, and several other

19   Circuits have expressed approval of complete bans on all private

20   unattended displays in public fora as valid time, place, and manner

21   restrictions.  See Capitol Square Review & Advisory Bd. v. Pinette,

22   515 U.S. 753, 761 (1995)[6]; Am. Jewish Cong., 90 F.3d at 384; see also

23   _____

24        [6]In the plurality decision in Pinette, eight justices expressed
     opinions that the government could ban all unattended displays in
25   traditional public fora.  Pinette, 515 U.S. at 761 (Scalia, J., in
     which Rehnquist, C.J., Kennedy, J., and Thomas, J., joined); id. at
26   784 (Souter, J., concurring in part and concurring in the judgment,
     with whom O'Connor, J., and Breyer, J., joined); id. at 803—04
27   (Stevens, J., dissenting).  In both Pinette and American Jewish
     Congress, the discussion of bans on all private unattended displays
28                                              (continued...)

Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati, 363
F.3d 427, 434 (6th Cir. 2004); Knights of Columbus, 272 F.3d at 33;
Wells v. City & Cnty. of Denver, 257 F.3d 1132, 1147—50 (10th Cir.
2001); Americans United for Separation of Church & State v. City of
Grand Rapids, 980 F.2d 1538, 1554 (6th Cir. 1992) (en banc); Lubavitch
Chabad House, Inc. v. City of Chicago, 917 F.2d 341, 347 (7th Cir.
1990).

In fact, the court in Knights of Columbus approved of a complete
ban on private unattended displays in a nearly identical factual
situation as the case at bar.  There, for decades a fraternal
organization had set up a creche in a public park during the months of
November and December.  272 F.3d at 29.  The town then began receiving
requests for a "wide range" of other religious structures, requests to
place a sign objecting to the creche, and requests to erect displays
related to other holidays during other parts of the year.  Id.  The
town correctly believed that if it allowed the creche, it would have
to grant competing applications, putting it on the "horns of a
dilemma: it could not constitutionally pick and choose among competing
applications, but granting them all likely would compromise the
aesthetic and historic elements of [the park]."  Id. at 29—30.  In
response to these issues, the town limited eligibility for public
expression in the park to active events less than eight hours in
duration, limited displays to those connected to those events, and

---

[6](...continued)
was dicta, so this Court is technically not bound by that point.
Nevertheless, the views of the en banc panel in American Jewish
Congress and of eight justices in Pinette provide strong evidence that
the Ninth Circuit would adopt this view as a holding if given the
opportunity to do so.

banned the placement of all unattended structures.  Id. at 30.  When
the fraternal organization applied to erect the creche as an
unattended display, a permit was denied, and the group sued.  Id.

After noting that there was no dispute that the park was a public
forum and the creche was protected speech, the Court concluded that
the town's ban on unattended structures was a valid content-neutral
time, place, or manner restriction.  The town's interest in aesthetic
preservation justified the ban, which was narrowly tailored to serve
that interest, even though it was not the least restrictive means
available.  Id. at 32—33.  The court cited Pinette, American Jewish
Congress, and other cases for the proposition that a total ban on
unattended structures was valid.  Id. at 33.  And the ban left open
alternative channels of speech, including by allowing the display of
the creche during permitted events or at any time on nearby private
property.  Id. at 34.

         a.  Significant Government Interest

In this case, the record reflects several significant interests
supporting the ban on all unattended structures in Palisades Park.
Given the limited park space and uniqueness of Palisades park, the
proliferation of applications for Winter Displays reduced the public's
ability to use Palisades Park during the month of December, see Long
Beach Area Peace Network v. City of Long Beach, 574 F.3d 1011, 1024
(9th Cir. 2008) (recognizing a substantial interest in "regulating
competing uses of public fora"); see also Ward v. Rock Against Racism,
491 U.S. 781, 797 (1989) ("The city enjoys a substantial interest in
ensuring the ability of its citizens to enjoy whatever benefits the
city parks have to offer, from amplified music to silent
meditation."); increased the impacts on the park's aesthetics and

views, creating clutter and damage to the grass, see Knights of Columbus, 272 F.3d at 32 (finding preservation of aesthetics a significant interest); Long Beach Area Peace Network, 574 F.3d at 1024 (recognizing a substantial interest in "maintaining parks in an 'attractive and intact condition'"); One World, 76 F.3d at 1013 (finding elimination of "visual clutter" to be a significant interest); and increased the resources the City needed to manage the increased demands on the first-come, first-served application process and the ensuing lottery for awarding spaces.[7]

Apart from these interests, City Council members also expressed their desire to resolve the controversy that had arisen over the competing applications for spaces for Winter Displays in Palisades Park.  Plaintiff argues that the "the avoidance of controversy is not a valid ground for restricting speech in a public forum." Cornelius, 473 U.S. at 811.  While true, that argument is misplaced — the City did not isolate and ban Plaintiff's speech because its content might invite controversy.  See Texas v. Johnson, 491 U.S. 397, 414 ("If there is a bedrock principle of the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").  While the City Council recognized that a dispute existed between Plaintiffs and other applicants who wanted to erect non-religious displays, both had equal rights to erect displays in Palisades Park.  The City Council's

---

[7]Plaintiff attacks the persuasiveness of City's evidence that it incurred increased administrative burdens in 2010 and 2011 by pointing to the fact that the City had not incurred these burdens in previous years.  But in prior years the City did not have to manage the level of demand that existed in 2010 and 2011.  It is no surprise, then, the City expended more resources in 2010 and 2011 than it had at any time in the past.

1  response was to implement a content-neutral ban on all unattended

2  displays, which was permissible according to Pinette, American Jewish

3  Congress, and Knights of Columbus.

4  　　　　　　　　b.　Narrow Tailoring

5  　　As the court in Knights of Columbus recognized, "[t]he narrow

6  tailoring requirement 'does not mandate a least restrictive means

7  analysis,'" 272 F.3d at 33, although a regulation may not "burden

8  substantially more speech than necessary to achieve a scheme's

9  important goals," Santa Monica Food Not Bombs v. City of Santa Monica,

10 450 F.3d 1022, 1038 (9th Cir. 2006).  The narrow-tailoring requirement

11 is met "so long as the . . . regulation promotes a substantial

12 government interest that would be achieved less effectively absent the

13 regulation." Id. (internal quotation marks omitted; brackets in

14 original).  "So long as the means chosen are not substantially broader

15 than necessary to achieve the government's interest . . . the

16 regulation will not be invalid simply because a court concludes that

17 the government's interest could be adequately served by some less-

18 speech-restrictive alternative." Ward, 491 U.S. at 800.

19 　　Here, the City's total ban on unattended displays targeted the

20 precise problems that the Winter Displays exemption created — the

21 increased impacts on park use and aesthetics, as well as the increased

22 administrative burdens of accommodating all applicants without regard

23 to the content of the proposed displays, which the City was

24 constitutionally required to do.  See Am. Jewish Cong., 90 F.3d at

25 384.  Plaintiff posits a litany of alternatives it claims are less

26 restrictive, but none ameliorated all the problems the City

27

28

identified.[8]   In any case, the City was not required to adopt those

alternatives because eliminating the Winter Displays exemption

adequately addressed all the impacts of unattended displays.   See

Knights of Columbus, 272 F.3d at 32—33 (rejecting argument that the

town was obligated to adopt less than a total ban on unattended

structures); Wells, 257 F.3d at 1148 (finding ban on unattended

displays narrowly tailored because, without it, the city's "asserted

interests would certainly be 'achieved less effectively'").[9]

      c. Ample Alternative Channels for Speech

  "'[T]he First Amendment does not guarantee the right to

communicate one's views at all times and places or in any manner that

may be desired.'"   Bay Area Peace Navy v. United States, 914 F.2d

1224, 1229 (9th Cir. 1990).   But a content-neutral regulation must

leave open ample alternative channels for speech.   See Long Beach Area

Peace Network, 574 F.3d at 1025.   Alternatives are not ample "'if the

---

 [8]Plaintiff suggests that the City could have adopted height and size restrictions; limited the number of spaces available; limited displays relevant to the winter season; conducted a blind lottery without the first-come, first-served requirement; or required indemnification for any property damage. (Reply 16.)   None of these alternatives would have adequately addressed all of the City's concerns.   For example, height, size, location, duration, and indemnification restrictions might have addressed some of the aesthetic impacts of displays, but they probably would have increased the administrative burdens of tracking and ensuring compliance with a host of new regulations.

 [9]Plaintiff relies on United States v. Grace, 461 U.S. 171, 175—76 (1983), in which the Court struck down a ban on the display of a "flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement" on sidewalks surrounding the U.S. Supreme Court building.   The Court concluded that the ban was overbroad because it did not serve the purposes of protecting persons and property and avoiding the appearance of outside influences on the Supreme Court's decisions.   Id. at 182—84.   Unlike in Grace, the City here has demonstrated that the total ban on unattended displays serves the City's asserted interests, while lesser restrictions would not.

1  speaker is not permitted to reach the intended audience,'" "if the
2  location of the expressive activity is part of the expressive
3  message,'" if there is no "opportunity for spontaneity," or if the
4  alternatives are overly costly or inconvenient.   Id.

5       Here, the blanket ban has left open many alternative avenues for
6  Plaintiff to convey its religious message.  For instance, Plaintiff
7  could erect displays in 12 public parks around the City (excluding
8  Palisades Park) as part of a one-day Community Events permit, or
9  Plaintiff could erect attended displays in all 25 of the City's public
10 parks — including in the very same locations as the prior Nativity
11 scenes erected in Palisades Park — any time the parks are open and so
12 long as a Community Events permit is not otherwise required.
13 (Ginsberg Decl. ¶ 19; Compl. ¶ 51.)  And the ban on unattended
14 displays in Palisades Park has no effect on Plaintiff's ability to
15 erect displays on private property or to disseminate its message in
16 public parks in a multitude of ways, such as handing out literature,
17 discussing religious messages, holding religious symbols or signs, or
18 even caroling or performing.  See Wells, 257 F.3d at 1149 (finding
19 ample alternatives for speech existed despite ban on all unattended
20 displays because speakers could still leaflet, demonstrate, picket,
21 and engage in all other speech when the speaker is present).

22      Plaintiff raises several arguments to suggest that these
23 alternatives are not adequate, but none is persuasive.  First,
24 Plaintiff claims that the blanket ban on unattended displays prevents
25 it from reaching its intended audience — the pedestrians and motorists
26 who pass by Palisades Park.  See Bay Area Peace Navy, 914 F.2d at
27 1229.  But that is inaccurate — the ban does not foreclose Plaintiff
28 from conveying its message to anyone in or around Palisades Park; it

only eliminates one way in which Plaintiff conveys it.  Id. (noting that regulations have been upheld when they do not "affect any individual's freedom to exercise the right to speak and to distribute literature in the same place" where other methods of speech are prohibited and when they do not deny access within the forum (emphasis removed)).

Nor is Plaintiff's "ability to communicate effectively . . . threatened" by the ban, as Plaintiff claims.  See id. (noting that alternatives may be inadequate "if the speaker's 'ability to communicate effectively is threatened").  Plaintiff claims that something less than the erection of unattended Nativity scenes in Palisades Park would not "effectively communicate the Nativity story," although Plaintiff does not explain why.  (Reply 23.)  Plaintiff does offer evidence that its Nativity displays require substantial effort to erect and dismantle, so it may be impractical to erect and take down the displays daily.  (Jameson Decl. ¶¶ 28—34.)  But Plaintiff does not have a right to erect the Nativity displays in precisely the same way as it has in the past in order to convey its message when smaller attended displays or other modes of communication are available to convey its message.  Santa Monica Food Not Bombs, 450 F.3d at 1048.[10]

In the end, a blanket ban on all private unattended structures in

---

[10]Plaintiff suggests that attended displays may create the same impacts as unattended displays, potentially undermining the City's interests in banning unattended displays.  Yet, there is no evidence in the record on what impact attended displays might have on aesthetics and other public uses of Palisades Park.  It might come to pass that they pose the same problems as unattended displays, and the City might appropriately respond to those problems.  But that scenario is not before the Court.

1  public fora "merely prohibits one manner of expression (unattended

2  structures) in a particular place (the [park]) at certain times (when

3  unconnected with an event)." Knights of Columbus, 272 F.3d at 31; see

4  also id. at 34 (finding ample alternatives for speech because the

5  plaintiff could display the creche in the course of an event lasting

6  up to eight hours in the park or at any time on nearby private

7  property).  As in Knights of Columbus, the City's ban on unattended

8  displays has left Plaintiff with ample alternative opportunities to

9  convey its religious message.

10         3.   Conclusion

11     Because the City's ban on all unattended displays in Palisades

12  Park is a valid content-neutral time, place, or manner restriction,

13  Plaintiff has failed to demonstrate a violation of its free speech

14  rights sufficient to justify granting a preliminary injunction.

15  **B.   Establishment Clause Claim**

16     Plaintiff also claims that the City's blanket ban on unattended

17  displays in Palisades Park violates the Establishment Clause of the

18  First Amendment.  The City's ban is permissible under the

19  Establishment Clause if it has a secular purpose; it neither advances

20  nor inhibits religion in its principal or primary effect; and it does

21  not foster excessive entanglement with religion.  Kreisner, 1 F.3d at

22  781.  A statute that regulates unattended private displays in public

23  fora, including private religious displays, is permissible under the

24  Establishment Clause so long as it is a valid content-neutral time,

25  place, or manner regulation.  See Am. Jewish Cong., 90 F.3d at 384.

26     The Court has already concluded that the City's blanket ban on

27  all private unattended displays is a valid content-neutral time,

28  place, or manner restriction.  Thus, it has a secular purpose of

1  serving the City's interests in preserving aesthetics, reducing
2  administrative burdens, and managing competing uses of Palisades Park;
3  it applies to all unattended displays, so it neither advances nor
4  inhibits religious in its effect; and it does not entangle the City in
5  religion because it applies equally to all unattended displays.  See
6  Wells, 257 F.3d at 1153 (finding that unattended display ban that was
7  a valid content-neutral regulation of speech also passed muster under
8  the Establishment Clause).  Thus, Plaintiff has not demonstrated a
9  violation of the Establishment Clause sufficient to support a
10 preliminary injunction.

11     **C.   Equal Protection Claim**

12     Plaintiff also claims that the City's blanket ban on unattended
13 displays violated its equal protection rights.  To demonstrate a
14 violation, Plaintiff must show that it was "intentionally treated
15 differently from others similarly situated and that there is no
16 rational basis for the difference in treatment."  Village of
17 Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam).
18 Plaintiff has offered no evidence that it was treated differently from
19 any other similarly situated individual or entity applying to erect
20 unattended displays in Palisades Park.  Indeed, as explained below,
21 Plaintiff's chief complaint is that it was not treated more favorably
22 than other applicants who were not "desirous of celebrating the
23 seasonal holidays" as Plaintiff was.  Therefore, this claim also
24 cannot support issuance of a preliminary injunction.

25     **D.   Nature of Injunction Requested**

26     Even if Plaintiff could show a strong likelihood of succeeding on
27 its constitutional claims, the Court could not grant the injunction
28 Plaintiff has requested.  While Plaintiff has challenged the City's

blanket ban on all private unattended displays, it does not want to revert to the City's prior system that combined a first-come, first-served rule with a lottery, even though that was a constitutionally permissible content-neutral system for allocating space in Palisades Park. See Kreisner, 1 F.3d at 787. Instead, Plaintiff seeks an injunction that would revive the Winter Displays exception, but limit applications to Plaintiff's Nativity display and other displays "desirous of celebrating the seasonal holidays," while also "deny[ing] applications that violate such an objective."

If the City allows unattended displays, it must do so in a content-neutral way pursuant to valid time, place, or manner regulations, which includes ensuring that any regulation neither favors nor inhibits religious speech. See Am. Jewish Cong., 90 F.3d at 384 (striking down city's decision to allow one religious display but exclude all other displays); Kreisner, 1 F.3d at 783 (explaining that city could not forbid religious displays while allowing non-religious displays absent a compelling interest). Plaintiff seeks relief that the Court cannot grant — to permit the City to implement a system that enables it to approve or deny applications for displays based on content and viewpoint, that is, those "desirous of celebrating the seasonal holidays."[11] See Am. Jewish Cong., 90 F.3d at 385 (rejecting argument that displays could be restricted because they protested against religious displays); see also Knights of

---

[11]Even this standard is vague and wholly unworkable. How does a City staff member determine whether an applicant is "desirous of celebrating the seasonal holidays"? Does the staff member inquire into the applicant's motives? Or does the staff member examine the proposed display? Even if the City could examine the content of proposed displays, the lack of guidelines would create unfettered discretion problems. See Am. Jewish Cong., 90 F.3d at 385.

Columbus, 272 F.3d at 33—34 (rejecting notion that the town could accept creche display and reject others because the creche was "more beautiful than all the others"); Eagon ex rel. Eagon v. City of Elk City, 72 F.3d 1480, 1487—88 (10th Cir. 1996) (finding content-based discrimination when city excluded "partisan" message from "Christmas in the Park" celebration).

Although Plaintiff forcefully argues that the City could limit the erection of Winter Displays to applicants "desirous of celebrating the seasonal holidays," Plaintiff's position fails to account for the status of Palisades Park as a traditional public forum.  No one in this case disputes that Palisades Park is a traditional public forum, so without a compelling interest, the City could not allow some unattended displays based on their subject or content, but exclude others.[12]  Because Plaintiff advances no compelling interest that would support a restriction of Winter Displays to applicants "desirous of celebrating the seasonal holidays," the Court could not grant an injunction to that effect.

Under the circumstances, the City correctly understood that it had two options in Palisades Park: allow private unattended displays without regard to content and pursuant to valid time, place, and manner regulations like the combined first-come, first-served and lottery system created in 2003, see Kreisner, 1 F.3d at 787; or ban all private unattended displays entirely, see Am. Jewish Congress, 90

---

[12]For this reason, Plaintiff's reliance on Freedom from Religion Foundation, Inc. v. City of Warren, __ F. Supp. 2d __, __, 2012 WL 1964113, at *8 (E.D. Mich. May 31, 2012) is misplaced because that case involved a limited public forum, which enabled the city to exclude messages that did not "celebrate the traditional holiday season and promote goodwill" from a holiday display.

F.3d at 384.   When the former system proved too burdensome and
unworkable, the City permissibly retreated to the latter system.   The
alternative course proposed by Plaintiff would result in impermissible
content-based and viewpoint regulation, so even if Plaintiff showed a
constitutional violation, the Court could not grant the injunction
requested.

**CONCLUSION**

The City's blanket ban on all private unattended displays in
Palisades Park did not violate Plaintiff's constitutional rights.
Therefore, Plaintiff has failed to raise serious questions going to
the merits of its claims and on that ground alone, Plaintiff's motion
for a preliminary injunction is DENIED.

**DATED: November 19, 2012**          _____
                                      **AUDREY B. COLLINS**
                                      **UNITED STATES DISTRICT JUDGE**